RECORD NO. 13-1588

In The

# United States Court of Appeals

## For The Fourth Circuit

## CODY A. HEARN; CHRISTOPHER A. HEARN, individually and as Personal Representative of the Estate of Henry C. Hearn,

*Plaintiffs – Appellants*,

**v.**

## LANCASTER COUNTY, *et al.*,

*Defendants – Appellees*.

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF SOUTH CAROLINA AT BEAUFORT

————————

### BRIEF OF APPELLANTS

————————

**William A. McKinnon**
**MCGOWAN, HOOD & FELDER, LLC**
**1539 Health Care Drive**
**Rock Hill, South Carolina 29732**
**(803) 327-7800**

**Brent P. Stewart**
**STEWART LAW OFFICES, LLC**
**Post Office Box 670**
**Rock Hill, South Carolina 29731**
**(803) 328-5600**

*Counsel for Appellants*

*Counsel for Appellants*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. _____         Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____
(name of party/amicus)


_____

 who is _____, makes the following disclosure:
        (appellant/appellee/amicus)


1.      Is party/amicus a publicly held corporation or other publicly held entity?      YES      NO


2.      Does party/amicus have any parent corporations?                              YES      NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:




3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                              YES      NO
        If yes, identify all such owners:

- 1 -

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    YES    NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    YES    NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    YES    NO
      If yes, identify any trustee and the members of any creditors' committee:

Signature: _____    Date: _____

Counsel for: _____

## CERTIFICATE OF SERVICE

***************************

I certify that on _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____    _____
(signature)                                                    (date)

07/19/2012
SCC

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. _____        Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____

(name of party/amicus)

_____

 who is _____, makes the following disclosure:
        (appellant/appellee/amicus)


1.      Is party/amicus a publicly held corporation or other publicly held entity?      YES      NO


2.      Does party/amicus have any parent corporations?                          YES      NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:




3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                      YES      NO
        If yes, identify all such owners:

- 1 -

4.       Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?     YES     NO
If yes, identify entity and nature of interest:

5.       Is party a trade association? (amici curiae do not complete this question)     YES     NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.       Does this case arise out of a bankruptcy proceeding?     YES     NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: _____     Date: _____

Counsel for: _____

## CERTIFICATE OF SERVICE

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

I certify that on _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____     _____
(signature)                                   (date)

## **<u>TABLE OF CONTENTS</u>**

<u>Page</u>

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF JURISDICTION.........................................................1

STATEMENT OF THE ISSUES.............................................................2

STATEMENT OF THE CASE...............................................................3

STATEMENT OF FACTS ....................................................................4

SUMMARY OF ARGUMENT ..............................................................8

ARGUMENT .................................................................................10

    STANDARD OF REVIEW ............................................................10

    DISCUSSION OF THE ISSUES ...................................................10

    I.     PLAINTIFFS-APPELLANTS PRODUCED EVIDENCE FROM WHICH A REASONABLE JURY COULD CONCLUDE DEFENDANTS-APPELLEES WERE DELIBERATELY INDIFFERENT TO MR. HEARN'S SERIOUS MEDICAL NEED ...........................................10

         a.    Mr. Hearn's hand-written letter is an obvious expression of his suicidal intention...........................................16

         b.    There is a genuine issue as to whether Lancaster County officials were deliberately indifferent to Mr. Hearn's suicidal intentions ...................................................18

             i.    Deputy Sheriff Donovan Small ......................................19

             ii.    Sergeant James Whitaker...............................25

             iii.    Lieutenant Chuck Kirkley .............................28

i

          iv.     Sergeant Mitzi Snipes ......................................................30

    c.     The District Court's ruling is inconsistent with the underlying purpose for § 1983 litigation .................................32

II.    DEFENDANTS-APPELLEES ARE NOT ENTITLED TO QUALIFIED IMMUNITY ....................................................................34

CONCLUSION .........................................................................................43

REQUEST FOR ORAL ARGUMENT ...................................................44

ADDENDUM

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### <u>CASES</u>

Am. Civil Liberties Union of Md. v. Wicomico County, Md.,
  999 F.2d 780 (4th Cir. 1993) ...........................................................................36

Anderson v. Creighton,
  483 U.S. 635 (1987)..........................................................................................42

Blum v. Bacon,
  457 U.S. 132 (1982)..........................................................................................34

Brice v. Va. Beach Corr. Ctr.,
  58 F.3d 101 (4th Cir. 1995) ..............................................................................16

Buffington v. Baltimore County, Md.,
  913 F.2d 113 (4th Cir. 1990) ............................................................................12

Charbonnages de France v. Smith,
  597 F.2d 406 (4th Cir. 1979) ............................................................................10

Clinton v. County of York,
  893 F. Supp. 581 (D.S.C. 1995) .......................................................................15

Coleman v. Parkman,
  349 F.3d 534 (8th Cir. 2003) ............................................................................13

Comstock v. McCrary,
  273 F.3d 693 (6th Cir. 2001) ............................................................................14

Cooper v. County of Washtenaw,
  222 Fed. Appx. 459 (6th Cir. 2007) .................................................................33

Doe v. S.C. Dep't of Soc. Servs.,
  597 F.3d 163 (4th Cir. 2010) ............................................................................35

Estelle v. Gamble,
    429 U.S. 975 (1976)...................................................................................11

Farmer v. Brennan,
    511 U.S. 825 (1994)............................................................................<u>passim</u>

Gibson v. Laurens County Detention Ctr.,
    2011 WL 3903061 (D.S.C. June 14, 2011) .....................................15

Gomez v. Atkins,
    296 F.3d 253 (4th Cir. 2002) ...........................................................35

Gordon v. Kidd,
    971 F.2d 1087 (4th Cir. 1992) ...........................................11, 38, 39

Gould v. Davis,
    165 F.3d 265 (4th Cir. 1998) ...................................................40, 41

Harlow v. Fitzgerald,
    457 U.S. 800 (1982)....................................................................35, 41

Hoy v. Simpson,
    182 F.3d 908 (4th Cir. 1999) .........................................................14

Jennings v. Univ. of N.C.,
    482 F.3d 686 (4th Cir. 2007) .........................................................10

Kentucky v. Graham,
    473 U.S. 159 (1985)..........................................................................35

Lee v. Downs,
    641 F.2d 1117 (4th Cir. 1981) .......................................................12

McCall v. Williams,
    52 F. Supp. 2d 611 (D.S.C. 1999) ..................................................38

Miller v. Federal Deposit Ins. Corp.,
    906 F.2d 972, 974 (4th Cir. 1990) ................................................21

Monell v. Department of Social Services,
    436 U.S. 658 (1978)......................................................................27

Nadolski v. Hunnicut,
    2009 WL 1659907 (N. D. Ind. June 15, 2009).......................................22, 23

Newport v. Fact Concerts, Inc.,
    453 U.S. 247 (1981)......................................................................32

Owen v. City of Independence, Mo.,
    445 U.S. 622 (1980)......................................................................32

Partridge v. Two Unknown Police Officers,
    791 F.2d 1182 (5th Cir. 1986) ..............................................11, 39

Pierce v. Ford Motor Co.,
    190 F.2d 910 (4th Cir. 1951) ........................................................10

Pritchett v. Alford,
    973 F.2d 307 (4th Cir. 1992) ..............................................36, 38

Rainey v. Conerly,
    973 F.2d 321 (4th Cir. 1992) ..............................................21, 36

Ray Comm'ns Inc. v. Clear Channel Comm'ns, Inc.,
    673 F.3d 294 (4th Cir. 2012) ........................................................21

Ridpath v. Bd. Of Governors Marshall Univ.,
    447 F.3d 292 (4th Cir. 2006) ........................................................35

Robinson v. S.C. Dep't of Corrections,
    2011 WL 1770817 (D.S.C. May 10, 2011) ....................................15

Robinson v. S.C. Dep't of Pub. Safety,
    222 Fed. Appx. 330 (4th Cir. 2007) ..............................................36

Saucier v. Katz,
    533 U.S. 194 (2001)..................................................................35, 37

Scarbro v. New Hanover County,
    374 Fed. Appx. 366 (4th Cir. 2010) ............................................................14

Short v. Smoot,
    436 F.3d 422 (4th Cir. 2006) ......................................................................23, 24

Simmons v. Poe,
    47 F.3d 137 (4th Cir. 1995) ................................................................................10

Surdak v. Ozmint,
    2012 WL 385095 (D.S.C. Jan. 12, 2012) ................................................15, 31

United States v. Leak,
    123 F.3d 787 (4th Cir. 1997) ..............................................................................21

Vathekan v. Prince George's County,
    154 F.3d 173 (4th Cir. 1998) ..............................................................................36

Vinnedge v. Gibbs,
    550 F.2d 926 (4th Cir. 1977) ......................................................................26, 27

Ward v. Holmes,
    28 F.3d 1212 (4th Cir. 1994) ..............................................................................38

Wright v. Collins,
    766 F.2d 841 (4th Cir. 1985) ......................................................................26, 27

Wyatt v. Cole,
    504 U.S. 158 (1992)..............................................................................................32

Young v. City of Mt. Ranier,
    238 F.3d 567 (4th Cir. 2001) ..............................................................................11

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. VIII .......................................................................................11, 41

U.S. Const. amend. XIV .....................................................................................1, 11, 41

vi

**<u>STATUTES</u>**

28 U.S.C. § 1291 ........................................................................................1

28 U.S.C. § 1331 ........................................................................................1

28 U.S.C. § 1367(a) ....................................................................................1

42 U.S.C. § 1983.................................................................................<u>passim</u>

**<u>RULES</u>**

Fed. R. App. P. 4(a)(1)(A) ........................................................................1

Fed. R. Civ. P. 56(c)................................................................................10

## STATEMENT OF JURISDICTION

Any citizen deprived of a federal Constitutional right by a person acting under color of state law may seek legal and equitable remedies for all losses caused by the deprivation. 42 U.S.C. § 1983. Among other claims, Plaintiffs-Appellants' South Carolina Complaint alleged Defendants-Appellees violated Henry Hearn's Fourteenth Amendment Due Process right through deliberate indifference to Mr. Hearn's serious mental health need. Defendants-Appellees noticed removal of Plaintiffs-Appellants' suit by invoking the District Court's jurisdiction over Appellants' § 1983 claim, a claim arising under federal law. See 28 U.S.C. § 1331. The District Court obtained supplemental jurisdiction over Plaintiffs-Appellants' South Carolina common law claims. 28 U.S.C. § 1367(a).

On May 1, 2013, the District Court filed an order granting Defendant-Appellees' Motion for Summary Judgment as to Plaintiffs-Appellants' § 1983 claims. Plaintiffs-Appellants complied with the Federal Rules of Appellate Procedure by filing a Notice of Appeal on May 2, 2013. See Fed. R. App. P. 4(a)(1)(A). The order was a "final decision[] of the district court" and this Court has jurisdiction over Appellants' appeal of the order. 28 U.S.C. § 1291.

## <u>STATEMENT OF THE ISSUES</u>

1.    Whether the District Court erred in granting summary judgment on Plaintiffs-Appellants' § 1983 "deliberate indifference" claims in reliance on the conclusion that no reasonable jury could interpret Henry Hearn's hand-written letter distributing assets, selecting funeral procession music, asking that his face not be "sunk in," and saying "Goodbye" as an obvious suicide note; and

2.    Whether Defendants-Appellees' conduct entitles them to summary judgment based on qualified immunity.

## **STATEMENT OF THE CASE**

Cody and Christopher Hearn, the sons of Henry C. Hearn and co-personal representatives of Henry Hearn's ("Mr. Hearn") estate, filed wrongful death and survival claims against Lancaster County, its Sheriff, and several named and unnamed employees, agents, or representatives of the Lancaster County Sheriff's Office following Mr. Hearn's suicide at the Lancaster County Detention Center. The Hearns' March 25, 2011, Complaint asserted claims pursuant to the South Carolina Tort Claims Act and federal claims for violation of Mr. Hearn's federal constitutional rights.

The County and individual defendants filed a Notice of Removal and Answer on May 4, 2011. During a nearly two year period of discovery and pretrial procedure, the parties exchanged documents, retained and deposed experts, and deposed each party. On February 12, 2013, Defendants-Appellees moved for summary judgment on all the Hearns' claims. The issues raised in the motion were fully briefed by the parties and submitted to the district court for consideration.

On May 1, 2013, the District Court granted Defendants-Appellees summary judgment on the Hearns' § 1983 claims and remanded the state law claims. The Hearns filed a timely Notice of Appeal on May 2, 2013.

## STATEMENT OF FACTS

On September 13, 2009, Henry C. Hearn hung himself in the Lancaster County Detention Center a few hours after he was arrested by members of the Lancaster County Sheriff's Office for criminal domestic violence. Workers at the Lancaster County Sheriff's Office are supervised by Lancaster County Sheriff Barry S. Faile. Lancaster County sheriff deputies are directly appointed by Sheriff Faile. The Lancaster County Detention Center is overseen on a day-to-day basis by Administrator Debbie Horne.

Mr. Hearn's personal life was unstable for a period of time before his arrest and death. Approximately one year before his death, Mr. Hearn separated from his wife Darcie. J.A. at 41, lines 13-20. Ms. Hearn recalls a history of arguments and yelling with her ex-husband. J.A. at 88, lines 6-12. In the days before his arrest, Mr. Hearn was living in the woods near Ms. Hearn's home. Mr. Hearn was not living in a cabin or tent. He simply placed sheets on the ground and lived exposed to the elements. This makeshift campsite had cans and trash lying around the sheets, an indication that Mr. Hearn had spent some time living there. J.A. at 107, lines 7-11. On September 13, 2009, Darcie Hearn called law enforcement to respond to her home. J.A. at 89, lines 8-11. She was concerned about Mr. Hearn's presence in the woods as she did not trust him. J.A. at 89, line 18. Ms. Hearn's call was first heeded by Lancaster County Deputy Sheriff Donovan Small who met

4

with Ms. Hearn and learned of her concerns regarding Mr. Hearn's unusual presence near her home. J.A. at 266.

Deputy Small canvassed the woods and observed the campsite but not Mr. Hearn. J.A. at 267, lines 3-11. Lying near the sheets on which Mr. Hearn was living was a note pad containing a handwritten five-page note. J.A. at 219-23. In the note, addressed in part to Darcie and in part to Mr. Hearn's daughter Daisy, Mr. Hearn wrote that he "simply can't take the hurt no more." He spoke of himself in the past tense, declaring "I would have been the kind of man and father you wanted me to be…" J.A. at 219. He asked Darcie to retrieve his valuables from another location including all of his cash and his prized Elvis Presley autograph. Mr. Hearn said "Goodbye" to his ex-wife and daughter, later issuing a blanket apology to Daisy. J.A. at 221-23. After stating his desire not to have his "face sunk in," Mr. Hearn identified four songs with messages appropriate for a memorial service. J.A. at 221. Mr. Hearn's letter concluded with special words for Daisy. Mr. Hearn wanted all of his assets to go to her after his death. In closing, Mr. Hearn told Daisy, "I love you with all my heart." J.A. at 223.

Deputy Small admits that he "kind of skimmed over" the note. J.A. at 267, line 21. However, Small's incident report indicates that he "read" the note and did so in sufficient detail to quote several of the note's passages in the report. J.A. at 275-76. While at the scene, Deputy Small was joined by Sgt. James Whitaker, a

5

more senior officer with the Lancaster County Sheriff's Office. Small handed Sgt. Whitaker the notepad containing Mr. Hearn's suicide note. J.A. at 184, lines 17-18. Deputy Small's report makes clear that Sgt. Whitaker "read the note pad." Sgt. Whitaker commented on the suicide note to Deputy Small. J.A. at 185, lines 8-10. Later, Sgt. Whitaker left the scene to respond to another call. J.A. at 191, lines 8-12. When Deputy Small responded to a second call to Ms. Hearn's home, Sgt. Whitaker was not present.

During his response to the second call, Deputy Small met Mr. Hearn in the woods behind Ms. Hearn's home and spoke with him. J.A. at 110, lines 7-9. At some point during this conversation, Small phoned Lt. Chuck Kirkley for advice on the situation. J.A. at 111, lines 11-15. Small told Lt. Kirkley that Mr. Hearn was living in the woods near his ex-wife's house J.A. at 144, lines 14-18. After conferring with Lt. Kirkley, Deputy Small decided to arrest Mr. Hearn for criminal domestic violence. J.A. at 111, line 25 – 112, line 3. Small put Hearn in a police car and drove him to the Lancaster County Detention Center. During the drive, Deputy Small asked about the note. J.A. at 113, lines 1-15. Once at the detention center, Small approached Lt. Kirkley regarding Mr. Hearn and the note. In the "squad room," Small "showed [Lt. Kirkley] the note" and Lt. Kirkley admitted that he "looked over" the note. J.A. at 123, lines 24-25; J.A. at 147, lines 16:3-4.

Deputy Small then handed Mr. Hearn over to Sgt. Mitzi Snipes, a Lancaster County Sheriff Department agent, to be booked in to the jail. J.A. at 125, lines 6-9. Sgt. Snipes completed the booking process by filling out paperwork and asking Mr. Hearn some basic questions. J.A. at 298. While she was booking Mr. Hearn, Sgt. Snipes received the note pad and "flipped through it." J.A. at 298, lines 3-9. Deputy Small, Sgt. Whitaker, Lt. Kirkley and Sgt. Snipes testified at their depositions that inmates or arrestees suspected of mental illness or suicidal thoughts must be evaluated at the hospital before they can be placed in the jail. Sgt. Snipes testified that suicidal inmates are to be placed in a special "rubber room" cell and the officer must call the Department of Mental Health. J.A. at 166, lines 3-7. In Mr. Hearn's case, however, Sgt. Snipes booked Mr. Hearn like any other arrestee, notwithstanding the clear expressions of his desire to kill himself. Within hours, Mr. Hearn killed himself in his cell.

## SUMMARY OF ARGUMENT

Henry Hearn drafted a letter to his ex-wife and daughter in which he undeniably expressed his intention to kill himself. The tenor and purpose of the note were beyond question. Mr. Hearn could not "take the hurt no more"; he planned his funeral and his burial arrangements ("I don't want my face sunk in"). Defendants-Appellees, Lancaster County Sheriff Office officials, witnessed Mr. Hearn's intoxicated demeanor and observed his odd living quarters outside his ex-wife's home. Crucially, each official read Mr. Hearn's obvious suicide note.

Whatever each official may now claim in depositions, Mr. Hearn's letter was so clearly a suicide note that the officials cannot claim to have lacked knowledge of Mr. Hearn's self-destructive intentions. The officials' interactions with Mr. Hearn further evidence this knowledge. When an even potentially suicidal inmate is arrested in Lancaster County, he **must** be transferred to an emergency room for psychological evaluation before placement in the detention center. This is the clearly established rule developed by county policy and understood as a requirement by all county officials.

Defendants-Appellees knew Mr. Hearn was suicidal and did nothing to protect this vulnerable man's due process rights while in their custody. Each officer acted personally in deliberate indifference to Mr. Hearn's fundamental constitutional right leading to his pain, suffering, and death. Plaintiffs-Appellants

8

presented evidence sufficient to present a jury question on all elements of their

§ 1983 claims and the District Court's summary judgment order was in error.

## ARGUMENT

## STANDARD OF REVIEW

This Court reviews a district court's granting of summary judgment *de novo* in the light most favorable to the non-moving party. See Jennings v. Univ. of N.C., 482 F.3d 686, 694 (4th Cir. 2007); Simmons v. Poe, 47 F.3d 1370, 1378 (4th Cir. 1995). Accordingly, the Court must consider the pleadings and all allegations and determine whether there is a genuine issue of material fact to be submitted to a trier of fact. Fed. R. Civ. P. 56(c). A Court may not "try the case in advance by summary judgment." Pierce v. Ford Motor Co., 190 F.2d 910, 915 (4th Cir. 1951). In reviewing the District Court's summary judgment order, an appellate court "must assess the evidence as forecast in the documentary materials before the district court in the light most favorable to the party opposing the motion" and accept the non-movant's version of all that is in dispute. Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979).

## DISCUSSION OF THE ISSUES

**I.    PLAINTIFFS-APPELLANTS PRODUCED EVIDENCE FROM WHICH A REASONABLE JURY COULD CONCLUDE DEFENDANTS-APPELLEES WERE DELIBERATELY INDIFFERENT TO MR. HEARN'S SERIOUS MEDICAL NEED.**

Civil rights violations committed by state actors fall within 42 U.S.C. § 1983, which permits suit against any person acting under color of state law who deprives a citizen of a right guaranteed by the United States Constitution or other

10

federal law. On September 13, 2009, Mr. Hearn was arrested by members of the Lancaster County Sheriff's Office and booked at the Lancaster County Detention Center. Plaintiffs-Appellants allege Defendants-Appellees, deputy sheriffs and detention center employees, were deliberately indifferent to Mr. Hearn's serious medical need while Mr. Hearn was a pretrial detainee at the detention center.

State officials acting with deliberate indifference to a prisoner's serious medical need violate the prisoner's Eighth Amendment right to be free from cruel or unusual punishment. Estelle v. Gamble, 429 U.S. 97, 104-05 (1976). The same principle and analysis applies to pretrial detainees through the Fourteenth Amendment's Due Process Clause. See Young v. City of Mt. Ranier, 238 F.3d 567, 575 (4th Cir. 2001)("[p]retrial detainees are entitled to at least the same protection under the Fourteenth Amendment as are convicted prisoners under the Eighth Amendment").

A pretrial detainee's due process right to be free from deliberate indifference to serious medical needs applies to physical illnesses and injuries as well as psychological/mental ailments. A state official who "fail[s] to take any steps to save a suicidal detainee" violates the inmate's due process right just as much as an official who allows a clearly injured inmate's condition to dramatically worsen. Gordon v. Kidd, 971 F.2d 1087, 1096 (4th Cir. 1992)(quoting Partridge v. Two Unknown Police Officers, 791 F.2d 1182, 1187 (5th Cir. 1986). The Fourth Circuit

11

recognizes that "where police know that a pretrial detainee is on the verge of suicide, that psychological condition can constitute the kind of serious medical need to which state officials must, under the due process clauses, not be deliberately indifferent." Buffington v. Baltimore County, Md., 913 F.2d 113, 120 (4th Cir. 1990). Stated differently, "prison officials have a duty to protect prisoners from self-destruction or self-injury." Lee v. Downs, 641 F.2d 1117, 1121 (4th Cir. 1981).

The Supreme Court explained "deliberate indifference" in Farmer v. Brennan, 511 U.S. 825, 835 (1994), as requiring conduct by a state official rising above ordinary negligence but "something less than acts or omissions for the very purpose of causing harm with knowledge that harm will result." A plaintiff need not prove "purposeful or knowing conduct" to establish deliberate indifference. Id. at 836. Deliberate indifference "is the equivalent of recklessly disregarding" a risk of serious harm to a pretrial detainee. Id. Drawing from principles of criminal recklessness, the Farmer court held deliberate indifference requires an official must "both be aware of facts from which the inference could be draw that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837.

Contrary to Defendants-Appellees' assertions to the court below, a state official's self-serving testimony that he/she did not subjectively perceive a risk of suicide from patently obvious suicidal indicators does not defeat a claim of

deliberate indifference and certainly does not entitle the state official to summary judgment. To defeat summary judgment or even prevail at trial, Plaintiffs-Appellants are not required to present direct testimonial evidence where the Lancaster County deputy sheriffs, contrary to their legal interests, boldly confess their recognition of Mr. Hearn's clear suicidal intentions and their utter disregard of those intentions in the hours preceding his death. See e.g., Coleman v. Parkman, 349 F.3d 534, 538 n. 2 (8th Cir. 2003)("a plaintiff need not secure officials' admissions to support a verdict").

As the court held in Farmer, "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." 511 U.S. at 842. The requisite knowledge may also be inferred "from the very fact that the risk was obvious." Id. At trial and certainly in response to a summary judgment motion, a § 1983 plaintiff can support his claim that a state official "actually knew" of a serious medical need with evidence that the official "must have known." Coleman, 349 F.3d at 538 n. 2. Mr. Hearn's suicidal plans were clear from the circumstances and from his suicide note's opening lines where a despondent Mr. Hearn confessed that he "just simply can't take the hurt no [sic] more." J.A. at 219.

Courts following the Farmer deliberate indifference construction have not adopted the standard applied by the District Court in this action. These courts

13

recognize Farmer's clear rule that subjective knowledge may be proven by many different forms of evidence and an inference of subjective knowledge may arise from an obvious risk. Farmer permits courts "to infer from circumstantial evidence that a prison official had the requisite knowledge." Comstock v. McCrary, 273 F.3d 693, 703 (6th Cir. 2001). The Fourth Circuit recognizes and applies Farmer's clear allowance for circumstantial evidence of subjective knowledge and permissive inferences of such knowledge from obvious risks. In Scarbro v. New Hanover County, 374 Fed. Appx. 366, 371 (4th Cir. 2010), the Court cited Farmer in concluding "[a] factfinder may infer that a prison official knew of a substantial risk of harm from the fact that the risk was obvious." As applied to the Scarbro facts, the court concluded that "[b]ecause the substantial risk of harm to [inmate] was so obvious, a jury could infer that [prison official] knew that [inmate] had a serious medical need." Id. (citing Farmer, 511 U.S. at 842); see also Hoy v. Simpson, 182 F.3d 908, at *4 (4th Cir. 1999)(table)(upholding district court's jury instruction on proof of deliberate indifference where district court "made clear that the jury in determining a defendant's state-of-mind should consider all of the facts and circumstances, including the obviousness of the risk").

The South Carolina District Court has also noted and applied Farmer's holdings on circumstantial evidence of subjective knowledge and the inference from obvious risks. "[C]onstructive knowledge" of an inmate's suicide intention

14

may be sufficient to show deliberate indifference under "the 'obviousness' exception articulated in <u>Farmer</u>." <u>Clinton v. County of York</u>, 893 F. Supp. 581, 585 n. 2 (D.S.C. 1995). The obviousness exception, though part of <u>Farmer</u>'s articulation of a subjective standard for deliberate indifference, is "quite similar" to the "objective 'reasonably should have known' standard" in place before <u>Farmer</u>. <u>Id.</u> In <u>Robinson v. S.C. Dep't of Corrections</u>, 2011 WL 1770817 at *3 (D.S.C. May 10, 2011), the Court again noted <u>Farmer</u>'s holding regarding obvious risks. Likewise in <u>Surdak v. Ozmint</u>, 2012 WL 385095, at *3 (D.S.C. Jan. 12, 2012), the Court held that "[w]hile the obviousness of a risk is not conclusive and a prison official may show that the obvious escaped him…he would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." (quoting <u>Farmer</u>, 511 U.S. at 843 n. 8).

The <u>Surdak</u> court granted summary judgment to a prison official but only because the inmate plaintiff failed to "demonstrate than an inference of harm to [the inmate] was in fact drawn **or that the risk was obvious**." 2012 WL 385095 at *4 (emphasis added). In the context of a failure to protect claim, "the objective information known to the official may be used to infer the knowledge he actually had, and to draw inferences about his actual state of mind." <u>Gibson v. Laurens County Detention Ctr.</u>, 2011 WL 3903061 at *3 (D.S.C. June 14, 2011).

15

From Fourth Circuit precedent, this much is clear: "even under this subjective standard, a prison official cannot hide behind an excuse that he was unaware of a risk, no matter how obvious." <u>Brice v. Va. Beach Corr. Ctr.</u>, 58 F.3d 101, 105 (4th Cir. 1995). That is, "an injury might be so obvious that the factfinder could conclude that the guard *did* know of it because he could not have failed to know it." <u>Id.</u> at 105 (emphasis in original). Here, each officer read Mr. Hearn's obvious suicide note and did nothing in response. Notwithstanding their current claims of ignorance, Mr. Hearn's serious medical need was so obvious from his letter and demeanor that a reasonable factfinder could easily conclude each of the Defendants-Appellees could not have failed to know it.

### a.    Mr. Hearn's hand-written letter is an obvious expression of his suicidal intention.

Strewn along a makeshift campsite in the woods behind Mr. Hearn's ex-wife's home, Deputy Small discovered a notepad with a handwritten note Mr. Hearn drafted. J.A. 107, line 14 – 108, line 9. This note was later viewed in varying levels of detail by Whitaker, Kirkley, and Snipes. On the note's first page, visible as Small picked up the pad, Mr. Hearn acknowledged he "simply can't take the hurt no more." He goes on to describe his days as a father in the conditional past tense claiming, "I would have been the kind of man and father you wanted me to be…" J.A. at 219.

It is clear Mr. Hearn previously saw himself at a crossroads between life and death ("I only have 2 options") and recent events convinced him the option of life was no longer viable ("I'm guessing this was the answer"). Id. The first page also begins Mr. Hearn's effort to make final distribution of his personal property. On page two, Mr. Hearn drew a detailed map to ensure his most prized possessions (including an Elvis Presley autograph) were retrieved and preserved after his death. J.A. at 220.

The note's third page speaks to Mr. Hearn's desired legacy. He wanted his ex-wife to "never forget the love I have for you and our daughter" and pleaded with Ms. Hearn to, in his absence, "try not to forget the good times we had" rather than "dwelling always on the bad." J.A. at 221. He followed this plea with a declaration of love for his ex-wife and daughter, each of whom he identified by name. Then, Mr. Hearn simply said "Goodbye," punctuating his sentiment with "God be with you and protect you both." Id. Mr. Hearn then listed friends and family members to be notified of his passing. The final portion of page three contains Mr. Hearn's funeral wishes. This is evident as Mr. Hearn prefaced the section with the statement, "I don't want my face sunk in." Id. Four songs appropriate for a memorial service are listed.

On page four of the note, Mr. Hearn returned to his attempt at final distribution of what would be his estate. He advised Ms. Hearn that "[i]f anybody

gets anything of mine, it will be Daisy." J.A. at 222. In closing, Mr. Hearn included final words to his daughter that Ms. Hearn was not permitted to read. Mr. Hearn issued a blanket apology to his daughter and reminded her that, despite his absence, "I love you with all my heart." Id.

### b.    There is a genuine issue as to whether Lancaster County officials were deliberately indifferent to Mr. Hearn's suicidal intentions.

The central issue underlying the District Court's ruling was whether a reasonable jury could conclude each Defendant-Appellee knew Mr. Hearn's suicidal intention, either through actual knowledge of his intention or by virtue of the obvious expression of that intention in his letter. Plaintiffs-Appellants' law enforcement expert Ken Katsaris testified that these Lancaster County officers "obviously…had knowledge" that Mr. Hearn intended suicide after reading his letter. J.A. at 357, lines 15-16. Regarding Sergeant Mitzi Snipes, Mr. Katsaris testified that she had knowledge of the proper response to the dangerous circumstances Mr. Hearn's detention presented and did not respond. J.A. at 358, lines 1-5. Deputy Small also "ha[d] knowledge of what Hearn was thinking." By placing his "significant knowledge" of Hearn's intention in his incident report, Small had knowledge of Hearn's intention "committed to writing that could not be ignored." J.A. at 359, lines 16-24.

### i.     Deputy Sheriff Donovan Small

The District Court erred in finding no genuine issue disputed fact as to whether Deputy Small was deliberately indifferent to Mr. Hearn's serious medical need. Small's claim of ignorance regarding Mr. Hearn's suicidal intention is based on two assertions: (1) Small's denial that Mr. Hearn's letter was a suicide note; and (2) Small's conversation with Mr. Hearn about the note's contents. Deputy Small testified at his deposition that he interpreted the note Mr. Hearn wrote as just "a note to his wife." J.A. at 107, line 24. Small claims he viewed the note as Mr. Hearn's attempt to make his ex-wife feel bad about Mr. Hearn's homelessness. J.A. at 108, lines 2-6. Small portrays these statements as fatal to Plaintiffs' deliberate indifference claim. In other words, he claims a state actor's path to safety when sued for deliberate indifference is complete if the actor simply says he did not actually perceive a patently obvious suicide note as anything abnormal.

As discussed above, this argument does not comport with Farmer or this Court's opinions applying Farmer to similar fact scenarios. The Court must consider all of "the usual ways" a point may be proven including circumstantial evidence. Farmer, 511 U.S. at 842. Here, there is circumstantial evidence supporting the inference Small was actually aware of the suicide note's obvious character. Deputy Small claims the note did not concern him since he interpreted it as Mr. Hearn's attempt make his ex-wife feel bad. J.A. at 108, lines 3-6. If that was

19

truly the case, then Deputy Small's next actions do not make sense. Deputy Small testified that he later asked Mr. Hearn about the note's contents on the car ride to the station. J.A. at 112, lines 11-20. At one point, Small asked Mr. Hearn "what did it mean." J.A. at 113, lines 12-13. This is behavior more consistent with a person who believed the note's contents indicated suicidal ideations and stands as circumstantial evidence Small subjectively drew that conclusion notwithstanding his self-serving deposition statements made 2 ½ years after the event.

There is other evidence that calls into question the credibility of Deputy Small's deposition denials. At the deposition, Small denied reading the note at any depth; he specifically said he only "kind of skimmed it." J.A. at 107, line 21. However, Deputy Small's report of Mr. Hearn's arrest that was documented on the date of incident, specifically says "Deputy D. Small read the note pad." J.A. at 275. It is Deputy Small's incident report statement, and not his deposition denial, that finds support from the remainder of the evidence. In fact, Deputy Small's in-depth reading of the suicide note is clear from the incident report itself which quotes the note. The report states, "H. Hearn had stated where his other belongings were and that winter was coming and he did not know what else to do. The letter also stated…to go get his belongings, and that he was saying goodbye and that he loved D. Hearns and Daisy." J.A. at 275. This portion is a nearly verbatim quotation of

20

sections from Mr. Hearn's suicide note.[1] The logical conclusion arising from Deputy Small's quotations from the suicide note is that he read the note at some depth, a conclusion clearly at odds with the picture Small attempted to paint during his deposition.

At the very least, Deputy Small's deposition statements raise serious credibility questions. The long-standing rule in this Circuit is that "credibility determinations are not fodder for summary judgment proceedings." <u>Ray Comm'ns Inc. v. Clear Channel Comm'ns, Inc.</u>, 673 F.3d 294, 305 (4th Cir. 2012). The "general rule [is] that summary judgment is seldom appropriate wherein particular states of mind are decisive elements of a claim or defense." <u>U.S. v. Leak</u>, 123 F.3d 787, 794 (4th Cir. 1997)(quoting <u>Miller v. Federal Deposit Ins. Corp.</u>, 906 F.2d 972, 974 (4th Cir. 1990)); <u>see also</u> <u>Rainey v. Conerly</u>, 973 F.2d 321, 324 (4th Cir. 1992)(in § 1983 claim based on excessive force in jail, court denied summary judgment on qualified immunity issue as the case "depend[ed] entirely on a credibility determination…and as such, the issue is inappropriate for resolution by summary judgment").

---

[1] Additionally, these quotations are clear evidence Deputy Small read more than just the suicide note's first page. Mr. Hearn's directions to the remainder of his personal belongings extend from page one to two and his declaration of love/goodbye to Ms. Hearn and Daisy is in the middle of the note's third page. <u>See</u> J.A. at 219-23.

Courts from other jurisdictions have explicitly denied summary judgment on the subjective element of the deliberate indifference analysis where the state actor's sworn assertion that he failed to recognize the risk raised serious credibility issues. For example, Nadolski v. Hunnicut, 2009 WL 1659907 (N. D. Ind. June 15, 2009), the court considered a deliberate indifference claim against jail officials after a female inmate arrested for drug possession became violently ill in a holding cell, was observed lying on the cell's floor, and still went hours without treatment before being sent to the hospital. A corrections officer who performed multiple visual checks on the inmate's cell adamantly claimed he was unaware the inmate had a serious medical need. Id. at * 7. The officer acknowledged observing the inmate lying on the cell floor but claimed it was not concerning as he thought the inmate was on the floor because the floor was cooler than other surfaces within the cell. Id. at * 8. The court found this and other elements of the officer's account "curious" statements that "beg the question" of whether the account could be believed. Id. at * 10. With that in mind, the court concluded "the issue of whether [the officer] was deliberately indifferent to [inmate's] medical needs turn[ed] on credibility," specifically the credibility of the officer's statement that he was subjectively unaware of the inmate's serious medical need. Id. at * 12.

The Nadolski court noted the well-understood rule barring credibility determinations at the summary judgment stage and, since the content of the

22

officer's statement along with other facts made credibility "the heart of [the officer's] defense," summary judgment was denied. Id. at * 10. The factfinder alone could decide whether an officer who observed an inmate face-first on a cell floor was credible in his assertion that he did not believe the inmate had a serious medical need. The same principle should be applied here. There are several reasons above why Deputy Small's deposition statements are "curious" and raise credibility questions. A factfinder alone should decide whether an officer who read a note making final distribution of personal property, designating funeral procession music, and saying "Goodbye" is credible when he claims he was subjectively unaware Mr. Hearn was suicidal.

Small also claims there is no genuine issue of material fact on the remaining prong of the deliberate indifference analysis, i.e. a deliberate indifferent response to the serious medical need. Deputy Small claims he responded reasonably to Mr. Hearn's serious medical need simply through Small's conversation with Hearn during the car ride to the detention center. Farmer holds that a state actor's response to a serious medical need of which the actor is subjectively aware is sufficient to defeat a deliberate indifference claim if the response was "reasonable." 511 U.S. at 844. The Fourth Circuit has applied the same principle. See Short v. Smoot, 436 F.3d 422, 427 (4th Cir. 2006)(referring to this element of deliberate indifferent analysis in terms of "the reasonableness of the response").

The Short court granted summary judgment on this element only after concluding the state actor's conduct was "an objectively reasonable response." 436 F.3d at 428.

There is evidence indicating Deputy Small was subjective aware of Mr. Hearn's serious medical need, i.e. his desire and intent to kill himself. Deputy Small's response was not only unreasonable but also wholly indifferent to the need. Deputy Small described the proper response to a suicidal arrestee. They are to be "taken to the ER" so that the inmate can see a doctor. J.A. at 105, lines 10-11. This is not a matter of preference, it is the rule. J.A. at 105, lines 12-17. Lt. Kirkley and Deputy Whitaker confirm that an officer aware of a suicidal inmate must send the inmate to the hospital. J.A. at 295, lines 15-16; J.A. at 282, lines 12-16. Given the evidence of Deputy Small's subjective awareness of Mr. Hearn's suicidal intention, Small utterly failed to respond to the need. The only response to be taken was an emergency room referral. Deputy Small did not try to perform this response and fail, he simply did nothing in furtherance of the mandatory response. This was unreasonable and wholly indifferent to Mr. Hearn's serious medical need.

In sum, Mr. Hearn's suicidal ideation on the date of his arrest was an objectively serious medical need to which Deputy Small was not permitted to be deliberatively indifferent. There is evidence indicating Small was subjectively aware of Mr. Hearn's suicidal intent despite Small's deposition statements to the

24

contrary. The note's obvious statements of a suicidal man are further evidence on the subjective element. Finally, in response to Mr. Hearn's intent to kill himself, Deputy Small utterly failed to send Mr. Hearn to the emergency room, the one response officers were required to do in these circumstances. Therefore, Appellants have presented jury questions on their deliberate indifference claim against Detective Small, and the District Court erred in granting Small's summary judgment motion.

### ii.    Sergeant James Whitaker

Sergeant James Whitaker responded to a call at Ms. Hearn's house on September 13, 2009 to assist Deputy Small who was already at the scene. J.A. at 278, lines 14-17. Sgt. Whitaker went into the woods to Mr. Hearn's campsite. J.A. at 278, lines 23-25. Deputy Small handed Sgt. Whitaker the notepad containing Mr. Hearn's suicide note. J.A. at 279, lines 17-18. Sgt. Whitaker commented on the suicide note to Deputy Small. J.A. at 280, lines 8-10. Later, Sgt. Whitaker left the scene to respond to another call. J.A. at 283, lines 8-12. When Deputy Small responded to a second call to Ms. Hearn's home, Sgt. Whitaker was not present.

Summary judgment as to Sgt. Whitaker was based largely on two claims: (1) Sgt. Whitaker did not actually read Mr. Hearn's suicide note; and (2) Sgt. Whitaker was not personally involved in Mr. Hearn's arrest. The first claim is based solely on Sgt. Whitaker's deposition statements. Sgt. Whitaker made several

statements about the degree of his interaction with the suicide note. Whitaker says he "skimmed over it," "looked over it," "looked over…the front," and "skimmed across it." J.A. at 279-81. These deposition statements are inconsistent with Deputy Small's incident report, drafted on the date of incident. Deputy Small reports that he "showed the note pad to Sgt. Whitaker, **who read the note pad**." See J.A. at 275 (emphasis added). This inconsistency raises a credibility issue for Sgt. Whitaker's claims that he did not read the suicide note and did not subjectively appreciate the suicide note's clear message.

While Sgt. Whitaker did not personally assist Deputy Small in Mr. Hearn's arrest, that fact does not require summary judgment on Appellants' claim that Sgt. Whitaker was deliberately indifferent to Mr. Hearn's serious medical need. It is true that a state actor must "act personally" to deprive an individual of his constitutional rights to be liable under § 1983. Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985)(quoting Vinnedge v. Gibbs, 550 F.2d 926, 928 (4th Cir. 1977)). The Wright court's quote goes on to add the doctrine of respondeat superior does not apply to § 1983 claims. Id. In other words, there is a direct connection between the "act personally" requirement and the courts' refusal to permit vicarious liability for constitutional violations.

Section 1983 is not a mechanism for holding supervisors liable for the conduct of their employees under the common law doctrine of *respondeat*

*superior*. This is the message the Supreme Court delivered in Monell v. Department of Social Services, 436 U.S. 658, 691 (1978) where the Court held that a state actor "cannot be held liable solely because it employs a tortfeasor." The Fourth Circuit has applied this Monell principle by holding that a § 1983 defendant must "act personally" to deprive the plaintiff of a constitutional right. Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985)(citing Vinnedge v. Gibbs, 550 F.2d 926, 928 (4th Cir. 1977). This language from Wright is nothing more than an alternative statement of the Monell no-*respondeat superior* principle. This is evident from Wright's next sentence. See Id. ("The doctrine of respondeat superior has no application under [§ 1983]").

Plaintiffs' claim against Sgt. Whitaker is not a vicarious liability claim. Plaintiffs do not fault Whitaker for Deputy Small's misconduct. Instead, Sgt. Whitaker was personally indifferent to Mr. Hearn's serious medical need. Deputy Small's report provides evidence that Whitaker read the suicide note. As discussed above, the obvious suicidal character of the note (even on its first page) supports an inference that no officer could possibly read the note and fail to appreciate it as a suicide note. As Plaintiffs' expert Ken Katsaris testified, the entirety of the circumstances Small and Whitaker encountered, including the suicide note's contents and Mr. Hearn's current living arrangement "would put [an] officer on notice of a substantial risk of harm." J.A. at 353. Sgt. Whitaker was certainly in a

27

position to direct Mr. Hearn away from the jail and to the hospital for evaluation/treatment. A hospital referral was the required response to the situation Sgt. Whitaker encountered on September 13, 2009. J.A. at 282, lines 10-16 (inmate must be taken to hospital if inmate "has given [the] officer indication of being suicidal"). Sgt. Whitaker made no response to Mr. Hearn's medical need.

In sum, there is evidence Sgt. Whitaker was subjectively aware of Mr. Hearn's serious medical need and utterly failed to respond to that need. Accordingly, the District Court erred in granting summary judgment to Sgt. Whitaker.

### iii.    Lieutenant Chuck Kirkley

Lt. Kirkley was Deputy Small's shift lieutenant with the Lancaster County Sheriff's Department. J.A. at 139, line 15. From the scene of Mr. Hearn's campsite, Deputy Small called Lt. Kirkley for assistance. J.A. at 141, line 24 – 142, line 2. Small reported his conversation with Ms. Hearn who reported Mr. Hearn was living in the woods and possibly stealing things from her home. J.A. at 143, lines 9-17. Lt. Kirkley and Deputy Small conferred by phone about possible charges against Mr. Hearn. J.A. at 145, line 22-146, line 3. Once the decision was made to arrest Mr. Hearn, Deputy Small brought Mr. Hearn to the sheriff's office/detention center where Lt. Kirkley was waiting. Lt. Kirkley acknowledges that he "looked over" the suicide note at the sheriff's office. J.A. at 147, line 4.

28

Deputy Small's incident report also indicates Lt. Kirkley looked over the note with sufficient detail to identify it as Mr. Hearn's personal property.

The District Court granted summary judgment to Lt. Kirkley by finding Kirkley could not have acted personally to deprive Mr. Hearn of his constitutional right because Kirkley was not present at Mr. Hearn's arrest. However, as noted in reference to Sgt. Whitaker, Plaintiffs' claim against Lt. Kirkley is based on his own actions/inactions and not those of Deputy Small or any other Defendant-Appellee. Lt. Kirkley read a clear suicide note and utterly failed to respond to the serious medical need the suicide note revealed. While Lt. Kirkley does say in his deposition that he interpreted the notepad as something other than a suicide note (J.A. at 148, lines 1-4), he later gives very different testimony. At one point, Lt. Kirkley appears to agree with Plaintiffs' counsel suggestion that the only reasonable way to interpret the notepad was as a suicide note. When asked whether there was any "other reasonable way to interpret [Mr. Hearn's letter] other than as a suicide note," Kirkley responded "No." J.A. at 149, lines 22-24. As Lt. Kirkley admitted, for suicidal inmates an officer "[m]ust send him to the hospital." J.A. at 295, line 5. Instead, Lt. Kirkley did nothing. These facts create a jury question as to whether Lt. Kirkley was deliberately indifferent to Mr. Hearn's serious medical need, and the District Court's grant of summary judgment to Kirkley was in error.

### iv.    Sergeant Mitzi Snipes

Sgt. Snipes was the booking officer at the Lancaster County Detention Center when Deputy Small entered the center with Mr. Hearn. J.A. at 297, lines 9-12. Sgt. Snipes' booking duties included completion of paperwork and a cursory medical screening. J.A. at 297, lines 16-24. At one point, Sgt. Snipes asked Mr. Hearn to identify an emergency contact person and Hearn said "nobody." J.A. at 302:4-9. Deputy Small brought Sgt. Snipes Mr. Hearn's notepad containing the suicide note. J.A. at 298, line 24 – 299, line 12. Sgt. Snipes acknowledges that she "flipped through the notebook" but claims she was merely searching for contraband and did not read the pad's contents. J.A. at 299, lines 3-11. Although post-mortem tests revealed Mr. Hearn was under the influence of alcohol beyond the state's legal limit for operating a motor vehicle, Sgt. Snipes claims Mr. Hearn did not appear intoxicated when he was booked. J.A. at 300, line 24 – 301, line 2.

Sgt. Snipes acknowledges having in her hands the notepad containing an obvious suicide note. As noted above, <u>Farmer</u> and progeny allow for the obviousness of a risk/medical need to be considered along with circumstantial evidence of the risk/medical need even Snipes claims she was subjectively ignorant that Mr. Hearn intended to harm himself. The deliberate indifference standard also recognizes an officer may "not escape liability if the evidence showed that [s]he merely refused to verify underlying facts that [s]he strongly suspected to be true, or

30

declined to confirm inferences of risk that [s]he strongly suspected to exist." Surdak v. Ozmint, 2012 WL 385095, at *3 (D.S.C. Jan. 12, 2012)(quoting Farmer, 511 U.S. at 843 n. 8). Sgt. Snipes does not mention in her deposition any questions she asked Deputy Small about Mr. Hearn's mental standing when receiving Mr. Hearn for booking. Failure to ask these questions violates "recognized jail procedure" (J.A. at 355, lines 5-10) and is consistent with a person refusing to verify underlying facts or declining to confirm the inference of Mr. Hearn's obvious suicidal intentions. Sgt. Snipes may not "escape liability" for deliberate indifference by taking this approach to the jail's booking process.

Also, Sgt. Snipes utterly failed to consider Mr. Hearn's intoxication or the clear indication of isolation necessarily arising from Mr. Hearn's denial of an emergency contact person. The sum of these factors raises an issue of disputed fact as to whether Sgt. Snipes was subjectively aware of Mr. Hearn's intent to harm himself. Sgt. Snipes' testimony and the additional evidence cited above must to be considered and decided by a factfinder. There is also evidence of deliberate indifference in Sgt. Snipes' response to the serious medical need of which she was aware. The detention center was equipped with a "rubber room," i.e. a special cell designed to eliminate tools a suicidal inmate could use to injure himself. J.A. at 166, lines 8-10. An inmate with suicidal intentions must be placed on "suicide watch" in the rubber room cell and the department of mental health must be

31

contacted. J.A. at 166, lines 3-25. Sgt. Snipes' utter failure to take any of these precautions, especially in light of evidence indicating she was subjectively aware of Mr. Hearn's suicidal ideation, raises a jury issue on Plaintiffs' deliberate indifference claim against Sgt. Snipes and summary judgment should have been denied.

### c.      The District Court's ruling is inconsistent with the underlying purpose for § 1983 litigation.

Section 1983 is intended to protect citizens from state government abuses infringing on rights guaranteed to all citizens through the U.S. Constitution or federal law. The statute is also intended to deter state actors from depriving citizens of federal rights. Newport v. Fact Concerts, Inc., 453 U.S. 247, 268 (1981)("deterrence of future abuses of power by persons acting under color of state law is an important purpose of § 1983"). When a state actor violates a citizen's federal rights, a § 1983 claim is available in part to deter state officials from similar abuses in the future. Wyatt v. Cole, 504 U.S. 158, 161 (1992)(finding § 1983's chief aims are deterrence "and to provide relief to victims if such deterrence fails"). The reality of potential § 1983 liability "should create an incentive for officials who may harbor doubts about the lawfulness of their intended actions to err on the side of protecting citizens' constitutional rights." Owen v. City of Independence, Mo., 445 U.S. 622, 651-52 (1980).

Plaintiffs-Appellants certainly recognize § 1983 claims are not negligence claims and present a greater evidentiary burden than plaintiffs face in claims based on merely careless behavior. However, to permit state actors to so easily immunize themselves from § 1983 liability through entirely self-serving, after-the-fact protestations of ignorance removes from Plaintiffs-Appellants' reach redress for the state's violation of Mr. Hearn's fundamental right to due process of law. The way in which the District Court's order deemed Plaintiffs-Appellant's evidentiary showing insufficient to create a triable issue of fact on "deliberate indifference" opens an escape hatch for state actors not authorized by <u>Farmer</u> or its progeny. Evidence short of a defendant's hat-in-hand admission of knowledge of and apathy toward an inmate's suicidal intention can be sufficient to show deliberate indifference. The District Court's ruling fails to recognize this principle and, in the process, raises a § 1983 plaintiff's evidentiary burden to nearly unreachable heights.[2]

The District Court's interpretation and application of § 1983 violates the deterrent and compensatory objectives of the statute. In the jail suicide context,

---

[2] Courts have acknowledged that an excessively strict interpretation of the "deliberately indifferent" standard at the summary judgment stage can have devastating effect on potentially meritorious claims that can only be fully proven at trial. <u>See</u> <u>Cooper v. County of Washtenaw</u>, 222 Fed. Appx. 459, 466 (6th Cir. 2007)(while courts must adhere to the "deliberate indifference" standard, they must not interpret standard in way "rendering it prohibitively difficult for a plaintiff to succeed at the summary judgment stage").

potential § 1983 liability is intended to deter a deputy sheriff or detention center officer from ignoring clear indications of suicidal intentions from the inmates they supervise. The reading of "deliberate indifference" offered by Defendants-Appellees and at least tacitly adopted by the District Court does the opposite. A hypothetical cynical detention center officer can feel fairly comfortable in ignoring an inmate's suicide risk given that the officer may avoid liability by claiming years later that he did not know the inmate posed any risk to himself.

The net result is a litigation structure that removes the incentive § 1983 is intended to create for state actors to respect citizen rights and dramatically decreases the likelihood that a wronged citizen will recover when his rights are violated. Accordingly, the District Court's ruling should be reversed not only because it misapplies federal "deliberate indifference" jurisprudence to the facts of this case, but also because it forwards an interpretation and application of § 1983 that undermines the statute's core objectives.

## II.    DEFENDANTS-APPELLEES ARE NOT ENTITLED TO QUALIFIED IMMUNITY.[3]

The doctrine of qualified immunity can provide "government officials performing discretionary functions" protection from liability under § 1983 if "their

---

[3] The District Court did not rule on qualified immunity, specifically declining to address the issue given the Court's ruling on deliberate indifference. J.A. at 340 n. 2. Plaintiffs-Appellants' include a discussion of the issue in light of Defendants-Appellee's right to rely on any matter in the record to seek affirmance of the District Court's order. See Blum v. Bacon, 457 U.S. 132, 137 n. 2 (1982).

conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would be aware." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity is intended to balance two important interests: "the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably" but also "the need to hold public officials accountable when they exercise power irresponsibly." Doe v. S.C. Dep't of Soc. Servs., 597 F.3d 163, 169 (4th Cir. 2010). The assertion of qualified immunity is available to government officials sued in their individual capacities but "[t]his defense is not available in an official-capacity suit brought against a governmental entity or a government officer as that entity's agent." Ridpath v. Bd. Of Governors Marshall Univ., 447 F.3d 292, 306 (4th Cir. 2006)(citing Kentucky v. Graham, 473 U.S. 159, 165-67 (1985)). The court must view the facts in a light most favorable to the plaintiff when deciding on the application of qualified immunity. Gomez v. Atkins, 296 F.3d 253, 260-61 (4th Cir. 2002)(citing Saucier v. Katz, 533 U.S. 194, 201 (2001)). In practical terms, the court must resolve any dispute of fact in the plaintiff's favor. Gomez, 296 F.2d at 261.

In many instances, the question of qualified immunity may be answered at the summary judgment stage of litigation. However, there are other instances where the exact course of events surrounding the defendant's alleged constitutional violation is unclear and summary judgment is not an appropriate means of deciding

the issue. For example, in Rainey, 973 F.2d at 324, the court denied summary judgment because "a determination of what actually happened is absolutely necessary to decide whether [the defendant] could reasonably have believed his actions were lawful." See also Vathekan v. Prince George's County, 154 F.3d 173, 179-80 (4th Cir. 1998)(denying summary judgment where disputed facts existed as to events surrounding the alleged constitutional violation).

When determining the reasonableness of a state actor's conduct for qualified immunity purposes, issues may arise that "necessitate the resolution of disputed factual issues surrounding the conduct." Pritchett v. Alford, 973 F.2d 307, 312 (4th Cir. 1992). When a state official's entitled to qualified immunity cannot be resolved without resolution of a factual dispute, the dispute must be resolved by the jury at trial. Am. Civil Liberties Union of Md. v. Wicomico County, Md., 999 F.2d 780, 784 (4th Cir. 1993). Additionally, many credibility questions bearing on the qualified immunity question cannot be decided at the summary judgment stage. See Robinson v. S.C. Dep't of Pub. Safety, 222 Fed. Appx. 330, 332 (4th Cir. 2007)(finding district court "made an improper credibility finding" in finding defendant was entitled to qualified immunity); Rainey, 973 F.2d at 324 (denying summary judgment on qualified immunity issue as case "depend[ed] entirely on a credibility determination…and as such, the issue is inappropriate for resolution by summary judgment").

The qualified immunity issue is resolved through a multi-step analysis in which the court first considers the "threshold question" of whether the facts alleged show a state actor's conduct violated a constitutional right. <u>Saucier</u>, 533 U.S. at 201. This requirement is met "if a violation could be made out on a favorable view of the parties' submissions." <u>Id.</u> Next, the court considers whether the constitutional right was clearly established at the time of the conduct in question. Finally, the court considers whether "a reasonable officer could have believed, in light of the clearly established law, that his conduct was lawful." <u>Id.</u> at 199. The threshold question's answer in this case is addressed in the previous section opposing Defendants-Appellees' position that they were not deliberately indifferent to Mr. Hearn's serious medical need. As noted in that section, there is evidence for each officer indicating subjective knowledge of Mr. Hearn's suicidal intention and conduct deliberately indifferent to that unambiguous intention. At the very least a violation "could be made out" of Plaintiffs-Appellants' claims and the evidence presented in this case.

The next question to consider is whether the constitutional right violated was clearly established. In many ways, this prong of the analysis is uncontested. In their briefing to the District Court, Defendants-Appellees argued:

> it is well settled that the parameters of a pretrial detainee's right to be free from deliberate indifference by government officials to serious medical needs, including the right to be free from deliberate indifference to a serious risk of suicide, was clearly established at the time of the Decedent's death.

37

J.A. at 65 (citing <u>Gordon</u>, 971 F.2d at 1094; <u>Ward v. Holmes</u>, 28 F.3d 1212 (4th Cir. 1994)).

This right as Defendants-Appellees have defined it is sufficiently specific for purposes of the qualified immunity "clearly established" analysis. It is true that the right in question may not be defined at extreme levels of generality. For example, while a right to due process of law is clearly established, the right must be more specifically defined for purposes of a qualified immunity analysis. <u>See</u> <u>McCall v. Williams</u>, 52 F. Supp. 2d 611, 619 (D.S.C. 1999). Defendants-Appellants' iteration of the right in question is much more specific than the general due process right in that it specifies the condition of the citizen whose right is deprived ("pretrial detainee") and states the specific harm Mr. Hearn faced ("suicide") when the officers acted (i.e. failed to respond to Mr. Hearn's suicide plan). This description focuses on the right "at the level of its application to the specific conduct being challenged." <u>Pritchett</u>, 973 F.2d at 312.

Though unnecessary to meet the specificity requirements for this analysis, the precise right of which Mr. Hearn was deprived could be further narrowed. Mr. Hearn was deprived of his right to be free from arresting/booking officers' complete disregard of his clearly expressed suicidal objective once the officers placed Mr. Hearn in state custody. This right is clearly established as it has been recognized by Fourth Circuit precedent. This Court held in <u>Gordon</u> that a due

38

process violation lies where a state actor "fail[s] to take any steps to save a suicidal detainee." 971 F.2d at 1096-97 (quoting <u>Partridge v. Two Unknown Police Officers</u>, 791 F.2d at 1187.

According to the evidence presented including Plaintiffs-Appellants' law enforcement and corrections expert Ken Katsaris, Defendants-Appellees failed to take any steps to save Mr. Hearn from committing suicide. Instead, they simply "put him in individual confined custody without assessment." J.A. at 351, line 24 - 352, line 1. There were many things the officers were required by law to do once they learned Mr. Hearn was suicidal. An inmate may be placed on "suicide watch," housed in a rubber room, and stripped of all clothing or other potential self-harm items. J.A. at 166-67. Defendants-Appellees' failure to do anything led Mr. Katsaris to describe the officers as "totally misassess[ing] their obligation." J.A. at 355, lines 7-8. Defendants-Appellees proposed for the District Court what they believe is the question at the center of the reasonableness prong of the qualified immunity analysis. J.A. at 66. In their view, the question is whether it was "reasonable for the Defendants in this action to not take additional steps to protect the Decedent from committing suicide." <u>Id.</u> Plaintiffs-Appellants dispute this characterization as it necessarily implies Defendants-Appellees took at least some steps to protect Mr. Hearn from committing suicide. The evidence shows these officers did nothing to save Mr. Hearn.

Deputy Small's car ride questions to Mr. Hearn cannot reasonably be considered a response to Mr. Hearn's medical need. An objectively reasonable officer knows he is not to make interpretations of a suicidal inmate's precise diagnosis. A reasonable officer recognizes his duty to get a suicidal arrestee "medical assistance and let the people who are experts assess them." J.A. at 351, lines 17-20. Each officer confirms Mr. Katsaris' statement in their depositions by acknowledging the official policy requiring referral of suspected suicidal inmates to medical personnel. Moreover, suicidal men like Mr. Hearn will lie when directly asked if they intend suicide. Mr. Hearn was so intent on killing himself that acknowledging the plan in response to a direct question from Small would have posed an impediment to effectuating the plan Mr. Hearn would not have permitted. J.A. at 354, lines 3-9.

This leads to the final question of whether a reasonable officer in Defendants-Appellees' position could have believed his/her conduct was lawful given the clearly established law at the time. In cases like this one where there is evidence of a constitutional violation of a clearly established right, a state actor faces a significant challenge to receive the protection of qualified immunity. The actors must show "why, if their actions were in violation of clearly established law, a reasonable person would not have been aware of that law." Gould v. Davis, 165 F.3d 265, 273 (4th Cir. 1998). As this Court has noted, once a qualified immunity

analysis reaches this final prong, "the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." Id. (quoting Harlow, 457 U.S. at 818-19).

For this final prong of the qualified immunity analysis, Defendants-Appellees may not claim they subjectively believed their apathy toward Mr. Hearn's suicide intention was not a violation of his constitutional rights. Unlike the subjective analysis for an Eighth Amendment or Fourteenth Amendment deliberate indifference claim, "the qualified immunity analysis is an objective inquiry." Gould v. Davis, 165 F.3d 265, 273 (4th Cir. 1998). An objective reasonableness standard was chosen as a signal of "the Supreme Court's repudiation of a subjective qualified immunity standard." Id. In other words, there is no "good faith immunity" for government officials accused of constitutional violations. Id.

Similar to Gould, Defendants-Appellees can offer no reason why a reasonable officer in their position would not know that a detainee's fundamental rights are violated if officers blatantly ignore the detainee's unambiguously stated intention to kill himself. A clearly distraught, drunk, despondent, and suicidal man was taken at the officers' behest to a jail and left alone with the means and desire to immediately end his life. Defendants-Appellants booked him as if he was any other inmate and walked away leaving Mr. Hearn to carry out his well-publicized self-destruction plan. In frequently used qualified immunity parlance, the evidence

shows these officers did not simply make a "bad guess in gray areas" but "transgressed bright lines" that established Mr. Hearn's constitutional rights. See Anderson v. Creighton, 483 U.S. 635, 639-40 (1987). Qualified immunity should not be applied in this case and summary judgment on Defendants-Appellees invocation of the immunity is inappropriate.

## **CONCLUSION**

Based on the arguments stated above, Plaintiffs-Appellants respectfully request the Court reverse the District Court's summary judgment order on Plaintiffs-Appellants' § 1983 claims. Viewed in the light most favorable to the Hearns, the evidence presents a genuine issue of material fact regarding Defendants-Appellants' deliberate indifference to Mr. Hearn's serious medical need after each officer read Mr. Hearn's obvious suicide note. The District Court erred in granting summary on these claims. Additionally, the officers' conduct violated Mr. Hearn's clearly established constitutional right. Summary judgment on Defendants-Appellees' attempted invocation of qualified immunity is not appropriate and the District Court's order should not be affirmed on this alternative basis.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 34(a), Plaintiffs-Appellants requests oral argument in this matter. Due to the sharp disagreements between the parties on both the facts and law, Plaintiffs-Appellants believe oral argument will benefit the Court in clarifying the disputed issues.

/s/ William A. McKinnon
William A. McKinnon
MCGOWAN, HOOD & FELDER, LLC
1539 Health Care Drive
Rock Hill, SC  29732
(803) 327-7800
(803) 328-5656 (Fax)
bmckinnon@mcgowanhood.com

Brent P. Stewart
STEWART LAW OFFICES, LLC
Post Office Box 670
Rock Hill, SC  29731
(803) 328-5600
(803) 328-5876 (Fax)
bpstewart@hotmail.com

Attorneys for Plaintiffs-Appellants

Rock Hill, South Carolina

July 16, 2013

# **ADDENDUM**

2007 Fed.App. 0118N

222 Fed.Appx. 459

This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Sixth Circuit Rule 28. (Find CTA6 Rule 28)
United States Court of Appeals,
Sixth Circuit.

Dawn COOPER, Personal Representative of the Estate of Demitrius Morton, Deceased, Plaintiff-Appellant,
v.
COUNTY OF WASHTENAW, City of Ann Arbor, Anthony Woodford, Washtenaw County Sergeant, Pamela Raciti, Washtenaw County Officer, Eugene Hahn, Washtenaw County Officer, Michael Watchowski, Ann Arbor Police Officer, Steve Lawrence, Ann Arbor Police Officer, Defendants-Appellees.

No. 06-1013.    |    Feb. 14, 2007.

**Synopsis**
**Background:** Personal representative of deceased inmate's estate sued county, county deputies, city and city police officers, alleging that the defendant's violated the inmate's constitutional rights by failing to prevent his suicide. The United States District Court for the Eastern District of Michigan, 2005 WL 3071882, granted summary judgment for defendants, and the representative appealed.

**Holdings:** The Court of Appeals, Clay, Circuit Judge, held that:

[1] triable fact issues existed as to whether a city police officer was on notice that the inmate was on suicide watch, and whether the officer had the requisite knowledge of the inmate's suicide risk;

[2] that officer was not entitled to summary judgment on qualified immunity grounds;

[3] a second city police officer and one of the county deputies were not on notice that the inmate was on suicide watch, thus precluding imposition of liability; and

[4] county deputy who allegedly failed to notify city police officers that an inmate for whom they would be responsible was under a suicide watch did not violate the inmate's Eighth Amendment rights.

Affirmed in part, and reversed and remanded in part.

Rogers, J., filed a concurring opinion.

**\*461** On Appeal from the United States District Court for the Eastern District of Michigan.

BEFORE: CLAY, ROGERS, and SUTTON, Circuit Judges.

**Opinion**

CLAY, Circuit Judge.

2007 Fed.App. 0118N

Plaintiff Dawn Cooper, personal representative of the estate of Demitrius Morton ("Morton"), a deceased prisoner at Washtenaw County Jail, appeals the district court order granting summary judgment in favor of Defendants Washtenaw County, the City of Ann Arbor, and all officers named individually as Defendants (collectively "Defendants"). The district court dismissed Plaintiff's 42 U.S.C. § 1983 claim alleging Defendants violated Morton's Eighth Amendment rights by acting with deliberate indifference to his known risk of suicidal behavior. For the reasons that are set forth below, we **AFFIRM** the district court's decision granting summary judgment as to Defendants Lawrence, Woodford, Hahn, Raciti, and the County of Washtenaw; we **REVERSE** the grant of summary judgment as to Defendants Watchowski and the City of Ann Arbor.


## BACKGROUND

The details of this case are tragic. On March 3, 2003, thirty-five year old Demetrius Morton pled guilty to domestic assault and battery. Morton was released on personal recognizance and ordered to return to court on April 3, 2003 for sentencing. Morton failed to appear on April 3, 2003 and a bench warrant was issued for his arrest. On June 3, 2003 he was arrested by Dearborn police, and an arrangement was made to transfer him to the custody of the Ann Arbor police. During the exchange, Morton attempted to escape and was caught. The capture prompted him to become violent toward the arresting officers and toward himself. During his transport to Ann Arbor, he banged his head on the safety glass of the patrol vehicle and stated that he wanted to kill himself. Reacting to his violent behavior, Ann Arbor police transported Morton to the University of Michigan for psychological evaluation to determine if he needed to be hospitalized as he presented a danger to himself and others. Morton tested positive for cocaine and his blood alcohol level was found to be .363, which is over four times the legal limit for operating a motor vehicle. University medical specialists concluded that hospitalization was unnecessary and that Morton's violent behavior was the result of his drug and alcohol use. Morton was released from the University Hospital the same day and taken to his arraignment.

At the arraignment, Morton once again reacted violently when he was told he would not be released while he awaited his sentencing hearing set for June 12, 2003. **\*462**  He banged his head on the table and yelled that he wanted to kill himself. Morton had to be physically restrained and escorted out of the courtroom by the officers present. Despite the recommendation for the University hospital that Morton did not present a danger to himself, the judge ordered Morton to be placed on suicide watch until sentencing. Officer Watchowski of the Ann Arbor police, one of the defendants in this action, was present at this arraignment. Defendant Watchowski testified that he did not hear the court place Morton on suicide watch. However, he admitted that it is customary for him to have received a copy of the court disposition and that he likely received one in this case as well. Further, while he claimed that he could not remember if he read it or not, he admitted that it is likely that if he received the court disposition then he would have read it. The Ann Arbor police transported Morton to Washtenaw County jail, where he would be housed until sentencing. Defendant Watchowski was not one of the transporting officers.

Defendant Deputy Raciti booked Morton when he arrived at the Washtenaw County Jail on June 3, 2003. Defendant Raciti placed Morton on suicide watch pursuant to the court's order. This was the sixth time Morton had been an inmate at Washtenaw County Jail. During three of his previous incarcerations at the jail he had been placed on suicide watch. Placing Morton on suicide watch consisted of placing him in an observation cell under 24-hour observation, where he was housed from June 3, 2003 until he was transported to his sentencing hearing on June 12, 2003. The observation cells are rooms with glass walls so that the prisoner can be observed constantly. Morton was also given a "bam bam" gown to wear. [1]  These gowns are given to inmates on suicide watch, as well as inmates who have other special medical needs. The observational cells are additionally used both to house inmates on suicide watch and inmates who need to be observed for other medical and psychological needs. Over the course of his nine day stay, Morton was given consistent medical evaluations and "was cleared of all alcohol/narcotic withdrawals" on June 8, 2003.

Defendants Officers Michael Watchowski and Steve Lawrence, both of whom were Ann Arbor police officers, were the transport officers on June 12, 2003 who were responsible for taking Morton to his sentencing hearing. When the officers arrived, both Defendants Officer Pamela Raciti and Sergeant Anthony Woodford of Washtenaw County were on duty at the county jail.

2007 Fed.App. 0118N

When Defendants Watchowski and Lawrence inquired as to how Morton was doing, Defendants Raciti and Woodford informed them that Morton was "doing fine" and he was "alright to be transported as far as [Defendant Woodford] kn[ew]." (J.A. at 395). Neither Defendant Raciti nor Defendant Woodford told either Defendant Watchowski or Defendant Lawrence that Morton was on suicide watch.

When they first arrived, Defendants Watchowski and Lawrence saw that Morton was being held in an observational cell and saw him wearing a bam bam gown. Before he was released into the custody of Defendants Watchowski and Lawrence, Morton was changed out of the bam bam gown and into a white uniform, consisting of white pants and a white shirt. This **463** uniform is issued to inmates who have special needs, which can include suicidal tendencies, drug or alcohol problems, or medical conditions. Defendant Eugene Hahn, Washtenaw County Corrections Officer, was responsible for preparing the transportation log concerning Morton's June 12, 2003 transportation to the sentencing hearing. Defendant Hahn had no direct contact with Morton or the Ann Arbor Defendants. Washtenaw Deputy Pilarski claimed that he informed Defendant Watchowski that Morton was on suicide watch before Watchowski left the county jail, and Corporal Crowell confirmed that he heard this conversation. Defendant Watchowski claimed that he cannot remember whether he was told this or not.

Defendants Watchowski and Lawrence spoke with Morton on the ride to the sentencing hearing and according to them he "seemed ... normal" and there was "no indication" he had any suicidal tendencies. (J.A. at 397). Morton arrived at the courthouse without incident. When Morton was sentenced to ninety-three days in jail, he accepted the sentence calmly. Defendants returned Morton to a holding cell after the sentencing until they could transport him back to the jail. Defendants left Morton for a little over an hour unsupervised. When they returned, they discovered that he had hanged himself with his shirt in the cell.

Plaintiff brought this action, claiming that Defendants showed deliberate indifference to the suicidal tendencies of Morton. Defendants moved for summary judgment. Defendants Watchowski and Lawrence both admitted that suicide risk was a major concern when inmates were seen wearing bam bam gowns, but they further testified that other reasons were equally possible for the gown. Defendant Raciti confirmed that inmates are given this gown in situations other than potential suicide risks. Defendants also testified that inmates were placed in observational cells for reasons other than suicide prevention. Plaintiff introduced no testimony that contradicted the assertions that suicide risk is only one of several reasons an inmate may be held in an observation cell or wear a bam bam gown.

The district court noted that Plaintiff was unable to allege facts indicating that Defendants acted any more than negligently in their interactions with respect to Morton's suicide risk. The court emphasized that the standard for deliberate indifference is whether the official "knows of and disregards an excessive risk to inmate health or safety." (J.A. at 395). The district court reasoned that with respect to Defendant Woodford, Plaintiff offered no evidence that would tend to indicate that Plaintiff met the requisite standard. Because Plaintiff's argument with respect to Defendant Woodford was that he failed to tell Defendants Watchowski and Lawrence that Morton was on suicide watch, the district court reasoned that this was simple negligence. With respect to Defendant Raciti, Plaintiff once again argued that her failure to inform the Ann Arbor police that Morton was suicidal constituted a violation of Morton's Eighth Amendment rights. Again, the district court reasoned that this amounted only to negligence. The district court pointed out that Plaintiff failed to make any argument to support the allegation that Defendant Hahn showed deliberate indifference toward Morton, because he never had any direct contact with him. The court analyzed Defendants Watchowski and Lawrence together and concluded that, assuming Plaintiff successfully alleged that they had observed enough indicia of suicidal behavior to have drawn the inference, Plaintiff was unable to prove that they had actually drawn the inference. Finally, the court pointed out that Plaintiff's **464** "failure to train" argument against Defendants Washtenaw County and the City of Ann Arbor was meritless because § 1983 claims cannot grant relief on an allegation of failure to train unless Plaintiff alleged that the County and the City themselves engaged in the constitutional violation. Thus, the district court granted summary judgment in favor of all Defendants. Plaintiff timely filed a Notice of Appeal of this order.

**DISCUSSION**

Cooper v. County of Washtenaw, 222 Fed.Appx. 459 (2007)

2007 Fed.App. 0118N

## I. The district court improperly granted summary judgment with respect to Defendant Watchowski, but properly granted summary judgment with respect to the other individual Defendants

### A. Standard of Review

This Court reviews a district court's grant of summary judgment *de novo. Blackmore v. Kalamazoo,* 390 F.3d 890, 894-95 (6th Cir.2004). Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact, and all inferences should be made in favor of the non-moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

To support its motion, the moving party may show "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548. While all inferences must be drawn in favor of the nonmoving party, this Court is under no obligation to imagine favorable facts where the nonmoving party has alleged none. "[T]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### B. Standard for a § 1983 Claim

Section 1983 does not alone confer rights upon an individual. Instead, it is a vehicle to assert violations of constitutional rights guaranteed elsewhere. *Graham v. Connor,* 490 U.S. 386, 393-94, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Thus, in order to successfully bring a § 1983 claim, a plaintiff must allege 1) the violation of an underlying constitutional right by; and 2) a state actor who committed the violation while acting under the color of law. *Baker v. McCollan,* 443 U.S. 137, 140, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979).

In the present case, Plaintiff alleges that by showing deliberate indifference to Morton's demonstrated suicidal tendencies, Defendants violated his Eighth Amendment rights. (Pl.'s Brief at 3). Plaintiff properly bases the underlying violation upon the Eighth Amendment because Morton was a convicted prisoner at the time of his suicide. "[T]he Eighth Amendment, which is specifically concerned with the unnecessary and wanton infliction of pain in penal institutions, serves as the primary source of substantive protection to convicted prisoners in cases such as this one...." *Whitley v. Albers,* 475 U.S. 312, 327, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). Further, "this constitutional guarantee encompasses a right to medical care for serious medical needs, including psychological needs." *Perez v. Oakland County,* 466 F.3d 416, 423 (6th Cir.2006). Plaintiff is, **\*465** therefore, able to meet the first requirement for alleging a § 1983 claim. Additionally, Plaintiff names two municipalities and four agents of the state as Defendants. Accordingly, it is undisputed that their actions were undertaken under color of law. Thus, this § 1983 claim is properly formulated.

### C. Deliberate Indifference

The question before us is whether there exists a triable issue of fact over whether Defendants discharged their constitutional responsibilities while Morton was in custody. "[T]he Constitution gives governments considerable leeway when it comes to the day-to-day challenges of managing a prison and erects a series of hurdles that allegations of prisoner mistreatment must clear before they proceed to a jury." *Clark-Murphy v. Foreback,* 439 F.3d 280, 286 (6th Cir.2006). Accordingly, deliberate indifference involves two distinct steps. First, a plaintiff must "establish[ ] that 'the official knows of and disregards an excessive risk to inmate health or safety,' which is to say 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Id.* (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). This requirement comprises the constitutional violation question and contains both an objective and subjective element. Once a plaintiff is able to make the initial showing that there was in fact a constitutional violation, a defendant may still avoid liability if the defendant is entitled to qualified immunity. To overcome a

claim of qualified immunity, plaintiff must show that "the right at issue was ... 'clearly established' at the time of the violation." *Comstock v. McCrary,* 273 F.3d 693, 703 (6th Cir.2001).

## 1. Constitutional Question

"[T]he Eighth Amendment prohibits mistreatment only if it is tantamount to 'punishment,' and thus courts have imposed liability upon prison officials only where they are 'so deliberately indifferent to the serious medical needs of prisoners as to unnecessarily and wantonly inflict pain.' " *Perez,* 466 F.3d at 424 (quoting *Horn v. Madison County Fiscal Court,* 22 F.3d 653, 660 (6th Cir.1994)). This Court has defined "[a] serious medical need [as] 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.' " *Blackmore,* 390 F.3d at 897 (quoting *Gaudreault v. Municipality of Salem,* 923 F.2d 203, 208 (1st Cir.1990)). It is well-established in this Circuit that suicidal tendencies are considered "serious medical needs" for the purposes of this analysis. *See, e.g., Horn,* 22 F.3d at 660; *Barber v. City of Salem, Ohio,* 953 F.2d 232, 239-40 (6th Cir.1992).

There are two distinct prongs of the deliberate indifference standard: An objective component and a subjective component. First, the medical need "must be, objectively, sufficiently serious." *Farmer,* 511 U.S. at 835, 114 S.Ct. 1970. As we have stated, it is beyond dispute that suicidal tendencies meet this objective component. *Horn,* 22 F.3d at 660. The subjective component, on the other hand, requires facts that indicate "that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock,* 273 F.3d at 703.

Thus, the subjective component actually has three prongs embedded within it. First, the plaintiff must show that the official subjectively perceived the facts **\*466** that gave rise to the inference of the risk. *Id.* Then, the plaintiff must show that the official actually drew the inference, and, importantly, not just that he or she should have done so. *Farmer,* 511 U.S. at 839, 114 S.Ct. 1970; *Brooks v. Celeste,* 39 F.3d 125, 128 (6th Cir.1994). Finally, the plaintiff must show that the official consciously disregarded the perceived risk. *Farmer,* 511 U.S. at 839, 114 S.Ct. 1970.

The constitutional question is further complicated by the oft-repeated caveat "that deliberate indifference entails something more than mere negligence." *Farmer,* 511 U.S. at 835, 114 S.Ct. 1970. Precisely how much more is required remains difficult to determine. "Deliberate indifference requires a degree of culpability greater than mere negligence, but less than 'acts or omissions for the very purpose of causing harm or with knowledge that harm will result.' " *Miller v. Calhoun County,* 408 F.3d 803, 812 (6th Cir.2005) (quoting *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970). In *Farmer,* the Court indicated that the line between these two concepts is marked by actual knowledge. The Court defines deliberate difference as criminal recklessness and notes that "[t]he criminal law ... generally permits a finding of recklessness only when a person disregards a risk of harm of which he is aware." *Farmer,* 511 U.S. at 836-837, 114 S.Ct. 1970. The line between negligence and deliberate indifference is particularly difficult to draw when the risk at issue is suicide because the officials will necessarily be accused of a failure to act, which usually falls in the domain of negligence. We have clarified that the proper inquiry in a case where an inmate has committed suicide is "whether the decedent showed a strong likelihood that he would attempt to take his own life in such a manner that failure [by a defendant] to take adequate precautions amounted to deliberate indifference to the decedent's serious medical needs." *Gray v. City of Detroit,* 399 F.3d 612, 616 (6th Cir.2005) (quoting *Barber v. City of Salem,* 953 F.2d 232, 239-40 (6th Cir.1992)).

Noticeably, this is a difficult standard to meet at the summary judgment stage. Thus, this Court must adhere to a standard that simultaneously retains a difference between negligence and deliberate indifference while not rendering it prohibitively difficult for a plaintiff to succeed at the summary judgment stage. This Court has held that

> [a]lthough the plaintiff bears the onerous burden of proving the official's subjective knowledge, this element is subject to proof by "the usual ways." *Farmer,* 511 U.S. at 842, 114 S.Ct. 1970. Thus, the Supreme Court noted that it was permissible for reviewing courts to infer from circumstantial evidence that a prison official had the requisite knowledge. *Id.* at 842, 114 S.Ct. 1970. Moreover, the Court warned, a prison official may "not escape liability if the evidence showed that he merely

refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." *Id.* at 843 n. 8, 114 S.Ct. 1970.

*Comstock,* 273 F.3d at 703. Accordingly, we do not demand that a plaintiff prove that he or she will ultimately be successful on the § 1983 claim at this stage in order to survive summary judgment. Instead, a plaintiff need only to "allege facts which, if true, would show that the official being sued perceived facts from which to infer substantial risk to the prisoner, that he [or she] did in fact draw the inference, and that he [or she] then disregarded that risk." *Id.* This satisfies our twin goals of keeping the standard high enough so that it does not amount to mere negligence and low enough that it is possible for a plaintiff **\*467** to survive summary judgment without proving his or her entire case.

In *Perez,* we were faced with a situation similar to the one before us presently. In that case, the plaintiff appealed the grant of summary judgment dismissing the plaintiff's § 1983 claim alleging deliberate indifference when the plaintiff's son, Perez, killed himself while being housed at the Oakland County jail. *Perez,* 466 F.3d at 419. One of the individual defendants who was named by plaintiff was Rice, who was the counselor assigned to work with Perez while he was in custody. *Id.* The plaintiff alleged that Rice's decision to remove Perez from an observational cell with other inmates amounted to deliberate indifference because she had previously deemed him to be suicidal and placed him on suicide watch. *Id.* at 424-25. The defendant responded that she did not disregard Perez's psychological needs, but that she genuinely did not perceive Perez to be suicidal any longer. *Id.*

The district court found that a genuine issue of fact remained as to whether Rice disregarded the risk and this Court agreed. In that case, we focused on the fact that the defendant had been in direct contact with Perez in the weeks leading up to his death. Because she had been the one to place him on suicide watch, we concluded that she had actual knowledge that Perez had exhibited suicidal tendencies. *Id.* Thus, a triable issue of fact remained as to whether the decision to discharge him from suicide watch and place him in an unmonitored cell surpassed mere negligence and amounted to deliberate indifference. In so concluding, we held that when "[v]iewing this evidence in the light most favorable to [plaintiff], this evidence can be construed as demonstrating that Rice had the subjective knowledge, at least at times, that Perez posed a risk of suicide." *Id.* at 425. Thus, in *Perez,* we held that once actual knowledge of the risk could be shown at the summary judgment stage, the question of whether there was conscious disregard of that risk was to be determined by the jury. *Id. See also, Clark-Murphy,* 439 F.3d at 289 ("For summary-judgment purposes, we hold only that these 11 defendants could have perceived a substantial risk of serious harm to Clark. Whether in fact they perceived, inferred or disregarded that risk is an issue for trial.")

### 2. Qualified Immunity

After a plaintiff makes the necessary showing with respect to the constitutional question, a defendant may still assert qualified immunity to succeed on summary judgment. *Perez,* 466 F.3d at 426. "The philosophy behind the doctrine of qualified immunity 'is a desire to avoid the substantial costs imposed on government, and society, by subjecting officials to the risks of trial.' " *Skousen v. Brighton High Sch.,* 305 F.3d 520, 526 (6th Cir.2002) (quoting *Vaughn v. United States Small Bus. Admin.,* 65 F.3d 1322, 1326 (6th Cir.1995)). The purpose of the doctrine is to shield "government officials performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). As we have noted, the question of whether qualified immunity exists involves a two-part inquiry. *Perez,* 466 F.3d at 426.

The initial question before the court in a qualified immunity inquiry is whether the facts, taken in the light most favorable to the plaintiff, indicate that the officer's conduct violated a constitutional right. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272(2001). If the answer **\*468** to this first question is no, then the inquiry is ended. In other words, the first step of the qualified immunity analysis is determining whether the plaintiff has proved the constitutional question. If the plaintiff can show that a constitutional violation occurred, we must ask whether the constitutional right at issue was "clearly established" at the time of the violation. *Id.* at 202, 121 S.Ct. 2151. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."

2007 Fed.App. 0118N

*Id.* Importantly, qualified immunity is not analyzed as an affirmative defense. When a defendant claims qualified immunity, it creates a hurdle for the plaintiff to surmount before he or she can overcome the claim. The burden of showing that a right was clearly established falls wholly on the plaintiff. *Key v. Grayson,* 179 F.3d 996, 1000 (6th Cir.1999). The plaintiff must further show that the right was clearly established "in light of the specific context of the case, not as a broad general proposition." *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. Thus, if reasonable officers could disagree about the lawfulness of the conduct in question, immunity must be granted. *Key,* 179 F.3d at 1000.

A plaintiff must make the showing that a right was clearly established by looking "principally to the law of this circuit and to the Supreme Court." *Perez,* 466 F.3d 416. "However, we have held that the lack of Supreme Court or Sixth Circuit precedent 'is not a sufficient condition for concluding that the law is unclear on the subject and [thus that] qualified immunity must be granted to a defendant.' " *Id.* (quoting *McCloud v. Testa,* 97 F.3d 1536, 1556 (6th Cir.1996)). "[T]he decisions of other courts can also clearly establish the law[,] but they must point [unmistakably] to the unconstitutionality of the conduct and be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct was unconstitutional." *Summar v. Bennett,* 157 F.3d 1054, 1058 (6th Cir.1998) (internal citation omitted). "There need not be a case with the exact same fact pattern, or even 'fundamentally similar' or 'materially similar' facts; rather, the question is whether the defendants had 'fair warning' that their actions were unconstitutional." *Cummings v. City of Akron,* 418 F.3d 676, 687 (6th Cir.2005) (quoting *Hope v. Pelzer,* 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)).

The Supreme Court has been cautious to draw a distinction between behavior that violates a statutory or constitutional right and behavior that violates an administrative procedure of the agency for which the officials work. Specifically, the Court has held that officials "do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision." *Davis v. Scherer,* 468 U.S. 183, 194, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). Guided by Supreme Court precedent, this Court has held that "under § 1983, the issue is whether [the officer] violated the Constitution, not whether he should be disciplined by the local police force." *Smith v. Freland,* 954 F.2d at 343, 347 (6th Cir.1992).

### D. Application to Individual Defendants [2]

#### 1. Defendant Watchowski

 [1]   Defendant Watchowski was present at Morton's original hearing on June 3, 2003 when the court ordered him placed on **\*469** suicide watch. Defendant Watchowski claimed that he did not hear the court place Morton on suicide watch, but that he likely received a copy of the court disposition, and if he received it he likely read it. Deputy Pilarski claimed that he informed Defendant Watchowski that Morton was on suicide watch. This was confirmed by Corporal Crowell, and Defendant Watchowski does not remember whether he was informed by Pilarski or not. Because Defendants move for summary judgment, we must draw all inferences in favor of Plaintiff. Thus, we will assume based on this evidence that Defendant Watchowski was put on notice that Morton was on suicide watch while he was at Washtenaw County Jail. When Defendant Watchowski appeared on June 12, 2003 to take Morton to his hearing, Morton was wearing a bam bam gown and was being housed in an observational cell. While the officers on duty told Watchowski that Morton was doing fine, these facts all taken together indicate that Watchowski had at least perceived enough facts to give rise to an inference of the risk, which is the first prong of the subjectivity component for deliberate indifference. *Comstock,* 273 F.3d at 703.

The next question is whether Watchowski actually drew the inference. As this Court stated in *Comstock,* this Court may infer knowledge from circumstantial evidence. *Id.* Because Defendant Watchowski was on notice that Morton was a suicide risk, it is appropriate to presume that Watchowski had the requisite knowledge. We need not address whether Plaintiff has alleged facts pertaining to the question of conscious disregard of the risk. As we held in *Perez* and its progeny, where there is evidence of actual knowledge of the risk, conscious disregard need not be explicitly alleged in order to survive summary judgment. *Perez,* 466 F.3d at 425; *Clark-Murphy,* 439 F.3d at 289. Therefore, we conclude that Plaintiff alleged sufficient facts to overcome summary judgment.

2007 Fed.App. 0118N

**[2]**    Defendant Watchowski alternatively argues that he is entitled to qualified immunity. Because Defendant Watchowski's actions amounted to a constitutional violation, the next question we must determine is "whether [Defendant Watchowski] had 'fair warning' that [his] actions were unconstitutional." *Cummings,* 418 F.3d at 687. We have previously addressed this question. "[O]nce a prisoner has been deemed suicidal, it is clearly established that the prisoner is entitled to continuing medical treatment." *Perez,* 466 F.3d at 428 (citing *Comstock,* 273 F.3d at 702-03). Thus, Defendant had fair warning that his actions would constitute a constitutional violation. Defendant failed to show that any rational trier of fact would conclude that he was entitled to qualified immunity and therefore summary judgment was inappropriate with respect to Defendant Watchowski.

### 2. Defendant Lawrence

**[3]**    While Defendant Lawrence and Defendant Watchowski were both Morton's transport officers, their degree of liability differs in that Defendant Lawrence had no actual knowledge that Morton was on suicide watch. The crux of Plaintiff's argument is that Defendant Lawrence *should* have known that Morton had a high risk of hurting himself because of the facts Defendant Lawrence perceived. Plaintiff argues that Defendant Lawrence knew Morton was on a suicide watch because of the bam bam gown in which he was outfitted, the observational cell in which he had been held, and the white uniform he was given upon his release. However, the record is replete with other explanations for each of those observations besides the suicide watch explanation.  **\*470**  Because each of those precautions could have indicated Morton had other special needs and needed to be observed, we cannot conclude that perceiving them put Defendant Lawrence on notice that Morton was suicidal. Further, Plaintiff's expert witness testimony shows at most that Defendant Lawrence should have known that Morton was suicidal, which is insufficient for a deliberate indifference claim. Finally, Plaintiff argues that the fact that Watchowski violated Ann Arbor security procedures by not at least checking on Morton after the requisite thirty minutes should give rise to the presumption that he acted unconstitutionally. However, the Supreme Court has foreclosed this argument. A violation of internal policy does not *ipso facto* give rise to a presumption of unconstitutionality. *Davis,* 468 U.S. at 194, 104 S.Ct. 3012. Thus, Lawrence was properly granted summary judgment.

### 3. Defendant Raciti

**[4]**    Defendant Raciti was responsible for placing Morton under suicide watch, so it is beyond dispute that she perceived the requisite facts that gave rise to an inference of a risk and that she actually knew that Morton was on suicide watch. Further, she did not warn either Defendant Watchowski or Defendant Lawrence, who would be responsible for monitoring Morton, that he was under observation as a suicide risk. Contrary to the assertion by Judge Rogers' concurrence that there is some dispute regarding this fact, there is absolutely no testimony on the record indicating that she ever gave such a warning. Despite these facts as understood by the lead opinion, we conclude that, as explained in Judge Rogers' concurrence, the district court properly granted summary judgment in favor of Defendant Raciti.

As the Supreme Court has held, the right that is violated must be clearly established "in light of the specific context of the case, not as a broad general proposition." *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. Thus, while it is well-established that an inmate who has exhibited suicidal tendencies is entitled to medical treatment, it must have been clear that Defendant Raciti's deliberate indifference deprived him of that treatment in order for her to be liable. Too many triable issues of fact remain with respect to whether Defendant Raciti knew her failure to warn would subject Morton to the injury he experienced.

Contrary to Judge Rogers' concurrence, the record is completely silent with respect to whether Defendant Raciti actually knew that Defendant Watchowski had attended Morton's arraignment. Without this knowledge, it would be illogical to relieve Defendant Raciti of her duty to warn Morton's transport officers that he was a suicide risk so that they could continue to closely observe him.

2007 Fed.App. 0118N

Even if we were to assume, *arguendo,* that Defendant Raciti was aware that Defendant Watchowski attended Morton's arraignment, material facts would remain in dispute about Defendant Raciti's potential liability. Defendant Raciti had no basis to assume that Defendant Watchowski remembered or even heard the judge place Morton on suicide watch nine days earlier. Further, the fact that Defendant Watchowski may have been aware that Morton was placed on suicide watch on June 3, 2003 does not address whether Defendant Raciti should have assumed Defendant Watchowski knew Morton was still on suicide watch on June 12, 2003. Morton's suicidal behavior was attributed to alcohol and drug use at his arraignment; by June 12, 2003, he had been cleared of all alcohol and narcotic withdrawal. Thus, Defendant **\*471** Raciti had no reason to refrain from informing Defendant Watchowski that Morton, although he was sober, still posed a suicide risk. Finally, because Defendant Raciti did not know whether Defendant Watchowski would be the officer charged with observing Morton, she may have had a duty to insure that Defendant Lawrence knew of Morton's suicidal tendencies as well. Contrary to the concurrence, the record is clear that only Defendant Watchowski, and not Defendant Lawrence, attended Morton's arraignment. (J.A. at 103-07; J.A. at 162-63). Clearly, many material facts remain in dispute about whether Defendant Raciti had "fair warning" that her failure to warn would result in a violation of Morton's constitutional rights. *Cummings,* 418 F.3d at 687. These remaining issues of fact indicate that it would be entirely possible for a rational trier of fact to find that Defendant Raciti acted with deliberate indifference toward Morton. Thus, summary judgment was inappropriate with respect to Raciti.

In order to reach the contrary conclusion, the concurrence has impermissibly engaged in its own fact-finding. The concurrence concludes that Defendant Raciti cannot be liable "because there is no evidence that Raciti knew that Watchowski and Lawrence were ignorant about or would ignore signs of Morton's suicide risk." However, this sweeping statement assumes facts wholly unsupported by the record. Contrary to the assertions made by the concurrence, it is very much disputed as to whether Defendants Watchowski and Lawrence observed signs indicating that Morton might be a suicide risk.

According to Defendant Raciti's testimony, she "assumed" that Defendants Watchowski and Lawrence knew that Morton was on suicide watch, but she did not know that for sure. (J.A. at 162). She based her assumption on the fact that the information could be found in the court disposition, on the fact that Morton was being housed in an observational cell, and on the fact that she was outfitted in a bam bam gown. However, she admitted that she did not know whether either Defendants Watchowski or Lawrence actually read the court disposition. Importantly, she also admitted that there were reasons other than being on suicide watch that a person might be held in an observational cell and be outfitted in a bam bam gown. Thus, the issue of whether Defendants Watchowski and Lawrence actually observed any signs that put them on notice that Morton was a suicide risk is in dispute. Because that issue goes to the very heart of the question of Defendant Raciti's liability, summary judgment should not be granted.

The concurrence refers to the connection between Raciti's actions and Morton's death as "tenuous" and essentially holds that only a direct causal effect of injuries can amount to deliberate indifference. However, such a holding improperly injects a proximate cause discussion into our deliberate indifference analysis. We have previously held that while proximate cause may be necessary "to assess whether the denial of medical care caused a serious medical injury in cases where the prisoner or pretrial detainee's 'affliction is seemingly minor or non-obvious,' no such evidence is required where the individual had a 'serious need for medical care that was so obvious that even a layperson would easily recognize the necessity for a doctor's attention.' " *Owensby v. City of Cincinnati,* 414 F.3d 596, 604 (6th Cir.2005) (quoting *Blackmore v. Kalamazoo County,* 390 F.3d 890, 899 (6th Cir.2004)). Specifically, in *Blackmore,* we held:

> Where the seriousness of a prisoner's needs for medical care is obvious even to a lay person, the constitutional violation may arise. This violation is not premised **\*472** upon the 'detrimental effect' of the delay, but rather that the delay alone in providing medical care creates a substantial risk of serious harm. When prison officials are aware of a prisoner's obvious and serious need for medical treatment and delay medical treatment of that condition for non-medical reasons, their conduct in causing the delay creates the constitutional infirmity. In such cases, the effect of the delay goes to the extent of the injury, not the existence of a serious medical condition.

2007 Fed.App. 0118N

*Id.* We have also previously held that once a prisoner has been deemed suicidal that prisoner is said to have this type of obvious and serious need for medical care. *Perez v. Oakland County,* 466 F.3d 416, 428 (6th Cir.2006); *Comstock v. McCrary,* 273 F.3d 693 (2001). Accordingly, there need not be a showing of proximate cause in order to hold Raciti liable.

Further, even if a showing that Raciti's failure to warn was the proximate cause of Morton's death were required, such a requirement would weigh strongly against the granting of summary judgment. As we have explicitly stated in the past, "[p]roximate cause, and its underlying foreseeability inquiry, is a question of fact for the jury." *James v. Meow Media, Inc.,* 300 F.3d 683, 692 (6th Cir.2002). Nevertheless, we conclude that summary judgment was appropriate with respect to Defendant Raciti for the reasons stated in the concurrence.

### 4. Defendant Woodford

 **[5]**    Because Defendant Woodford was not responsible for placing Morton on suicide watch, Plaintiff has failed to make a showing that Defendant Woodford drew the inference that Morton was a suicide risk. Without facts alleging that Defendant Woodford had the requisite knowledge of Morton's suicidal tendencies, he cannot be liable for deliberate indifference. Plaintiff's argument amounts to an allegation that he should have made the inference, which is insufficient for the reasons we discussed above with respect to Defendant Lawrence. Thus, Defendant Woodford was entitled to summary judgment.

## II. The district court improperly granted summary judgment with respect to Defendant City of Ann Arbor, but properly granted summary judgment with respect to Defendant County of Washtenaw

In an effort to shield municipalities from liability for § 1983 claims, the Supreme Court created a high burden for a plaintiff to meet to bring a § 1983 claim for failure to train. The Court held that

> [a] city is not liable under § 1983 unless a municipal "policy" or "custom" is the moving force behind the constitutional violation. Only where a failure to train reflects a "deliberate" or "conscious" choice by the municipality can the failure be properly thought of as an actionable city "policy." *Monell* will not be satisfied by a mere allegation that a training program represents a policy for which the city is responsible. Rather, the focus must be on whether the program is adequate to the tasks the particular employees must perform, and if it is not, on whether such inadequate training can justifiably be said to represent "city policy." Moreover, the identified deficiency in the training program must be closely related to the ultimate injury.

*City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). This Court has interpreted that standard and announced a three-part test to aid in the determination. This Court has held that "[t]o succeed on a failure to train or supervise claim [under a § 1983 theory], the plaintiff must prove the following: (1) the  **\*473**  training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis v. Cleveland Mun. Sch. Dist.,* 455 F.3d 690, 700 (6th Cir.2006). The inquiry, however, must extend beyond the question of whether the individual officers involved were poorly trained. The appropriate question is "whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent 'city policy.' " *City of Canton,* 489 U.S. at 390, 109 S.Ct. 1197. "Plaintiff must do more than point to something the city could have done to prevent the unfortunate incident." *Kahlich v. City of Grosse Pointe Farms,* 120 Fed.Appx. 580, 585 (6th Cir.2005) (unpublished) (citing *City of Canton,* 489 U.S. at 392, 109 S.Ct. 1197) (citation omitted). However, before this Court can apply the *Ellis* test, the plaintiff must first establish that the agents of the municipality have violated a constitutional right. *Watkins v. City of Battle Creek,* 273 F.3d 682, 687 (6th Cir.2001). Thus, this claim is inextricably linked to the plaintiff's first claim: If the individual defendants have violated no constitutional right, the municipality cannot be liable under § 1983 for a failure to train. *Id.*

2007 Fed.App. 0118N

In the present case, Defendant Watchowski's and Defendant Raciti's behavior arguably constitute constitutional violations. Whether the County of Washtenaw and the City of Ann Arbor may be liable is governed by the *Ellis* test. Because the district court concluded that there were no underlying constitutional violations, it summarily dismissed Plaintiff's claims against the municipalities without applying the *Ellis* test. Because we conclude that Watchowski's behavior constituted a constitutional violation, we shall remand the issue of the liability of the City of Ann Arbor to the district court to determine whether a rational trier of fact can conclude that Watchowski's deficient behavior can be fairly characterized as a "city policy." *City of Canton,* 489 U.S. at 390, 109 S.Ct. 1197. This Court should also remand the issue of the liability of the County of Washtenaw to the district court for the application of the *Ellis* test and further factual development. However, the County of Washtenaw shall be dismissed by the panel majority pursuant to the reasoning set forth by Judge Rogers' concurrence.

We remand to the district court the issue of the liability of the City of Ann Arbor; however, the dismissal of the County of Washtenaw pursuant to summary judgment will be affirmed based upon the holding of the majority constituted by Judges Rogers and Sutton as to that issue.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment with respect to Defendants Lawrence, Woodford, and Hahn, and **REVERSE and REMAND** with respect to Defendants Watchowski and the City of Ann Arbor. Summary judgment with respect to Defendants Raciti and the County of Washtenaw is **AFFIRMED** for the reasons stated in Judge Rogers' concurrence.

ROGERS, J., concurring:
I concur in the lead opinion except with regard to defendant Raciti, and therefore do not join Part I.D.3. and the portion of Part II dealing with Washtenaw County's potential liability under *Ellis v. Cleveland Municipal School District,* 455 F.3d 690, 700 (6th Cir.2006).

On June 12, 2003, when Officers Watchowski and Lawrence arrived to pick up **\*474** Morton, Officer Watchowski asked Corrections Officer Pamela Raciti how Morton was doing, to which Raciti responded that Morton was doing fine. JA 139. Raciti did not observe any problems from Morton during his nine-day period of incarceration, JA 157, and observed him smiling at one point. JA 160. There is some evidence that, during this conversation, Officer Raciti warned Officers Watchowski and Lawrence that Morton was on suicide watch. JA 164. The record, however, is not clear on this point, as Officer Raciti testified that she did not specifically remember warning the other officers, JA 164, and this disputed fact at this point should be resolved in the plaintiff's favor.

Assuming that Officer Raciti did not warn Officers Watchowski and Lawrence of Morton's suicide risk, Officer Raciti observed three significant facts that would warrant her reasonable belief that an experienced transportation officer, like Watchowski or Lawrence, would have been aware of the risk. First, the court ordered that Morton be put on suicide watch and Raciti believed that the court order was in the file that Watchowski and Lawrence received. (Officer Watchowski, as it turns out, was present in the courtroom when the judge instructed authorities to put Morton on suicide watch.) Second, Raciti believed that Watchowski and Lawrence knew that Morton was in an observation cell. Third, Raciti believed that Watchowski and Lawrence knew that Morton wore a bam-bam uniform, which, combined with the other two factors, suggested that Morton was on suicide watch.

These facts demonstrate a reasonable belief on Officer Raciti's part that Officers Watchowski and Lawrence should have been aware of Morton's suicide risk. Even if such a belief was not reasonable, the facts at least preclude the inference that Officer Raciti was deliberately indifferent by failing to warn Officers Watchowski and Lawrence of Morton's risk. Raciti's reliance on Officers Watchowski and Lawrence to deal with Morton's suicide risk might have been mistaken, or even careless. (There is

a dispute as to whether Officers Watchowski and Lawrence were aware of the risk.) Nevertheless, Raciti's actions cannot be determined to have sunk to the level of deliberate indifference.

Raciti's failure to warn Watchowski and Lawrence of Morton's suicide risk amounted, at most, to negligence because there is no evidence that Raciti knew that Watchowski and Lawson were ignorant about or would ignore signs of Morton's suicide risk. In essence, Cooper claims that an officer can be deliberately indifferent to a risk that others would be deliberately indifferent to a risk. The Supreme Court's decision in *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), however, instructs us not to find an officer liable for a tenuous connection similar to the one in this case.

**Parallel Citations**

2007 WL 557443 (C.A.6 (Mich.)), 2007 Fed.App. 0118N

Footnotes

1       Defendants' counsel explained during oral argument that "bam bam" gowns are so named for the Flintstones character "Bam Bam."
        The name refers to the fact that the jail's bam bam gowns are flimsy, one-piece gowns that are designed to tear apart upon the exertion
        of any pressure so that they cannot be used in a suicide attempt.
2       Defendant Hahn was not mentioned in Plaintiff's brief or in oral argument. Therefore, we deem any argument focusing on his actions
        waived.

End of Document                                                  © 2013 Thomson Reuters. No claim to original U.S. Government Works.

 © 2013 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 3903061
Only the Westlaw citation is currently available.
United States District Court,
D. South Carolina,
Charleston Division.

James Gordon GIBSON, Plaintiff,

v.

LAURENS COUNTY DETENTION CENTER, Sheriff Ricky Chastain, Major Christopher Hudson, Lt Sullivan,
Lt Champagne, Lt Vera Nedahausen, Lt. Westbury, Sgt. Lowry, and Six John Doe Assailants, Defendants.

Civil Action No. 2:10–2132–RBH–BHH.    |    June 14, 2011.

**Attorneys and Law Firms**

James Gordon Gibson, Columbia, SC, pro se.

Russell W. Harter, Jr., Chapman Harter and Groves, Greenville, SC, for Defendants.

**Opinion**

### *AMENDED REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE*

BRUCE HOWE HENDRICKS, United States Magistrate Judge.

**\*1** The Plaintiff, proceeding *pro se,* seeks relief pursuant to 42 U.S.C. § 1983. Before the court is the Defendants' Motion for Summary Judgment. (Dkt. # 39.)

Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), and Local Rule 73.02(B)(2)(d), D.S.C., this magistrate judge is authorized to review all pretrial matters in cases filed under 42 U.S.C. § 1983, and submit findings and recommendations to the District Court.

The Plaintiff brought this action seeking damages for alleged civil rights violations. (Dkt.# 1.) On January 18, 2011, the Defendants filed a Motion for Summary Judgment. (Dkt.# 39.) On January 20, 2011, pursuant to *Roseboro v. Garrison,* 528 F.2d 309 (4th Cir.1975), the Plaintiff was advised of the summary judgment procedure and the possible consequences if he failed to adequately respond to the motion. (Dkt.# 41.) On February 23, 2011, the Plaintiff filed a response opposing the motion. (Dkt.# 50.)

### *FACTS PRESENTED*

The Plaintiff is civilly committed as a sexually violent predator ("SVP") and currently housed at the Broad River Correctional Institution. The incidents alleged in the Complaint occurred while the Plaintiff was incarcerated at the Laurens County Detention Center ("LCDC"). On November 30, 2006, the Plaintiff was taken into custody pursuant to a civil commitment order and placed into the LCDC. (Compl.¶ 4.)

The Plaintiff alleges that on August 12, 2008, he informed Lt. Sullivan that he had been threatened by other inmates because he was deemed a sexually violent predator and he requested protection. (Compl.¶ 5.) He also alleges at some point the Defendants

Sheriff Ricky Chastain, Major Christopher Hudson, Lt. Vera Nedahausen, Lt. Champagne, Lt. Westbury, and Sgt. Lowry were all informed of the situation, but none of the Defendants took any action to protect the Plaintiff. *Id.*

On August 15, 2008, at approximately 9:00 p.m., six inmates entered his cell and beat him until he was unconscious. (Compl.¶ 6.) The Plaintiff alleges he reported the incident to Officer Bible and he was placed in a holding cell with no bedding where he alleges he remained for days and was forced to sleep on the floor. (Compl.¶ 7.) He alleges the Defendants refused to transport him to the hospital for five days. (*Id.* at ¶ 8.)

The Plaintiff alleges that he was finally transported to Laurens County Health Care System on August 20, 2008, where an x-ray revealed that the Plaintiff suffered from multiple facial fractures and a concussion. (Compl.¶ 9.) He also alleges he suffered from massive bruising, cuts, black eyes, and broken teeth. (Compl.¶ 10.) He alleges when he returned to the LCDC from the hospital, he was placed in a holding cell and denied further medical attention, except for being provided with Naproxen. (Compl.¶ 11.)

The Plaintiff alleges he was kept in the holding cell for another eight days before he was sent to Piedmont E.N.T. He states that reconstructive surgery was recommended and the surgery was scheduled for September 26, 2008, with a preoperative appointment scheduled for September 24, 2008. (Compl.¶ 12.)

 **\*2**  The Plaintiff states he was again placed in a holding cell for two or three days and then in another room with two cellmates where he was forced to sleep on the floor on a single mattress next to the toilet. (Compl.¶ 13.) He alleges his attackers began to intimidate and harass him and threw urine and bleach at him at least twice. *Id.*

The Plaintiff alleges that on September 25, 2008, he was denied his surgery and was instead transferred to the SVP Treatment Program at the Broad River Correctional Institution. (Compl.¶ 14.) He alleges that as of the date he filed his complaint, August 2, 2010, he has been denied medical care, including the reconstructive surgery. (Compl.¶ 15.)


### APPLICABLE LAW

**SUMMARY JUDGMENT STANDARD**

Rule 56 of the Federal Rule of Civil Procedure states as to a party who has moved for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that (1) there is no genuine issue as to any material fact; and (2) that he is entitled to summary judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. Rather, the non-moving party must demonstrate that specific, material facts exist which give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the petitioner's position is insufficient to withstand the summary judgment motion. *Anderson,* 477 U.S. at 252. Likewise, conclusory allegations

or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir.1985).

## DISCUSSION

Initially, the undersigned notes, as the Defendants contend, that the LCDC is not a proper defendant in this action. The LCDC is a building and is not a legal entity, political subdivision, and/or agency which is subject to suit. *Preval v. Reno,* 57 F.Supp.2d 307, 310 (E.D.Va.1999) (holding "[t]he Piedmont Regional Jail is not a 'person,' and therefore not amenable to suit under 42 U.S.C. § 1983."); *Brooks v. Pembroke City Jail,* 722 F.Supp. 1294, 1301 (E.D.N.C.1989) (holding "[c]laims under § 1983 are directed at 'persons' and the jail is not a person amenable to suit.") Accordingly, the LCDC should be dismissed a Defendant.

### Failure to Protect

**\*3** The Plaintiff alleges that the Defendants failed to protect from the August 15, 2008 attack by other inmates. The Defendants contends the Plaintiff has failed to state such a claim. The undersigned agrees.

Deliberate or callous indifference on the part of prison officials to a specific known risk of harm states an Eighth Amendment claim. *Pressly v. Hutto,* 816 F.2d 977, 979 (4th Cir.1987). Not every injury suffered by one inmate at the hands of other inmates, however, translates into constitutional liability for the prison officials responsible for the victim's safety. *See Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). In *Farmer,* the Supreme Court defined deliberate indifference, holding that "a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847. The test is not whether an official knew or should have known of the possibility of harm, but whether he did, in fact, know of it and consciously disregard that risk. "[T]he official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. While the objective information known to the official may be used to infer the knowledge he actually had, and to draw inferences about his actual state of mind, those inferences are not conclusive. Further, the Eighth Amendment is not violated by the negligent failure to protect inmates from violence. *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986); *Moore v. Winebrenner,* 927 F.2d 1312 (4th Cir.1991).

A failure to provide adequate security in general, however, is insufficient to establish a constitutional claim of deliberate indifference to protect. *See Grieveson v. Anderson,* 538 F.3d 763, 777 (7th Cir.2008) (holding that negligence with regard to providing security in general is insufficient to prove a constitutional violation); *see also Dale v. Poston,* 548 F.3d 563, 569 (7th Cir.2008) (stating that prisons are inherently dangerous places, and officers cannot be held liable for every injury an inmate receives at the hands of another inmate).

Here, the Plaintiff fails to establish an Eighth Amendment claim because he has not shown that the Defendants knew of a specific risk of harm to him and consciously disregarded that risk.

Included within the incident report regarding the assault is the Plaintiff's handwritten and signed voluntary statement which the Plaintiff has not disputed in any way. (Defs.' Mem. Supp. Summ. J. Mot. Attach. # 2—Incident Report.) In the statement, the Plaintiff stated that after canteen was passed out, at approximately 9:00 p.m., an inmate entered his room and asked the Plaintiff to trade a couple of cans of soup for some beef sticks. (*Id.* at 4.) The Plaintiff stated that he started to tell the inmate that he did not have anything to trade, when three other inmates came into his room "demanding the canteen." *Id.* The Plaintiff stated he told them they were not getting anything from him. *Id.* He stated that one of the inmates told him to "give it up" and then started punching the Plaintiff in the face. *Id.* He stated that when he started fighting back another inmate began kicking him in the face and head. *Id.* He stated that someone else kicked him in his stomach several times. *Id.* After the attack, the plaintiff attempted to identify which inmates were involved. Those inmates where immediately transferred to C–Max, pending an investigation.

**\*4**  While the record shows that the Plaintiff filed numerous requests to staff forms regarding his medical care, there is no evidence that the Plaintiff ever filed anything requesting protective custody or indicating that he was under fear or threat of harm from any other inmates. The only inmate request to staff form filed by the Plaintiff relating to any security issue was dated January 9, 2007, when the Plaintiff requested that a particular inmate be assigned as his cellmate. In that request to staff form, the Plaintiff stated "I do not want a piece of s—t put in this room or there will be problems. Also, I am not prejudiced against anyone but I do not want a black put in here unless he is older and not prone to the gang mentality." (Defs.' Mem. Supp. SUmm. J. Mot. Attach. # 4—Aff. at 5.)

In his Complaint, the Plaintiff alleges that at 12:30 p.m. on August 12, 2008, he told the Defendant Lt. Sullivan inmates were threatening him because of his SVP status and he alleges he requested protection. (Comp. at 2.) He alleges he informed each of the Defendants "at one point or another" of the "extreme matters and racial tensions, as well as, un-controlled violence and threats against him by these gang members running full force without impunity on A–Pod ..." *Id.*

First, the only evidence that Plaintiff has presented to support his claim that the Defendants failed to protect him are his own allegations. *White v. Boyle,* 538 F.2d 1077, 1079 (4th Cir.1976) (conclusory allegations are insufficient to withstand a properly supported motion for summary judgment). However, even accepting these allegations as true, the Plaintiff does not allege that any defendant was aware of a *specific* threat of harm to him. There is no evidence that the Plaintiff informed any of the Defendants that he had been threatened or that he feared an attack from another specific inmate or group of inmates.

Moreover, it is apparent from the Plaintiff's description of the incident that the violence he encountered on August 15, 2007, was a random occurrence. (Defs.' Mem. Supp. Summ. J. Mot. Attach. # 2—Incident Report at 4.) [1] Another inmate in his statement, also stated that the assault occurred after the Plaintiff refused to give the other inmates tobacco. (Defs.' Mem. Supp. Summ. J. Mot. Attach. # 2—Incident Report at 7.) Further, Pvt. Bible in his statement in the incident report stated that the Plaintiff had told him that the assault occurred over canteen items. (Defs.' Mem. Supp. Summ. J. Mot. Attach. # 4—Lt. Champagne Aff. Attach. at 4.) Finally, there is a notation in the Plaintiff's medical records which also refers to the fight having been over canteen items. (Defs.' Mem. Supp. Summ. J. Mot. Attach. # 4—Lt. Champagne Aff. at 6.)

The Plaintiff fails to establish that the Defendants knew of a specific risk of harm to him and consciously disregarded that risk. Accordingly, the Plaintiff's failure to protect claim should be dismissed.

**Denial of Medical Treatment**

 **\*5**  The Plaintiff alleges the Defendants were deliberately indifferent to his medical needs following the assault at the LCDC on August 15, 2008. The Defendants contend the Plaintiff has failed to state a claim of medical indifference. The undersigned finds that.

The government is "obligat[ed] to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). This obligation arises from an inmate's complete dependence upon prison medical staff to provide essential medical service. *Id.* The duty to attend to prisoners' medical needs, however, does not presuppose "that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Id.* at 105. [2] Instead, it is only when prison officials have exhibited "deliberate indifference" to a prisoner's "serious medical needs" that the Eighth Amendment is offended. *Id.* at 104. To be liable under this standard, the prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

Deliberate indifference is a very high standard. In *Miltier v. Beorn,* 896 F.2d 848, 851 (4th Cir.1990), the Fourth Circuit Court of Appeals noted that treatment "must be so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness, nevertheless, mere negligence or malpractice does not violate the Eighth Amendment."

Unless medical needs were serious or life threatening, and the defendant was deliberately and intentionally indifferent to those needs of which he was aware at the time, the plaintiff may not prevail. *Estelle,* 429 U.S. 104; *Farmer,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811; *Sosebee v. Murphy,* 797 F.2d 179 (4th Cir.1986). "A medical need is 'serious' if it is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention' or if denial of or a delay in treatment causes the inmate 'to suffer a life-long handicap or permanent loss.' " *Coppage v. Mann,* 906 F.Supp. 1025, 1037 (E.D.Va.1995) (*quoting Monmouth Co. Corr. Inst. Inmates v. Lanzaro,* 834 F.2d 326, 347 (3d Cir.1987)). To establish a claim of deliberate indifference against non-medical prison personnel, a plaintiff must demonstrate that the official was personally involved in the treatment or denial of treatment, or that they deliberately interfered with the treatment, or that they tacitly authorized or were indifferent to the medical provider's misconduct. *Miltier,* 896 F.2d at 853.

Further, claims of mere negligence, malpractice, or incorrect diagnosis are not actionable under § 1983. *Estelle,* 429 U.S. at 106. While the Constitution requires a prison to provide inmates with medical care, it does not demand that a prisoner receive the treatment of his choice. *Jackson v. Fair,* 846 F.2d 811, 817 (1st Cir.1988). "[A] prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation." *Nelson v. Shuffman,* 603 F.3d 439, 449 (8th Cir.2010) (internal quotation marks and citation omitted); *see also Wright v. Collins,* 766 F.2d 841, 849 (4th Cir.1985).

**\*6** The evidence shows that on the night of the assault, according to the incident report, a nurse directed that the Plaintiff be placed on "medical observation" and was to be awakened every 45 minutes to an hour to make sure his pupils were dilating and the same size. (Defs.' Mem. Supp. Summ. J. Mot. Attach. # 3—Sgt. Westbury Aff. Attach. at 5.) Then, on August 19, 2008, it was noted that the Plaintiff, who was complaining of ringing in both ears and had a large black eye, had not been evaluated in the E.R. and would be sent to the E.R. for evaluation. (Defs. Mem. Supp. Summ. J. Mot. Attach. # 4–Lt. Champagne Aff. Attach. at 6.)

On August 20, 2008, it was noted the Plaintiff had been sent to the E.R. and because the CT scan showed multiple facial fractures, a referral to an ENT was needed. *Id.* An appointment with Dr. Eisenhower was scheduled for August 28, 2008. *Id.* Surgery was scheduled for September 26, 2008, and cancelled the day before because the Plaintiff was sent to SCDC. (Defs. Mem. Supp. Summ. J. Mot. Attach. # 4–Lt. Champagne Aff. Attach. at 7.)

It is undisputed that the Plaintiff was not transported to the hospital until August 20, 2008, five days after the assault and that during the assault he suffered bruising, a large black eye, a concussion, and numerous facial fractures. Further, it is undisputed that he was sent to an ENT and reconstructive surgery was scheduled for September 26, 2008. It is also undisputed that the day before the scheduled surgery, the Plaintiff was transferred from the LCDC to the custody of the SCDC on September 25, 2008, and the surgery was cancelled.

The Defendants contend that "the Plaintiff seems to suggest that there was a delay in him being treated for his injury, but it is clear that the plaintiff did receive medical care for his condition and there is no indication that there was any unreasonable delay in providing medical care to the plaintiff which caused damage and/or further injury to him." (Defs.' Mem. Supp. Summ. J. Mot. at 12.)

In *Hill v. Dekalb Regional Youth Detention Center,* the Eleventh Circuit opined that "[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in the medical treatment to succeed." 40 F.3d 1176, 1188 (11th Cir.1994), There, however, the plaintiff attempted to establish that his medical need was sufficiently serious by relying on the effect of the delay in treatment. *Id.* Alternatively, a prisoner can demonstrate a sufficiently serious medical need when the medical condition is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko,* 535 F.3d at 241. When prison officials delay in providing medical treatment for an obvious medical need, the "violation is not premised upon the 'detrimental effect' of the delay, but rather that the delay alone in providing medical care creates a substantial risk of harm." *Blackmore v. Kalamazoo*

*County,* 390 F.3d 890, 899 (6th Cir.2004). Under these circumstances, the "[p]laintiff need not present verifying medical evidence to show that, even after receiving the delayed necessary treatment, his medical condition worsened or deteriorated. Instead, it is sufficient to show that he actually experienced the need for medical treatment, and that the need was not addressed for a reasonable time." *Id.* at 900. Here, the undersigned finds that there is question of fact as to whether the delay in sending the Plaintiff to the E.R. constitutes deliberate indifference to the Plaintiff's serious medical needs.

**\*7** Second, the undersigned notes that the Plaintiff claims that he was transferred from the LCDC to the SCDC by the Defendants to avoid having to provide surgery for the Plaintiff. (Compl. at 4.) The Defendants have offered nothing in support of denial of this allegation. In fact, in their memorandum, the Defendants do not even address the Plaintiff's transfer and cancellation of the surgery in regard to the Plaintiff's claims of denial of medical care. Therefore, in considering whether summary judgment for the Defendants on this claim is appropriate, the undersigned must assume that the Plaintiff's version of the facts is true. *Gray v. Spillman,* 925 F.2d 90, 95 (4th Cir.1991); *Davis v. Zahradenick,* 600 F.2d 458, 460 (4th Cir.1979).

Here, assuming the truth of Plaintiff's version of the facts, there is at least a genuine issue of fact with respect to whether Plaintiff received proper medical care and treatment following the assault. The undersigned cannot find as a matter of law that a reasonable trier of fact would conclude that the Defendants did not act deliberately indifferent to the Plaintiff's serious medical condition. Further, while some of the nonmedical Defendants ultimately may be found not liable, at this time, it is unclear whether these non-medical prison personnel were personally involved with a denial of treatment, deliberately interfered with prison doctors' treatment, or tacitly authorized or were indifferent to the prison physicians' misconduct. Therefore, the Defendants are not entitled to summary judgment on this claim.

## Supervisory Liability

To the extent that the Plaintiff seeks to impose liability based on respondeat superior, the doctrine does not apply in § 1983 proceedings. *Monell v. Department of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Love–Lane v. Martin,* 355 F.3d 766, 782 (4th Cir.2004). Absent an allegation of personal involvement or unconstitutional policy or custom, there is no legal basis to find these defendants liable. *Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir.1994).

Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *Id.* at 799.

The Fourth Circuit has held that, in order to impose supervisory liability under § 1983 for failure to train subordinates, a plaintiff must plead and prove that: (1) the subordinates actually violated the plaintiff's constitutional or statutory rights;(2) the supervisor failed to train properly the subordinates thus illustrating a "deliberate indifference" to the rights of the persons with whom the subordinates come into contact; and (3) the failure to train actually caused the subordinates to violate the plaintiff's rights. *Brown,* 308 F.Supp.2d at 701. Moreover, "[a] section 1983 failure-to-train claim cannot be maintained against a governmental employer in a case where there is no underlying constitutional violation by the employee." *Young v. City of Mt. Ranier,* 238 F.3d 567, 579 (4th Cir.2001).

**\*8** In his Complaint, the Plaintiff alleges that the Defendant Sheriff Chastain "failed to train, supervise, and/or control Defendants Major Christopher Hudson, Lt. Vera Nedahausen, Lt. Champagne, Lt. Sullivan, Lt. Westbury, and Sgt. Lowry who failed and/pr refused to protect Plaintiff against unwarranted assault ... [and] failed to personally protect Plaintiff against known and present unwarranted assault, .. refused to order, cause Plaintiff to be transported to proper medical attention on August 15, 2010(sic), denied Plaintiff to receive/order doctor prescribed medical reconstructive surgery ..., causing Plaintiff to suffer permanent/irreversible physical damage." (Compl. at 4.)

Here, not only has the Plaintiff alleged that the Sheriff Chastain was liable under a theory of supervisory liability, the Plaintiff also alleges that Sheriff Chastain is personally responsible for the alleged incidents. Thus, while the Plaintiff cannot show that the Defendant Sherriff Chastain is liable on a theory of respondeat superior or supervisory liability, his allegations also include allegations of personal involvement which preclude granting summary judgment for Sheriff Chastain at this time.

**Qualified Immunity**

The Defendants also seek summary judgment based on qualified immunity. Determining whether an official would be entitled to qualified immunity generally requires a two-step inquiry. *See Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). The court must determine whether, taken in the light most favorable to the Plaintiff, the facts alleged show that the official's conduct violated a constitutional right. *Parrish v. Cleveland,* 372 F.3d 294, 301–02 (4th Cir.2004). If the facts, so viewed, do not establish a violation of a constitutional right, the inquiry ends, and the Plaintiff cannot prevail. *Id.* If the facts do establish such a violation, however, the court must determine whether the right violated was clearly established at the time of the alleged offense. *Id.* In determining whether the right violated was clearly established, the court defines the right "in light of the specific context of the case, not as a broad general proposition." *Id.* "If the right was not clearly established in the specific context of the case—that is, if it was not clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted—then the law affords immunity from suit." *Id.* (citations and quotations omitted). "Fourth Circuit precedent is one source for determining whether the law was clearly established at the time of the alleged violation." *Vathekan v. Prince George's County,* 154 F.3d 173, 179 (4th Cir.1998); *Jean v. Collins,* 155 F.3d 701, 709 (4th Cir.1998) (en banc)) ("In determining whether a right was clearly established at the time of the claimed violation, 'courts in this circuit [ordinarily] need not look beyond the decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose ....' "). Because the constitutional rights alleged to have been violated were clearly established, and a "genuine issue of material fact" exists "regarding '[w]hether the conduct allegedly violative of the right[s] actually occurred," *Pritchett v. Alford,* 973 F.2d 307, 313 (4th Cir.1992)), the Defendants should be denied qualified immunity at the summary judgment stage as to the Plaintiff's medical indifference claims. [3]

### CONCLUSION

**\*9**  Based on the foregoing, it is recommended that the Defendants' Motion for Summary Judgment (Dkt.# 39) be GRANTED in part and DENIED in part. The Plaintiff's failure to protect claims should be dismissed with prejudice. Further, the LCDC should be dismissed as a Defendant.

IT IS SO RECOMMENDED.

Footnotes

1       Finally, to the extent the Plaintiff is complaining that any of the Defendants failed to comply with the SCDC policy regarding the housing of SVP detainee (Dkt. # –50–Pl.'s Mot. to Deny Defs. Summ. J. Mot. at 6.), such a claim fails, as the failure of prison officials to follow their own policies or procedures, standing alone, does not amount to a constitutional violation. *Keeler v. Pea,* 782 F.Supp. 42, 44 (D.S.C.1992) (holding violations of prison policies which fail to reach the level of a constitutional violation are not actionable under § 1983). *See also Riccio v. County of Fairfax,* 907 F.2d 1459, 1469 (4th Cir.1990) (holding if state law grants more procedural rights than the Constitution requires, a state's failure to abide by that law is not a federal due process issue).

2       At the time of the incidents alleges in the Complaint, the Plaintiff was being held at the LCDC pursuant to a civil detainment under the Sexually Violent Predators Act ("SVPA"). A civilly committed individual under the SVPA most closely resembles the custody status of a pre-trial detainee. *See LaSure v. Doby,* 2007 WL 1377694, \*5 (D.S.C. May 8, 2007) (citations omitted). Confinement conditions of pretrial detainees are to be evaluated under the Due Process Clause of the Fourteenth Amendment rather than under the Eighth Amendment. *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). However, the standard for reviewing medical claims of pretrial detainees under the Fourteenth Amendment is essentially the same as that for a convicted prisoner under the Eighth Amendment. *Hill v. Nicodemus,* 979 F.2d 987, 991 (4th Cir.1992).

3    Because the undersigned recommends that the failure to protect claims be dismissed on the merits, the undersigned discusses qualified immunity only as to the Plaintiff's denial of medical care claims. *See DiMeglio v. Haines,* 45 F.3d 790, 799 (4th Cir.1995) ("In many cases where a defendant has asserted qualified immunity, dismissal or even an award of summary judgment may be obviously warranted, based upon existing law, without the court ever ruling on the qualified immunity question.").

End of Document                                              © 2013 Thomson Reuters. No claim to original U.S. Government Works.

Appeal: 13-1588     Doc: 20     Filed: 07/16/2013     Pg: 78 of 121

Hoy ex rel. Brown v. Simpson, 182 F.3d 908 (1999)

Unpublished Disposition

182 F.3d 908

NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without
Reported Opinions" appearing in the Federal Reporter. See CTA4 Rule 32.1.
United States Court of Appeals, Fourth Circuit.

Catherine L. HOY, Guardian for Kevin A. Brown, Plaintiff-Appellant,

v.

Steve A. SIMPSON, Sheriff of Loudoun County; Daniel Dondero; Trula Peach; Lance Schul;
James Drummond; Shannon M. Daly; the Loudoun County Board of Supervisors; Michael
Cox; Jack Bradley; Jeffrey Fragala; Unknown Sheriff's Deputies, Defendants-Appellees.

Nos. 97-1583, 98-2605.    |    Argued April 9, 1999.    |    Decided June 25, 1999.

Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria, CA-96-726-A; Leonie M. Brinkema, District Judge.

**Attorneys and Law Firms**

James Paul Campbell, James P. Campbell & Associates, Leesburg, Virginia, for Appellant.

David Drake Hudgins, Hudgins, Carter & Coleman, Alexandria, Virginia, for Appellees.

ON BRIEF: William J. Rold, New York, New York, for Appellant. Paul T. Emerick, Jeffrey R. Dion, Hudgins, Carter & Coleman, Alexandria, Virginia, for Appellees.

Before LUTTIG and WILLIAMS, Circuit Judges, and BUTZNER, Senior Circuit Judge.

**Opinion**

### OPINION

PER CURIAM.

 **\*1**  Catherine L. Hoy brought this federal civil rights action, with pendent state law tort claims, against Loudoun County, the Sheriff of Loudoun County, and seven sheriff's deputies after her son Kevin Brown suffered injuries while being detained at the Loudoun County jail that left him in a persistent vegetative state. Hoy appeals the district court's dismissal of her claims against the County and the Sheriff, and its entry of judgment, after a jury trial, in favor of the sheriff's deputies.

### I.

On the evening of Friday, March 22, 1996, thirty-three year old Kevin Brown was arrested by police from the Town of Leesburg and jailed at the Loudoun County Adult Detention Center ("Loudoun County ADC" or "ADC") on a charge of public drunkenness. Brown was well-known to officials at the ADC, having been held fourteen times before on such charges. Brown was scheduled to be released at 8:00 a.m the next morning, but his release was delayed until the afternoon as a result of his continued intoxication.

At approximately 6:30 a.m. on Sunday, March 24, the morning after his release, Brown entered a 7-11 convenience store in Leesburg. Brown was obviously intoxicated-he was loud and verbally abusive and was having trouble maintaining his balance. While in the store, he began to vomit. A Leesburg police officer arrived on the scene and again took Brown into custody on charges of public drunkenness. The officer transported Brown to the Loudoun County ADC, where a magistrate signed a commitment card and ordered that Brown be released by 6:00 p.m. that evening, provided he was sober.

Brown was booked at 8:00 a.m. and placed in a holding cell, where he remained for the next twenty-two hours. Brown's exact condition at the time of his booking and throughout this period was a matter of some dispute at trial, but there is no doubt that he was highly intoxicated and spent most, if not all, of that time either asleep or unconscious. Sheriff's deputies at the ADC checked on Brown regularly throughout the day and night of March 24 and the early morning of March 25, and tried a number of times, unsuccessfully, to awaken him.

At approximately 5:25 a.m. on March 25, near the end of his shift, sheriff's deputy Bradley, who had failed in two attempts to rouse Brown during the night, stopped by to check on him. Bradley testified at trial that at this time he noticed that Brown was having difficulty breathing, which was a change from his condition as Bradley had observed it during the night. Bradley took immediate steps to aid Brown and summon medical assistance. Shift commander Sergeant Shannon Daly responded from less than ten yards away, and the women observed Brown vomiting or spitting what appeared to be clear fluid, including some blood and mucus. Daly summoned a rescue squad, which responded at approximately 5:35 a.m. The rescue squad gave Brown oxygen and placed him on an EKG monitor, and administered an anti-narcotic drug and another drug to raise his blood sugar. Brown was transported to Loudoun Hospital Center at 5:52 a.m., and arrived at 5:55 a.m. Over the next few hours and days, Brown experienced significant seizure activity and cerebral swelling, and was ultimately diagnosed as having slipped into a persistent vegetative state.

 **\*2**  Catherine Hoy, Brown's mother and guardian, brought this action in the United States District Court for the Eastern District of Virginia against Loudoun County, by its Board of Supervisors, Loudoun County Sheriff Steve Simpson, and seven sheriff's deputies, seeking damages and injunctive relief under 42 U.S.C. § 1983, on the grounds that Brown's due process rights had been violated, and damages under state law for both simple and gross negligence. The district court denied defendants' motion to dismiss and permitted the parties to proceed with extensive discovery. On cross-motions for summary judgment at the close of discovery, the district court granted summary judgment to the defendants on Counts III and IV (of seven) of the complaint alleging the liability of the County and the Sheriff for failure properly to train the deputies and to adopt procedures for the care of intoxicated detainees, and for the failure to provide an adequate facility. Sheriff Simpson remained a party to the action under a *respondeat superior* theory on the state law negligence and gross negligence counts (Counts VI and VII). Hoy's cross-motion for summary judgment was denied, and she voluntarily dismissed Count V of her complaint alleging the deputies' use of excessive force.

The case went to trial before a jury on the remaining four counts alleging denial of medical treatment, deliberate indifference to medical needs, negligence, and gross negligence. The trial lasted five days, during which the jury heard testimony from dozens of witnesses. At the close of Hoy's case, the Sheriff and his deputies moved for judgment as matter of law pursuant to Fed.R.Civ.P. 50. Pursuant to that motion, the district court dismissed Count VII, the simple negligence claim, because under Virginia law the County's sovereign immunity from suit extended to the Sheriff and his deputies for negligent performance of their discretionary governmental functions. Following the presentation of their case, the defendants renewed their Rule 50 motion, which the district court denied in full. Three counts were thus submitted to the jury: Counts I and II of the section 1983 action, alleging "Denial of Medical Treatment" and "Deliberate Indifference to Medical Needs," respectively, and Count VI, the state law gross negligence claim. After deliberating for less than three hours, the jury returned a unanimous verdict in favor of the defendants on all three counts. The court then denied plaintiff's motion for a new trial.

While plaintiff's appeal of the jury verdict and the summary judgment was pending, she filed a motion with this court under Fed.R.Civ.P. 60(b) to amend the record and present argument related to "newly discovered evidence." We held the appeal in abeyance and remanded the case to the district court for a determination on the merits of that motion, in which Hoy alleged that

defendants had withheld certain information pertaining to the Sheriff's compliance with Virginia Department of Corrections Standards in operating the ADC, and to the involvement of the Loudoun County Board of Supervisors in supervising the facility. Plaintiff argued that this evidence warranted vacating the district court's award of summary judgment to the Sheriff and the County on Count III of the First Amended Complaint alleging a failure by the Sheriff to train deputies and adopt proper policies for monitoring intoxicated detainees. The district court agreed, ruling that evidence of the Sheriff's failure to comply with Department of Corrections standards, of notice of deficiencies in training or procedures, and of policymaking activity by the Board of Supervisors, could have created genuine issues of material fact that would have made the grant of summary judgment improper. The court vacated its summary judgment order and re-opened discovery for a period of forty-five days on the limited issues identified by Hoy in her motion.

**\*3**  After taking sixteen depositions and filing a number of additional discovery motions, Hoy filed a Second Amended Complaint alleging in four new counts that Sheriff Simpson and the Loudoun County Board of Supervisors were deliberately indifferent specifically by failing to train deputies to perform a proper medical screening and to insure that the deputies' first-aid re-certifications were up to date, and by allowing newly appointed deputies to be assigned for work in the ADC. The complaint also included two new counts alleging liability for simple and gross negligence as a result of these training and supervisory deficiencies. Defendants moved to dismiss the Second Amended Complaint under Fed.R.Civ.P. 12(b)(6), and the district court granted the motion on the stated ground that plaintiff had failed to plead sufficient facts to establish a claim of deliberate indifference. Plaintiff now appeals the dismissal of her Second Amended Complaint as well as the earlier judgment entered on the jury verdict.

## II.

We consider first appellant's challenges to the judgment entered on the jury verdict in favor of the defendant sheriff's deputies. Appellant argues that the court erred by failing specifically to instruct the jurors that the state-of-mind required to support a finding of deliberate indifference could be established by circumstantial evidence and by giving a qualified immunity instruction that "hopelessly confused" them. Appellant also contends that she was prejudiced by the district court's failure to comply with the requirement of Fed.R.Civ.P. 51 that it advise the parties before closing argument of its proposed action on their requested instructions. Finding no reversible error, we affirm the jury verdict in favor of the sheriff's deputies.

### A.

Appellant claims first that she is entitled to a new trial because the district court's instructions on "deliberate indifference" were inadequate in light of the Supreme Court's decision in *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), defining that term for the purposes of establishing a constitutional violation. [1]  In *Farmer,* the Supreme Court sought to clarify the deliberate indifference standard it had announced nearly twenty years earlier in *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Explicitly rejecting the "invitation to adopt an objective test for deliberate indifference" along the lines of "civil-law recklessness," the Court adopted instead a subjective standard focusing on the defendant's *conscious* disregard of a substantial risk of harm. *Farmer,* 511 U.S.at 836-37. Thus, the Court held that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 838.

**\*4**  Appellant does not argue that the district court erred in instructing the jury on this actual knowledge requirement. Rather, she contends that the court erred by neglecting to explain to the jury, consistent with the Court's admonition in *Farmer,* that the question whether the official had the requisite knowledge "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that a risk was obvious."*Id.* at 842 (internal quotations and citation omitted).

Hoy ex rel. Brown v. Simpson, 182 F.3d 908 (1999)

We find that the district court did not abuse its discretion in denying appellant's requested jury instructions on deliberate indifference, because the court's instructions "adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the [appellant]." *Spell v. McDaniel,* 824 F.2d 1380,1395 (4th Cir.1987). First, although the district court did not give the specific instruction that appellant requested, it did give a standard general instruction on the value of circumstantial evidence in establishing any contested fact. J.A. at 2828-29.

Second, with respect to the specific deliberate indifference charge given, the district court began by essentially quoting to the jury the *Farmer* standard:

> [T]he plaintiff has the burden of showing that the defendant ... had both been aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and that the individual deputy sheriff also must have drawn such an inference.

J.A. at 2841. The district court did not stop there, however. It went on to explain that the jury

> would have to determine ... from *all the facts and circumstances of the case* whether or not any one or all or a group of these deputies had that kind of subjective awareness of the known serious medical needs of Mr. Brown in order ... to find that the deliberate indifference standard has been met.

J.A. at 2842 (emphasis added). Finally, the court went so far as to instruct that

> deliberate indifference may be demonstrated by either actual intent or reckless disregard. A person acts recklessly by disregarding a substantial risk of danger that is either known to the person or which would be *apparent to a reasonable person in that position.*

J.A. at 2842 (emphasis added). Thus, the district court made clear that the jury in determining a defendant's state-of-mind should consider all of the facts and circumstances, including the obviousness of the risk. Accordingly, we are satisfied that the district court's instruction adequately informed the jury of the essential principles of the deliberate indifference standard.

## B.

Next, appellant argues that the district court erred by giving the following qualified immunity instruction, which was a variation of one defendants had requested:

> **\*5**  Now a defendant in the position of a deputy sheriff is entitled to a qualified immunity only if he did not know what he did was in violation of federal law and if a competent public official would not have been expected at the time to know that the conduct was in violation of federal law. In deciding what a competent official would have known about the legality of the defendant's conduct, you may consider the nature of the defendant's official duties, the character of his official position, the information which was known to the defendant or not known to him, and the events which confronted him.
>
> You must ask yourself what a reasonable official in defendant's situation would have believed about the legality of the defendant's conduct. *You should not, however, consider that, what the defendant's subjective intent was, even if you believe it was to harm the plaintiff.* You may also use your common sense. If you find that a reasonable official in defendant's situation would believe his conduct to be lawful, then this element will be satisfied.

J.A. at 2846-47 (emphases added).

Appellant argues that this instruction constituted reversible error because its prohibition of any inquiry into subjective intent was "hopelessly confusing" when considered in conjunction with the deliberate indifference charge requiring the jurors to consider each defendant's state-of-mind. In addition, appellant contends, the question whether a defendant is entitled to qualified

Appeal: 13-1588    Doc: 20    Filed: 07/16/2013    Pg: 82 of 121

Hoy ex rel. Brown v. Simpson, 182 F.3d 908 (1999)

immunity is always a question of law and thus should never be submitted to the jury. *See, e.g., Warlick v. Cross,* 969 F.2d 303, 305 (7th Cir.1992).

Although we find nothing inherently confusing about two separate instructions that accurately convey that an alleged constitutional violation requires an inquiry into the defendant's subjective awareness while a defense to liability for that violation does not, appellant's contention-that qualified immunity should never be left to the jury-is less easily dismissed. For the instructions given in this case would seem to allow the jury to find that an individual defendant was in fact deliberately indifferent to Brown's serious medical needs, *but* that he was immune from liability because a reasonable officer would not know that such indifference constituted a violation of fed-eral law. Appellant's argument, and it is not without support, is that this latter conclusion would rest on a determination that it was not "clearly established," in the particularized sense that our caselaw requires, *see DiMeglio v. Haines,* 45 F.3d 790, 804 (4th Cir.1995), that deliberate indifference to an intoxicated pre-trial detainee's medical need would violate that detainee's constitutional rights to due process. This determination, appellant contends, is for the court to make. *See, e.g., Warren v. Dwyer,* 906 F.2d 70, 75 (2nd Cir.1990) ("The ultimate legal determination whether, on the facts found, a reasonable police officer should have known he acted unlawfully is a question of law better left for the court to decide.").

 **\*6** We need not decide whether allowing the jury to make this determination was error, however, because the jury's clear verdict that the defendants were *not* deliberately indifferent meant they precluded any consideration of the qualified immunity question, and thus any error in giving the instruction was harmless. *See Stone v. Peacock,* 968 F.2d 1163,1166 (11th Cir.1992) ("Even if a court improperly instructs the jury on qualified immunity, however, the error does not require reversal if it can be determined that the jury decided the case on the merits and not on qualified immunity.").

The district court, in consultation with the parties, prepared verdict forms that expressly and unambiguously asked the jurors to state their finding whether each defendant had violated Kevin Brown's constitutional rights. Thus, the jury received individual verdict forms for each defendant that read as follows:

> We, the Jury, unanimously find that the plaintiff, Catherine L. Hoy, guardian for Kevin A. Brown, has proven by a preponderance of the evidence that [the defendant] violated the civil rights of Kevin Brown by denying him medical treatment for a known serious medical need.

> We, the Jury, unanimously find that the plaintiff, Catherine L. Hoy, guardian for Kevin A. Brown, has proven by a preponderance of the evidence that [the defendant] violated the civil rights of Kevin Brown by being deliberately indifferent to a known serious medical need.

> We, the Jury, unanimously find that the plaintiff, Catherine L. Hoy, guardian for Kevin A. Brown, has proven by a preponderance of the evidence that [the defendant] was grossly negligent in her handling of Kevin Brown.

The jury answered each question with respect to each defendant by checking the box marked "No." Further, after the verdicts were read, the jury was polled at plaintiff's counsel's request, and each juror without hesitation confirmed that these were his verdicts as to each individual defendant. These verdicts clearly demonstrate that the jurors were persuaded by the defense the sheriff's deputies put on-a defense which emphasized *not* the deputies' assertion of qualified immunity from suit (which as best we can tell was never mentioned by either party), but rather, as the district court noted at a post-trial hearing, "the deliberate indifference concept ... and an argument about whether or not the catastrophic injuries to Mr. Hoy were, in fact, a result of all of this long sleep or a result of the status epilectus related to the significant alcohol history that he had." J.A. at 2879. [2] Because the jury concluded that there was no deliberate indifference, and thus had no cause to consider the subsequent question of whether the defendants were entitled to qualified immunity, the district court's instruction on that defense, even if given in error, was harmless. *Cf. Harwood v. Partredereit AF 15.5.81,* 944 F.2d 1187, 1192-3 (4th Cir.1991) ("When a jury is instructed on two theories of liability, one which is proper and the other which is not, the court must remand the case for a new trial unless it is reasonably certain that the jury's verdict was not influenced by the erroneously submitted ... theor[y]." (citation and internal quotations omitted) (alteration in original)).

**\*7**  If any confirmation were needed of the jury's determination that defendants were not deliberately indifferent to Brown's serious medical needs, it can be found in the jury's equally unequivocal resolution of the state law gross negligence claim, as to which no immunity defense was either applicable or given. In sending the gross negligence claim to the jury, the court gave the following instruction:

> [N]egligence is the failure to use ordinary care. Ordinary care is care a reasonable person would have used under the circumstances of this case.

> Gross negligence is a higher degree of negligence, and you must remember that throughout your deliberations. Gross negligence is that degree of negligence which shows such *indifference* to others as constitutes an utter disregard of caution, amounting to a complete neglect of the safety of another person. It is such negligence as would shock fairminded people, although it is *something less than willful recklessness.*

J.A. at 2848 (emphases added). In contrast, in charging the jury on deliberate indifference, the district court set a higher standard for liability, emphasizing that the section 1983 claims required either a showing that the individual defendants acted with *subjective awareness* of a serious medical need, defined as one that "is so obvious that a layperson would easily recognize the necessity for a doctor's attention," J.A. at 2842, or with willful recklessness:

> Mere negligence is not enough.... Another way of thinking about deliberate indifference to a serious medical need is when the treatment is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental unfairness. Deliberate indifference may be demonstrated by either actual intent or reckless disregard.... An act is reckless if done in *conscious* disregard of its known probable consequences.

J.A. 2842-44 (emphasis added).

This latter instruction tracked *Farmer,* in which the Supreme Court emphasized that liability under a section 1983 deliberate indifference claim required at the very least a finding of exactly this type of *willful* recklessness, akin to the concept of recklessness commonly applied in the criminal law context. *Farmer,* 511 U.S. at 837. In doing so, the Court explicitly declined to adopt as the Eighth Amendment standard the model of "civil-law recklessness" reflected in the district court's "gross negligence" instruction. *See id.*[3]

Thus, the jurors, in rejecting appellant's state law claim of gross negligence, found that she had not demonstrated even the civil law recklessness that the Supreme Court held in *Farmer* was *insufficient* to support a constitutional claim of deliberate indifference. It is no surprise, then, that the jury also found that the defendants were not *deliberately* indifferent to Brown's serious medical needs under a standard that required a finding not only of a substantial risk of serious harm, but also that the defendants had actual knowledge of that risk and consciously disregarded it.[4]

**\*8**  Accordingly, we are satisfied that the jury's verdicts rested, as their verdict forms unambiguously state, on a finding that no constitutional violation had occurred, and that any error in giving the qualified immunity instruction was therefore harmless.

## C.

Finally, appellant argues that she is entitled to a new trial because the district court failed to comply with the requirement of Fed.R.Civ.P. 51 that it inform the parties before closing arguments of its pro-posed actions on their requested instructions.[5] According to appellant, her counsel was "blind-sided" by the court's instructions, and thus unable properly to object to the court's assertedly erroneous deliberate indifference and qualified immunity charges. Although we agree with appellant that the district

Hoy ex rel. Brown v. Simpson, 182 F.3d 908 (1999)

court erred in failing to inform the parties with some degree of specificity before closing argument which instructions it intended to give, we again do not believe that appellant has demonstrated prejudice entitling her to a new trial.

The district court informed counsel, several days before closing arguments, of its intention

> to rely on Devitt and Blackmar on the standard jury instruction in terms of the civil rights statute. I'm going to use my standard instructions, which are a humanized version of Devitt and Blackmar.

J.A. at 2651. While appellees may be correct that Rule 51 does not require the court to provide counsel with the exact words it intends to use in instructing the jury, *see, e.g., Dunn v. St. Louis-San Francisco Ry. Co.,* 370 F.2d 681, 683 (10th Cir.1967) ("The court may inform counsel in general terms suitable to this purpose, and need not ... do so in a sentence-by-sentence outline."), it is also undoubtedly true that the rule *does* require, at the very least, that the court make

clear in advance *which* instructions in substance it intends to give. *See, e.g., Jones v. Southern Pacific R.R.,* 962 F.2d 447, 451 (1st Cir.1992) ("It is enough that counsel be apprised of the *substance* of the instructions." (emphasis added)). To hold otherwise would undermine the manifest purpose of the provision, which courts have identified as "promot[ing] intelligent advocacy by opposing counsel," and allowing counsel to "pattern their closing arguments on the points of law that will be explained to the jury in the final charge." *Estate of Stuart Lutren v. Chesapeake and Ohio Railroad,* 592 F.2d 941, 945 (6th Cir.1979); *see Wiedersum Assocs. v. National Homes Constr. Corp.,* 540 F.2d 62, 66 (2nd Cir.1976). Where, as here, the defendants have requested a qualified immunity instruction, a vague statement that the court intends to "rely on Devitt and Blackmar on the standard jury instruction in terms of the civil rights statute" cannot adequately serve this purpose, as the statement gives no indication at all whether the court intends to give some variant of that particular requested instruction (which, according to the treatise to which the court referred, is to be given in "relatively rare and limited" circumstances).

 **\*9**   Nonetheless, "noncompliance with [Rule 51] does not warrant a new trial unless material prejudice is shown to exist." *Hardigg v. Inglett,* 250 F.2d 895, 897 (4th Cir.1957). Given the provision's purpose, material prejudice from the court's failure to comply with Rule 51's notice requirement is generally established by a showing that the error "hinder[ed] [counsel] in their ability to present summations which fully dealt with the issues to be placed before the jury."*Wiedersum Assocs.,* 540 F.2d at 66. However, appellant does not argue before this court that her counsel's closing argument was adversely affected by the court's failure to comply with the rule. Rather, she contends only that counsel was prejudiced in his ability properly to object to the instructions that were actually given. Because we have determined, *see infra,* that any error in the instructions was harmless, we must also conclude, *a fortiori,* that appellant was not materially prejudiced by her counsel's asserted inability properly to object to those instructions. [6] Accordingly, because appellant has not even suggested that her counsel's summation suffered as a result of the court's non-compliance with Rule 51 and because the instructions in question did not themselves constitute reversible error,we do not find the material prejudice that would entitle appellant to a new trial. [7]

For these reasons, we affirm the judgment that the sheriff's deputies did not violate Brown's constitutional rights.


### III.

Hoy also appeals the district court's dismissal of the federal civil rights claims in her Second Amended Complaint alleging that the Sheriff and the County violated Brown's constitutional rights by failing properly to train the deputies or to provide adequate procedures for the screening and care of intoxicated detainees. The district court dismissed the complaint on the specific ground that plaintiff had not "adequately ple[d] sufficient facts to sustain a case involving deliberate indifference to the degree that a constitutional violation occurred,"

and that "principles of qualified immunity as well as the concepts of sovereign immunity" dictated this result. We affirm the dismissal of the federal civil rights claims, but do so on different grounds than those relied upon, or alluded to, by the

Appeal: 13-1588    Doc: 20    Filed: 07/16/2013    Pg: 85 of 121

Hoy ex rel. Brown v. Simpson, 182 F.3d 908 (1999)

district court. Rather, we affirm the dismissal of these claims because the jury's finding that the sheriff's deputies inflicted no constitutional injury on Brown removed any basis for liability of the County or the Sheriff under section 1983.

Municipal governments cannot be held liable under section 1983 on the basis of *respondeat superior. See Monell v. New York City Dep't of Social Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Rather, in order to establish municipal liability, a plaintiff must show the existence of a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Canton v. City of Harris,* 489 U.S. 378, 384, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Where the claim against the municipality is that its failure, or the failure of its policymakers, to provide proper training resulted in the alleged constitutional deprivation, liability will lie only where the "city's failure to train reflects deliberate indifference to the constitutional rights of its inhabitants." *Id.* at 392.

 **\*10**  The district court, in granting the motion to dismiss, focused only on the question whether appellant had sufficiently pled this necessary causal link. That is, the district court dismissed the claims after concluding that appellant had not alleged facts that could establish that the county's failure to train the sheriff's deputies reflected "deliberate indifference" to the constitutional rights of its inhabitants. *Id.* at 392. While we are dubious that such a determination could legitimately be made as a matter of law from the four corners of the complaint, we nonetheless affirm the judgment of dismissal. In light of the jury verdict, herein affirmed, that none of the individual sheriff's deputies was deliberately indifferent to Brown's serious medical needs, and thus that he suffered no constitutional deprivation, there simply is no basis for municipal liability even if appellant *could* establish that the county was deliberately indifferent under *Canton v. Harris. See City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) (*per curiam* ) ("[N]either *Monell v. New York City Dept. of Social Services* ... nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm."); *Giancola v. State of West Virginia Dept. of Pub. Safety,* 830 F.2d 547, 550 (4th Cir.1987) ("If the officers' actions were in compliance with constitutional standards, there is no liability on the part of ... the employing entities."); *Hinton v. City of Elwood, Kan.,* 997 F.2d 774, 782 (10th Cir.1993) ("A municipality may not be held liable where there was no underlying constitutional violation by any of its officers."). Accordingly, we affirm dismissal of the section 1983 claims against Loudoun County and the Sheriff.

## IV.

Finally, while we readily affirm the dismissal of the pendent state law negligence and gross negligence claims against the County on sovereign immunity grounds, *see Mann v. County Board,* 199 Va. 169, 98 S.E.2d 515(1957), we cannot do so, at least without further explanation, with respect to those same claims brought against the Sheriff in his individual capacity. Neither the district court in its order from the bench nor appellees in their briefs on appeal has attempted to explain why these state law claims against the Sheriff should not survive the motion to dismiss under Virginia tort law. Accordingly, we vacate the dismissal of the pendent state law claims against Sheriff Simpson and remand for consideration of their proper disposition.

## CONCLUSION

For the reasons stated herein, we affirm in part and vacate in part the judgment of the district court, and remand for further proceedings.

 **\*11**  *AFFIRMED IN PART, VACATED IN PART, AND REMANDED*

**Parallel Citations**

1999 WL 427193 (C.A.4 (Va.))

Hoy ex rel. Brown v. Simpson, 182 F.3d 908 (1999)

Footnotes

1    Although *Farmer v. Brennan* considered the "deliberate indifference" standard in the context of a prisoner's claim of a violation of the Eighth Amendment's prohibition against cruel and unusual punishment, this court has previously held that the same standard applies to due process

    claims brought by pre-trial detainees like Brown. *Gordon v. Kidd,* 971 F.2d 1087, 1094 (4th Cir.1992). In any event, plaintiff has not challenged the applicability of the deliberate indifference standard to either of the section 1983 counts of her complaint, in the district court or on appeal. Rather, she contends only that the district court did not properly instruct the jury as to the application of that standard.

2    In returning in less than three hours with unanimous verdicts indicating its wholesale acceptance of this defense, the jury demonstrated a view of the evidence presented at trial that was obviously shared by Judge Brinkema, who told counsel that plaintiff had presented "a weakcase," and that the court had given plaintiff the "benefit of the doubt" by not granting defendant's motion for judgment as a matter of law at the end of plaintiff's case. J.A. at 2871.

3    Indeed, the Supreme Court noted that the very term "gross negligence" was generally synonymous with the civil law recklessness that the Court held could not support a finding of a constitutional deprivation. *Farmer,* 511 at 836 n. 4.

4    Alternatively, the jury may have found that the defendants *were* grossly negligent, but that their gross negligence was not a proximate cause of Mr. Brown's injuries. J.A. at 2847. Indeed, defense counsel argued persuasively in his closing arguments that "Kevin Brown's medical emergency had nothing to do with his handling at the jail," J.A. at 2790, and that the plaintiff had not proven that "Brown would be any better off today if the deputies had acted differently." J.A. at 2791. A jury finding that the plaintiff had failed to establish proximate cause for purposes of the gross negligence claim would necessarily serve to defeat plaintiff's constitutional claims as well. *See* J.A. at 2844 (jury instructions) ("Now the third element in a civil rights action is proximate cause. And by the way, proximate cause also runs through the state cause of action for gross negligence, so this will help you on both of those.").

5    Rule 51 provides as follows:

    At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury.... No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection.

6    In light of the district court's deviation from the terms of the rule, we have, in an abundance of caution, reviewed appellant's specific claims of instructional error despite her counsel's arguable failure to preserve these

    exceptions with the degree of specificity the rule also requires. *See, e.g., Jerlyn Yacht Sales, Inc.,* 950 F.2d 60, 66 (1st Cir.1991) ( "[S]imply referring by number to a request filed prior to the charge is not sufficient to preserve an objection to the court's failure to give the requested instruction."). We have done so out of recognition that an additional consequence of the court's refusal to advise the parties in advance of its proposed action on their requested instructions was to leave plaintiff's counsel scrambling at the last moment to determine which of the parties' instructions the court actually gave, and in what form, so that counsel could properly frame and preserve her objections before the jury retired.

7    We note that the district court, in defending its "practice" of refusing to advise counsel any more specifically of its intentions with respect to requested instructions, commented that this practice had "not yet been addressed or criticized by the Court of Appeals." J.A. at 2899. The fact that we find no *reversible* error in *this* case should not be confused with an absence of "criticism" of a practice that we believe falls considerably short of the mandatory requirements of the Federal Rules of Civil Procedure and which, in some future case, will inevitably result in exactly the material prejudice to one or another party that the rule was designed to prevent.

**End of Document**                                                      © 2013 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 1659907
United States District Court,
N.D. Indiana,
Hammond Division.

Mathew NADOLSKI, as Personal Representative of the Estate of Melissa Puza, Plaintiff

v.

Michael HUNNICUT and the Porter County Sheriff's Department, Defendants. [1]

Cause No. 2:07–CV–164.    |    June 15, 2009.

**Attorneys and Law Firms**

Roseann P. Ivanovich, Merrillville, IN, Ross Hubbell, Young & Hubbell, Gary, IN, for Plaintiff

**Opinion**

**OPINION AND ORDER**

WILLIAM C. LEE, District Judge.

 *1  This matter is before the court for resolution of several pending motions. The defendants, Michael Hunnicut ("Hunnicut") and the Porter County Sheriff's Department ("Sheriff's Department") filed a motion for summary judgment on February 18, 2009. Docket at 56. The plaintiff, Mathew Nadolski ("Nadolski"), filed a response in opposition to the motion on March 18, 2009. Docket at 65. The defendants filed a reply brief on April 6, 2009. Docket at 70. Also, on April 3, 2009, the defendants filed a motion to strike the testimony of one of the plaintiff's witnesses. Docket at 67. The plaintiff filed a response to that motion on April 9, 2009 (docket at 74) and the defendants filed a reply on April 21, 2009 (docket at 75). In addition, the plaintiff filed a motion to strike the defendants' reply brief in support of their motion for summary judgment on April 6, 2009 (docket at 71), to which the defendants responded on April 7, 2009 (docket at 73). As of the date of this Opinion and Order, the plaintiff had not filed a reply brief concerning this motion. Finally, also on April 7, 2009, the defendants filed a motion for leave to file their reply brief in support of their motion for summary judgment *instanter.* Docket at 72. The plaintiff has not filed a separate response to this particular motion.

For the reasons discussed below, the plaintiff's motion to strike the defendants' reply brief is DENIED; the defendants' motion for leave to file their reply brief *instanter* is DENIED AS MOOT; the defendants' motion to strike the testimony of Dr. Nikkalyn Delaurentis is DENIED; and the defendants' motion for summary judgment is GRANTED in part and DENIED in part.

**I. FACTUAL BACKGROUND**

The facts giving rise to this lawsuit are tragic. On July 23, 2006, Melissa Puza, who was 29 years old and the mother of four children, was incarcerated as a pretrial detainee in the Porter County Jail in Valparaiso, Indiana. Puza was arrested on that date on charges of possession of a controlled substance, possession of drug paraphernalia, and criminal trespass. During a body search conducted as part of the Jail's processing procedure, officers found "crack" cocaine concealed in Puza's vagina. Puza was placed in a standard holding cell with other inmates and/or detainees. On July 24, Puza was placed in a medical isolation cell after other prisoners in the holding area alerted jail staff that she was vomiting. At 10:20 p.m. on that date, Puza was found unresponsive in her cell and transported to a hospital, where she later died due to cardiac dysrhythmia as a result of cocaine toxicity.

Nadolski was appointed Personal Representative of the Estate of Ms. Puza and brought this lawsuit on based on 42 U.S.C. § 1983, alleging that the defendants are liable for damages for her death. He also asserts claims on behalf of Puza's four children under the Indiana Survival statute, I.C. 34–9–3–4, and a claim under the Indiana Wrongful Death statute, I.C. 34–23–1–1. Nadolski alleges that the Porter County Sheriff's Department is liable under § 1983 for having denied Puza adequate medical care while she was incarcerated. Nadolski also alleges that Michael Hunnicut, an officer with the Sheriff's Department, is liable because he was deliberately indifferent to Puza's serious medical condition.[2] In their motion for summary judgment, the defendants raise numerous defenses they claim entitle them to judgment as a matter of law. Additional facts will be discussed below as they become relevant to the court's analysis and discussion.

## II. SUMMARY JUDGMENT STANDARD

 **\*2**  Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the nonmoving party. *See id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *id.,* 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.,* 209 F.3d 687, 692 (7th Cir.2000).

Summary judgment is not a substitute for a trial on the merits nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir.1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enterprises, Inc. v. First Chicago Corp.,* 975 F.2d 1290, 1294 (7th Cir.1992); *Wolf v. City of Fitchburg,* 870 F.2d 1327, 1330 (7th Cir.1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *See Celotex,* 477 U.S. at 322; *Ziliak v. AstraZeneca LP,* 324 F.3d 518, 520 (7th Cir.2003). A failure to prove one essential element "necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 323.

The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Celotex,* 477 U.S. at 325. A plaintiff's self-serving statements, which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment. *Albiero v. City of Kankakee,* 246 F.3d 927, 933 (7th Cir.2001); *Stagman v. Ryan,* 176 F.3d 986, 995 (7th Cir.1999); *Slowiak v. Land O'Lakes, Inc.,* 987 F.2d 1293, 1295 (7th Cir.1993).

## III. DISCUSSION

### A. Plaintiff's "Motion to Strike Defendants' Reply in Support of Their Motion for Summary Judgment as Untimely Filed" and Defendants' "Motion for Leave to File Their Reply in Support of Their Motion for Summary Judgment, *Instanter."*

 **\*3**  Nadolski wants the court to strike the defendants' reply brief because it was filed late. Motion to Strike, p. 1. Nadolski points out that the defendants' reply brief was due to be filed on April 2, 2009, but was not filed until April 3. *Id.,* pp. 1–2. On April 7, the defendants filed their Motion for Leave to File their Reply Brief in Support of their Motion for Summary Judgment, *Instanter.* On that same date, the defendants filed their response to Nadolski's motion to strike. In their response, the defendants

offer a *mea culpa,* stating that the late filing of their reply brief was "due to a clerical error." Defendant's Response to Motion to Strike, p. 2. The defendants also argue that "the delay of one day was not done in bad faith nor does it amount to prejudice to the Plaintiff." *Id.* The defendants also contend that "denying [them] the ability to reply to Plaintiff's Response in Opposition to the Defendants' Motion for Summary Judgment would amount to undue prejudice to Defendants." *Id.*

Filing deadlines, whether established by the Federal Rules, Local Rules, or by Order of this court, are expected to be strictly adhered to since they are established for the benefit of both parties as well as the court. Such deadlines help ensure the efficient management of the case. That said, Nadolski is requesting an extraordinary remedy given the minor (if not insignificant) nature of the defendants' infraction. Tellingly, Nadolski does not argue in his motion to strike that he was somehow prejudiced by the one day delay in the filing of the defendants' reply brief. Also, this case is hotly contested and replete with factual disputes and legal issues. Striking the defendants' reply brief for a minor mistake would deny them the opportunity to fully present their arguments and would deny the court the benefit of a fully briefed motion for summary judgment. For these reasons, the plaintiff's motion to strike the defendants' reply brief in support of their motion for summary judgment is DENIED. As a result of this court's denial of the plaintiff's motion to strike, and the fact that the defendants' reply brief was already filed and docketed in this case (see docket at 70), the defendants' motion for leave to file *instanter* is DENIED AS MOOT.

### B. Defendants' Motion to Strike Deposition Testimony of Dr. Nikkalyn Delaurentis.

The defendants move the court to strike the testimony of Dr. Nikkalyn Delaurentis, an expert witness designated by the plaintiff. Defendants' Motion to Strike, docket at 67. The defendants contend that the testimony "does not meet the requirements of Federal Rule of Evidence 702 or *Daubert v. Merrill Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 ... (1993)." *Id.,* p. 1. In addition, the defendants argue that Nadolski "fails to show in his [response to the defendants' motion for summary judgment] how Delaurentis is qualified to render the opinions contained therein." *Id.,* p. 2.

 **\*4** Federal Rule 702 states, in relevant part, as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon significant facts or data, (2) his testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The *Daubert* case and its progeny mandate that the trial court assess any proposed expert testimony to ensure that it meets the requirements for admissibility under Fed.R.Evid. 702. *Daubert,* 509 U.S. at 597. In *Daubert* the Supreme Court explained that the standard under Federal Rule of Evidence 702 does not depend upon whether the proposed evidence is "generally accepted," but requires that the evidence be reliable and relevant. The Court established the district courts as the "gatekeepers" for determining whether the proffered evidence meets the Federal Rule of Evidence 702 standard. As explained by the Court, "faced with a proffer of expert scientific testimony ... the trial judge must determine at the outset ... whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id.* at 592, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469. "This entails a preliminary assessment of whether the reasoning or methodology ... can be applied to the facts in issue." *Id.* at 592–93, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469. The Court stated that in order to "qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method." *Id.* at 590, 113 S.Ct. at 2795.

To assist the district courts in performing their gatekeeper role, the Supreme Court in *Daubert* listed four non-exclusive factors to be considered: (1) whether the theory or technique can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) whether it has a known or potential rate of error; and (4) whether it has been generally accepted within the scientific community. *Id.* at 592–94, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469.

Nadolski v. Hunnicut, Not Reported in F.Supp.2d (2009)

79 Fed. R. Evid. Serv. 1210

The defendants argue that Delaurentis's "opinions are not the product of reliable principles and methods and she has not applied the principles and methods reliably to the facts of the case. The portions of Delaurentis's deposition testimony cited by the Plaintiff in his reply contain a regurgitation of facts and a multitude of conclusions on ultimate issues of fact without any scientific basis or explanation based on the witness's alleged expertise, training, education, knowledge, skill, or experience." Defendants' Motion to Strike, p. 3. The defendants maintain that Delaurentis is unqualified to testify about medical procedures in a jail setting since she has never practiced medicine in such a setting and she admits she is not familiar with any state or federal laws concerning the standard of care that must be provided to prisoners and/or detainees. Defendants' Memorandum in Support of Motion to Strike, pp. 3–4. The defendants also argue that "Delaurentis's deposition [testimony] does nothing to assist a trier of fact in determining the issues. In the instant matter, the pertinent inquiries as they relate to these Defendants are: (1) whether ... Hunnicut was deliberately indifferent to a serious medical need of Puza; (2) whether the Porter County Sheriff's Department had a policy, custom or practice of denying medical care to its detainees; and (3) whether a failure to train the corrections officers in responding to the medical needs of the jail's detainees resulted in a deprivation of Puza's constitutional rights." *Id.,* pp. 4–5. According to the defendants, Delaurentis's testimony "does not aid a trier of fact in answering or understanding any of these questions. The defendants state that "to prove deliberate indifference, Plaintiff must show that Defendants were subjectively aware of the substantial risk of a serious harm to Puza and disregarded it.... Delaurentis's opinions make no mention of the subjective belief of corrections officer Hunnicut." *Id.,* p. 5. Finally, the defendants argue that "Delaurentis does not testify as to any other similar instances of constitutional injury due to custom or policy in the jail that may tend to establish a widespread and unconstitutional custom, policy or procedure on the part of the Porter County Sheriff's Department, nor does she offer any testimony regarding the training of jail staff." *Id.* For these reasons, the defendants maintain that the testimony of Delaurentis should be barred under Fed.R.Evid. 702 and *Daubert.*

**\*5** In his response, Nadolski argues that "Dr. Nikkalynn Delaurentis is testifying as an expert in emergency care, substance abuse and its effects, and the signs, symptoms and consequences of overdosing on cocaine.... She is not, at this time, testifying as an expert in jail medical care.[3] Her testimony will assist the trier of fact in assessing the medical aspects of this case.... She is a physician with extensive experience in the areas to which she is testifying, and she applied her experience, principles and methods to the facts of this case." Plaintiff's Response to Defendants' Motion to Strike, docket at 74, pp. 1–2.

In their reply brief, the defendants reiterate that, notwithstanding the fact that Delaurentis is a physician, "she has absolutely no experience with the care or treatment of individuals in a jail or corrections setting." Defendants' Reply in Support of Motion to Strike, docket at 75, p. 3. The defendants also argue that by presenting the testimony of Delaurentis, Nadolski is attempting "to spin this lawsuit into a medical malpractice claim." *Id.,* p. 5. Finally, the defendants point out that during her deposition, Delaurentis, after admitting that she was not versed or trained as to the standard of medical care the law mandates should be provided to jail inmates or detainees, stated that she believed it is the same standard of care that must be provided in a conventional hospital setting. *Id.,* p. 3. The defendants point out, correctly, that " '[u]nder the Eight Amendment, [plaintiff] is not entitled to demand specific care.' " *Id.* (quoting *Forbes v. Edgar,* 112 F.3d 262, 267 (7th Cir.1997)). It is well established that pretrial detainees are entitled to reasonable medical care and that jail officers and officials must take reasonable measures to prevent a substantial risk of harm to a detainee. *Williams v. Rodriguez,* 509 F.3d 392, 401 (7th Cir.2007) The defendants are correct that the standard of medical care that must be provided to such detainees does not necessarily have to be equivalent to what a patient would receive in a standard hospital or clinical setting, so long as the care rendered was not "blatantly inappropriate." *Edwards v. Snyder,* 478 F.3d 827, 831 (7th Cir.2007) (quoting *Snipes v. DeTella,* 95 F.3d 586, 592 (7th Cir.1996)). In that respect, Delaurentis's statement during her deposition that, in her opinion, Puza would have been entitled to the same level of medical care in the Porter County Jail that she would have received in a hospital is a misstatement of the law. Such a conclusion or opinion should not be permitted at trial since it could mislead the jury. For purposes of the present motion for summary judgment, however, the court will simply not consider the statement since it is not relevant to the court's analysis.[4]

The court refuses, however, to strike Delaurentis's testimony entirely. While the defendants are correct that Delaurentis is not qualified to offer opinion or conclusions concerning Hunnicut's subjective beliefs concerning Puza's medical condition, or opinion or conclusions concerning whether any failure on the part of the Sheriff's Department to train its personnel properly resulted in the denial of Puza's constitutional rights, she is qualified to testify about the emergency medical effects of cocaine

ingestion, the effects of cocaine overdose, the symptoms of cocaine intoxication, and perhaps other medically based facts, opinions, and conclusions concerning how cocaine intoxication would affect a woman of Puza's age and physical condition. In fact, testimony from a medical professional will likely be crucial in a case such as this. Competent medical testimony about the effects of cocaine ingestion, intoxication, and overdose will assist the jury in understanding what happened to Puza, why she experienced the symptoms she did on the day of her death, and, ultimately, whether Hunnicut deliberately ignored a serious health condition that Puza was experiencing and/or whether the Sheriff's Department properly trained its jail personnel to identify and respond to such a situation. This is not to say that Delaurentis or any other medical expert will be permitted to offer an opinion or conclusion on those ultimate issues, but such witnesses can certainly aid the jury in understanding the medical issues at play in this case. The extent to which the court will allow such expert testimony and/or the restrictions the court might place on such testimony will no doubt be addressed by way of pretrial motions in limine and the court's ruling on any such motions. But for purposes of the present motion for summary judgment, the court will consider the testimony elicited from Delaurentis to the extent it is probative of any issue presently before the court. For these reasons, the defendants' motion to strike Delaurentis's deposition testimony in its entirety is DENIED.

### C. Defendants' Motion for Summary Judgment.

**\*6** Hunnicut and the Sheriff's Department base their motion for summary judgment on several different theories. Hunnicut asserts that he is entitled to summary judgment on Nadolski's claim against him under 42 U.S.C. § 1983 since he "was not deliberately indifferent to Melissa Puza's medical needs." Defendants' Memorandum in Support of Motion for Summary Judgment ("Defendants' Memorandum"), docket at 59, p. 18. Hunnicut also argues that he is entitled to qualified immunity, which bars any § 1983 claim against him. *Id.,* p. 25. The Sheriff's Department argues that it is entitled to summary judgment because "the undisputed facts establish that the Department did not have a custom, policy or practice of denying inmates medical care" and did not fail to train its employees properly. *Id.,* pp. 26–28. In addition, both Hunnicut and the Sheriff's Department argue that they are entitled to immunity from any claims under the Indiana Wrongful Death statute or the Survival statute. *Id.,* pp. 31–33. Finally, both defendants assert that Nadolski's claims are barred by the doctrine of *res judicata. Id.,* pp. 33–36.

### 1. Claims Against Hunnicut Under 42 U.S.C. § 1983.

Hunnicut was employed as a Corrections Officer at the Porter County Jail at the time of the incidents giving rise to this lawsuit. Defendants' Memorandum, p. 11. Hunnicut was on duty from 3:00 p.m. until 11:00 p.m. on July 24, 2006. *Id.* When Puza was processed into the Jail she was searched pursuant to standard intake protocol. During that search, crack cocaine was found inside Puza's vagina. Plaintiff's Response to Motion for Summary Judgment ("Plaintiff's Response"), p. 8. As stated above, once inmates informed Jail personnel that Puza was vomiting she was moved to a separate cell, which also was equipped with an in-cell surveillance camera that allowed staff to monitor Puza on video. *Id.* On the videotape, Puza can be seen tossing about on a bed or cot, and is also seen vomiting several times.[5] At approximately 7:35 p.m. on July 24, Puza either rolls or falls off her cot and onto the floor. Nadolski maintains that "no staff member ever took Puza's vitals, otherwise examined Puza, or provided even cursory medical treatment." *Id.,* pp. 8–9.

*Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), teaches that a "prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Id.* at 828 (internal quotation omitted). A claim of deliberate indifference includes an objective component and a subjective component. First, the risk must be objectively serious, "one that society considers so grave that to expose any unwilling individual to it would offend contemporary standards of decency." *Christopher v. Buss,* 384 F.3d 879, 882 (7th Cir.2004) (emphasis in original); *see Farmer,* 511 U.S. at 832–34. Second, prison officials must have known of and disregarded the "excessive" risk of harm to the inmate. *Farmer,* 511 U.S. at 832–37. Negligence alone will not satisfy the requirements of deliberate indifference. *Davidson v. Cannon,* 474 U.S. 344, 347–48, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986).

**\*7** Pretrial detainees have a right to adequate medical care under the Fourteenth Amendment. *See Williams v. Rodriguez,* 509 F.3d 392, 401 (7th Cir.2007). Claims of inadequate medical care under the Fourteenth Amendment are analyzed using the same standard for deliberate indifference employed for an Eighth Amendment claim. *Id.* To succeed on such a claim for

a pretrial detainee such as Puza, Nadolski must prove that Puza had a serious medical need and that the defendants were deliberately indifferent to the need. *See Estelle v. Gamble,* 429 U.S. 97, 105–06, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Hayes v. Snyder,* 546 F.3d 516, 522 (7th Cir.2008). Deliberate indifference is a high standard requiring a plaintiff to prove that the defendants were aware of facts from which a substantial risk of serious harm could be inferred and that they actually drew that inference. *See Farmer,* 511 U.S. at 837; *Hayes,* 546 F.3d at 522. "[I]t is important to emphasize that medical malpractice, negligence, or even gross negligence does not equate to deliberate indifference." *Johnson v. Doughty,* 433 F.3d 1001, 1013 (7th Cir.2006). "Mere dissatisfaction or disagreement with a course of treatment is generally insufficient; [the courts] will defer to a medical professional's treatment decision unless 'no minimally competent professional would have so responded under those circumstances.' " *Id.* (internal citation omitted).

Hunnicut maintains that he was not subjectively aware of any serious medical need Puza had during her detention, and that he therefore was not deliberately indifferent to that need. Defendants' Memorandum, pp. 18–22. In support of this argument, Hunnicut claims that he "does not have any medical training besides the training he received in his corrections officer training." *Id.,* p. 18. He claims that he "relied on the opinions of the medical experts in the jail to render medical care to the detainees." *Id.* He admits, however, that he "had authority to render medical care to detainees at the Porter County Jail as a first responder ..." and that his "first responder duties are CPR and first aid." *Id.* He states that he "was not trained in monitoring patient vitals such as temperature or blood pressure." *Id.,* p. 19. (Curiously, however, his training did include learning how to use an electronic defibrillator. *Id.*) Hunnicut further states that when he "came on shift on July 24, 2006 at 3:00 p.m. he was not told anything about Puza's condition...." He "was not present at the Porter County Jail when Puza arrived...." He "was not present when Puza was booked into the jail[.] ..." and "he was not aware that Puza came in to the jail with contraband concealed on her person...." *Id.* (citing portions of the Deposition of Michael Hunnicut, Defendants' Exhibit I). The defendants concede that there are video cameras located in various places in the jail, including the medical isolation cell where Puza was eventually placed (and where she was housed during Hunnicut's shift). However, Hunnicut claims that "[t]here is not one officer constantly watching the monitors that monitor medical isolation." *Id.*

 **\*8**  Hunnicut claims that "[t]he only times that [he] personally observed Puza was when he performed his watch tour checks at approximately 9:46 p.m. and 10:20 p.m." *Id.* [6]  In the course of conducting these "watch tours," Hunnicut "would look into each cell and check on everyone.... On his first watch tour ... Hunnicut observed inmate Puza lying on the floor on her stomach with her head turned to the side.... Hunnicut checked Puza to see if she was breathing[.]" and he "observed chest movements and could hear breaths.... He stood observing Puza for one to two minutes...." *Id.,* pp. 19–20. According to his deposition testimony, Hunnicut was not alarmed by the fact that Puza was lying on the floor, since "it was cooler on the floor than in the higher level in the cell[.]" and it was not uncommon to see detainees lying on the floor. *Id.,* p. 20. Hunnicut claims that when he first saw Puza he did not detect any medical problem and that "[n]o one working at the Porter County Jail on July 24, 2006 ever gave [him] any indication that Puza was in need of medical attention." *Id.* Finally, Hunnicut states that "Puza herself never gave Hunnicut any indication that she was in need of medical attention[.]" and his own "observations of Puza did not make him believe that Puza was going through withdrawal." *Id.*

Hunnicut claims he next observed Puza at 10:20 p.m. during his second "watch tour," when he noticed that she was lying on the floor in the same position and appeared not to be breathing. *Id.,* p. 21. Hunnicut notified other confinement officers and began to administer CPR. *Id.* Another officer contacted emergency medical services (EMS), which arrived soon and transferred Puza to Porter County Hospital. *Id.* Hunnicut rode in the ambulance with Puza to the hospital. *Id.* Puza was declared dead at 11:25 p.m. and her death was determined to be the result of cardiac dysrhythmia due to cocaine toxicity. *Id.,* p. 22 (citing Indiana Department of Health Certificate of Death, Defendants' Exhibit L; Plaintiff's Exhibit 6). Hunnicut maintains that these "undisputed facts in the record establish that Officer Hunnicut was not subjectively aware of a substantial risk of serious harm to Puza as he was unaware that Puza was in need of medical care whatsoever until the time he discovered her unresponsive." *Id.,* p. 20.

Based on this version of the factual scenario, Hunnicut argues that he was not subjectively aware that Puza had any medical problem and that he was not deliberately indifferent to her medical needs, and is entitled to summary judgment in his favor on Nadolski's claim against him under 42 U.S.C. § 1983.

In his response brief, Nadolski challenges Hunnicut's version of the facts-and his assertion that he was unaware that Puza had a serious medical problem-by presenting the testimony of Emily Mierwa, who was a cellmate of Puza's, and the testimony of Bill Steele, who was a trustee in the jail. Mierwa testified in her deposition that on the morning of July 24, she observed Puza vomiting, noticed that one of Puza's eyes was dilated, and that Puza was not engaging in lucid conversation. Plaintiff's Response, pp. 23–24 (citing portions of deposition of Mierwa, Plaintiff's attachment 1, pp. 36–53). A few hours later, Mierwa noticed Puza's eyelids "fluttering" and "her eye would be like rolling around in her head." Mierwa Deposition, p. 42. At some point late in the morning on July 24, another cellmate named Tonya began pressing the in-cell intercom button to alert jail staff that Puza was ill and vomiting. *Id.,* p. 43. Mierwa testified that no jail staff arrived to check on Puza for "a couple of hours ...." *Id.* At that point, a nurse by the name of Ms. Dobson came to check on Puza but determined that she was okay and did not administer any medical care. *Id.,* p. 44. Dobson returned about one hour later and informed Mierwa that Puza "was fine and that she was just pregnant and dope sick .... " *Id.,* p. 45. Once again, according to Mierwa, Dobson did not provide any medical treatment for Puza, and did not take Puza's blood pressure or temperature. *Id.* About one hour after lunch time on that same day, Mierwa and other inmates began "pressing the [intercom] button repeatedly all day to no avail[.] ... because at this time Melissa's actions were becoming more erratic. She is dry heaving. This is when she really started to stare in space, become unresponsive." *Id.,* p. 47. Finally, several hours after Mierwa and Tonya began pressing the intercom button and alerting staff to what they felt was Puza's serious and deteriorating condition, Dobson and another staff member removed Puza from the holding cell. *Id.,* p. 53. When they did so, Dobson ordered Puza to "walk over here. We are going to take you out." *Id.* According to Mierwa, Puza replied, "I can't." Dobson then allegedly said, "what do you mean you can't? Of course you can." *Id.* Mierwa stated that Puza then "stumbled ... across the room to the wall from her bed, which was maybe a couple feet, and braced herself along the wall ... and she kind of stumbled to the door." *Id.*

**\*9** Bill Steele testified that he personally observed Puza while assisting jail guards in serving dinner to inmates and detainees. Plaintiff's Response, Attachment 1, deposition of Bill Steele, pp. 55–56. By this time, Puza had already been placed in a medical isolation cell. *Id.,* p. 56. When Steele returned to Puza's cell to retrieve her dinner plate, he noticed that "she was laying next to the toilet like, you know, not moving. And I had told the guard, Hey, you know, there's something wrong with, you know, this inmate." *Id.* Steele, who stated that he worked for ten years as an emergency medical technician (*id.* at 57) testified that Puza "was vomiting, she was pale, she was moving real slow, shaking ." *Id.,* p. 58. Steele advised a guard (*not* Hunnicut) of Puza's condition and the officer told Steele that Puza was "just dope sick and he just left her. He didn't get on his radio and call for help. There's a phone in there, he didn't call on the phone. The nurse's station is outside medical five feet [sic]. The door right across—right across the hall. He didn't go in there and tell the nurse nothing [sic]. He just went back to ... where he was stationed." *Id.*

The testimony of Mierwa and Steele make no mention of Hunnicut. Nonetheless, Nadolski presents this evidence and argues that it "proves" that Hunnicut must have been subjectively aware of Puza's serious medical condition since that condition began deteriorating quite seriously and dramatically several hours before Hunnicut began his shift. Plaintiff's Response, p. 23. Also, Nadolski points out that Hunnicut admitted in his deposition that he first observed Puza at approximately 5:00 p.m. during the dinner service, rather than at 9:46 as represented in the defendants' brief. *Id.,* p. 22 (citing Attachment 1, deposition of Michael Hunnicut, p. 29). Hunnicut also testified that "Ms. Puza did not complain to us of being ill at the time when we did med pass and dinner." *Id.,* p. 23; Hunnicut Deposition, p. 33. In addition, Hunnicut testified that "watch tours" were conducted hourly "from the 8:00 to 9:00 p .m. watch tour; the 9:00 to 10:00 p.m. watch tour; and the 10:00 to 11:00." *Id.* According to Nadolski, these statements by Hunnicut conflict not only with Hunnicut's earlier assertion that he only observed Puza twice (once at 9:46 and then at 10:20), but also with the testimony of Mierwa and Steele and "create [ ] and issue of fact as to whether ... Hunnicut [was] subjectively aware of Puza's serious medical needs." *Id.*

The difficulty with Nadolski's argument is twofold: first, as stated, neither Mierwa nor Steele mention that any of their concerns about Puza were relayed, either directly or indirectly, to Hunnicut; and second, Nadolski's argument that Hunnicut "would have

79 Fed. R. Evid. Serv. 1210

seen Puza in this condition and dinner and during his watch tour[.]" is presumptive. Thus, this evidence does not "prove" that Hunnicut was deliberately indifferent to Puza's medical needs, as Nadolski argues. On the other hand, the evidence does raise credibility issues. That is, what precisely did Hunnicut know and when did he know it? Nadolski claims that Mierwa's and Steele's testimony reveals that Puza was in serious distress beginning in the morning of the day she died, whereas Hunnicut alleges he did not observe any problem with her during the dinner hour, at 9:46 p.m. when he saw her lying on the floor of the medical isolation cell, or at any point in between. Then, at 10:20 p.m., Hunnicut noticed that Puza was not breathing, he called for help, and began administering CPR.

**\*10**  The facts of this case raise many questions. Notwithstanding Hunnicut's assertion that it is not uncommon for inmates or detainees to lie on the floor, Hunnicut's testimony regarding his actions when he observed Puza at 9:46 p.m. are curious. Puza was lying on the concrete floor next to her cot, and Hunnicut testified that he stood outside her cell for one to two minutes to make sure she was breathing. When he noticed her chest moving, he left without doing anything further. Nadolski argues that "[t]here would be no other good reason for Hunnicut to stand at the door for 2 minutes to see if Puza was breathing if he didn't think she was in serious need of medical attention." *Id.,* p. 28. That conclusion might be a stretch, especially since a jury could believe Hunnicut's claims that he knew nothing at all about any medical problem Puza was experiencing and didn't even know that she was being detained for drug possession. On the other hand, Hunnicut's actions beg the question, why did he simply stand outside Puza's cell (which after all was a medical isolation cell) to determine whether she was breathing, as opposed to entering the cell and attempting to assess her condition?

It is well established that a court may not (indeed, *cannot* ) make credibility determinations when analyzing and ruling on a motion for summary judgment. But Hunnicut's credibility is at the heart of his defense that he was completely unaware that Puza had a serious medical problem. Only a jury can resolve this fact question, after hearing Hunnicut's testimony and assessing his credibility. For this reason, the court will deny Hunnicut's motion for summary judgment on Nadolski's claim that Hunnicut was deliberately indifferent to Puza's serious medical needs.

Hunnicut also argues that he is entitled to qualified immunity from Nadolski's claims. Qualified immunity shields government employees from liability for civil damages arising from actions within the scope of their employment unless their conduct violated "clearly established ... constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *accord Thomas v. Ramos,* 130 F.3d 754, 763 (7th Cir.1997). Qualified immunity is an *"immunity from suit* rather than a mere defense to liability," *see Mitchell v. Forsyth,* 472 U.S. 511, 526–27, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). A court analyzes a defendant's claim of qualified immunity by determining (1) whether the facts alleged, "[t]aken in the light most favorable to the party asserting the injury, ... show the officer's conduct violated a constitutional right"; and (2) whether the right was clearly established at the time of its alleged violation. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Stated differently, even if the court concludes that the defendant's alleged actions were improper to the point of being unconstitutional, the defendant is still entitled to qualified immunity unless the unconstitutionality of the actions was clearly established at the time of their occurrence. *Id.*

**\*11**  "In determining whether a constitutional right has been clearly established, it is not necessary for the particular violation in question to have been previously held unlawful. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *see also Mitchell,* 472 U.S. at 535 n. 12 (holding that a clearly established right does not require judicial precedent to that effect). Instead, a clearly established constitutional right exists in the absence of precedent, where "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson,* 483 U.S. at 640. To that extent, government officials are considered "on notice" that conduct is violative of established law if the state of the law at the time gave them "fair warning" that their conduct would be unconstitutional. *Hope v. Pelzer,* 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). Pursuant to constitutional requirements, a pretrial detainee "may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell,* 441 U.S. at 535.

"Although the Eighth Amendment does not apply to pretrial detainees, pretrial detainees are entitled to *at least* as much protection as the constitution provides convicted prisoners. *See Cavalieri v. Shepard,* 321 F.3d 616, 620 (7th Cir.2003). The

Eighth Amendment protects an inmate from a governmental actor's "deliberate indifference to his basic needs." *Id.* at 620. Under this standard, conduct is "deliberately indifferent" when the official has acted in an intentional or criminally reckless manner, *i.e.,* "the defendant must have known that the plaintiff 'was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so.' " *Armstrong v. Squadrito,* 152 F.3d 564, 577 (7th Cir.1998) (quoting *West v. Waymire,* 114 F.3d 646, 651 (7th Cir.1997)). In *Armstrong,* the appellate court noted that "[u]nder other constitutional provisions [such as the Fourteenth Amendment] ... the standard for deliberate indifference appears closer to tort recklessness." *Id.* In recognition of this, the Seventh Circuit has articulated the test for deliberate indifference for Fourteenth Amendment purposes to be "a conscious disregard of known or obvious dangers." *Armstrong,* 152 F.3d at 577 (quoting *West,* 114 F.3d at 651). However, considering "the difficulty of peering into minds [of government officials or institutions]," this distinction is of little significance in practical application. *West,* 114 F.3d at 651. Thus, it is convenient and entirely appropriate to apply the same standard to claims arising under the Fourteenth Amendment (detainees) and Eighth Amendment (convicted prisoners) "without differentiation." *Henderson v. Sheahan,* 196 F.3d 839, 845 n. 2 (7th Cir.1999); *See Higgins v. Correctional Med. Servs. of Illinois, Inc.,* 178 F.3d 508, 511 (7th Cir.1999); *see also Mathis v. Fairman,* 120 F.3d 88, 91 (7th Cir.1997). In either case the plaintiff has the burden of showing that: (1) the harm to the plaintiff was objectively serious; and (2) the official was deliberately indifferent to her health or safety. *Cavalieri,* 321 F.3d at 620; *see also Farmer v. Brennan,* 511 U.S. 825, 834–37, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

 **\*12**  Hunnicut argues that "the undisputed facts establish that Hunnicut's actions did not violate Puza's constitutional rights[.]" and that "[t]he objective reasonableness of Hunnicut's conduct is unquestionable in this case ...."Defendants' Memorandum, p. 34. Accordingly, he states, he is entitled to qualified immunity.

There is no question that a detainee's right (or an inmate's right) to receive reasonable medical attention for a serious medical condition is a long and well-established constitutional right. *Board v. Farnham, et al.,* 394 F.3d 469, 481 (7th Cir.2005). For purposes of the present motion for summary judgment, the defendants' concede that Puza had a serious medical condition. The issue, then, is whether Hunnicut was deliberately indifferent to that condition. Given the court's conclusion that Hunnicut is not entitled to summary judgment on the § 1983 claim against him, he is likewise not entitled to qualified immunity. The issue of whether he was deliberately indifferent to Puza's medical needs turns on credibility, as the court has already discussed. In his response brief, Nadolski, when addressing the issue of qualified immunity, reiterates much of his factual recitation he presents with regard to the § 1983 claim against Hunnicut. Nadolski then concludes by stating that "[r]eviewing the facts of this case as they are considered most favorable to the plaintiff, this Honorable Court should conclude that there is sufficient evidence to determine that the plaintiff has alleged an objectively serious harm, and that Hunnicut was deliberately indifferent to [Puza's] serious need for medical assistance." Plaintiff's Response, p. 39. The court agrees with Nadolski's position. Considering the factual scenario in a light most favorable to the plaintiff, and resolving all factual disputes in favor of the plaintiff, makes it clear that genuine issues of material fact preclude the entry of summary judgment in favor of Hunnicut on the basis of qualified immunity.

## 2. Claims Against Porter County Sheriff's Department Under 42 U.S.C. § 1983.

The Seventh Circuit Court of Appeals has explained the parameters under which a municipality (or governmental unit such as a county sheriff's department) can be held liable for constitutional violations in an action under § 1983:

> "While a municipality is not vicariously liable under § 1983 for the acts of its employees, a constitutional deprivation may be attributable to a municipality 'when execution of a government's policy or custom ... inflicts the injury.' " *Montano v. City of Chicago,* 535 F.3d 558, 570 (7th Cir.2008) (citing *Monell,* 436 U.S. at 694, 98 S.Ct. 2018, 56 L.Ed.2d 611, and *Schlessinger v. Salimes,* 100 F.3d 519, 522 (7th Cir.1996)); *Eversole v. Steele,* 59 F.3d 710, 715 (7th Cir.1995) ("[M]unicipalities are answerable only for their own decisions and policies; they are not vicariously liable for the constitutional torts of their agents."). "A local government unit's unconstitutional policy or custom can be shown by: (1) an express policy causing the loss when enforced; (2) a widespread practice constituting a 'custom or usage' causing

the loss; or (3) a person with final policymaking authority causing the loss." *Walker v. Sheahan,* 526 F.3d 973, 977 (7th Cir.2008).

**\*13** *Houskins v. Sheahan,* 549 F.3d 480, 493 (7th Cir.2008).

The Sheriff's Department argues that its policies and procedures for handling the medical needs of detainees was adequate and proper. The Sheriff's Department states that "[t]he Porter County Jail has a medical isolation unit and full-time medical staff.... There is a medical office at the Porter County Jail for the medical staff.... The Porter County Jail entered into a contract with Advanced Correctional Healthcare in 2004 to provide better medical care at the jail.... A physician from Advanced Correctional Healthcare comes to the jail once a week to treat detainees.... Advanced Correctional Healthcare provided the Jail with protocols and procedures that were set out as guidelines to follow in treating inmate's medical needs .... the Advanced Correctional Healthcare protocols were guidelines rather than rules and regulations." Defendants' Memorandum, p. 22 (citing excerpts of depositions of Porter County Sheriff David Lain and Porter County Jail Warden John Widup, Defendants' Exhibits N and O, respectively).

In addition, the defendants point out that every person who is processed into the jail is assessed and "a medical screening report is filled out for every detainee ...." *Id.* If it is determined that a person has a serious medical condition, the jail will not place them in detention but, rather, will "have the arresting officer take the individual directly to the hospital." *Id.,* p. 23 (citing portion of deposition of Dobson). "During the nighttime hours when medical staff is not present in the building, Medical Director Cheryl Casko is available via telephone and radio." *Id.* Also, the defendants point out, "[t]here is a call button in each cell including the medical isolation cells.... If a detainee in the jail had a need for medical care, they could push a button inside their cell." *Id.* (citing Lain deposition). Based on the fact that the Porter County Jail has these medical procedures and precautions in place, the Sheriff's Department argues that it is entitled to summary judgment on Nadolski's § 1983 claims since "[t]here is no evidence of a custom, policy or practice of denying detainees medical care." *Id.,* p. 35. The Sheriff's Department argues that Nadolski "has not established a pattern of violations similar to the alleged violations of Puza's constitutional rights or the Porter County Sheriff's Department's awareness of such a pattern necessary to show a widespread practice and attach liability under 42 U.S.C. § 1983. Moreover, the Plaintiff has not pointed to a single policy, whether express or implied, of denying detainees of the Porter County Jail medical care." *Id.*

The Sheriff's Department also argues that Nadolski has failed to establish that the Department somehow failed to train its staff to handle medical problems properly. *Id.,* p. 37. The Department explains that "[n]ew hires at the Porter County Jail receive six weeks of initial training that covers a broad range of policies, procedures and practices." *Id.,* p. 38. During that training period, new hires spend three weeks in the Jail itself and "are with the Medical Department for at least one day." *Id.* Also, "[d]uring probationary period, the corrections officers have exposure to all sections of the jail including medical isolation. Each new jail officer gets a copy of the Rules and Regulations for the jail and all corrections officers are trained in CPR." *Id.*

**\*14**  In his response, Nadolski argues that there is evidence that the Sheriff's Department had in place certain customs and practices that establish (or at least raise a genuine issue of fact) that detainees in need of medical attention do not receive adequate medical care. Plaintiff's Response, pp. 13–20. For example, Nadolski claims that "[a]t the time of Puza's death, the Porter County Sheriff's Department had a custom and practice of requiring strict proof that a person had been vomiting before the staff would follow the protocol regarding vomiting and nausea." *Id.,* pp. 13–14. Nadolski points out that Warden Widup "testified that it was a custom and practice of the Porter County Jail staff to require inmates to show their vomit if they wanted to receive health care." *Id.,* p. 14 (citing portion of Widup Deposition, attachment 1). Nadolski also notes that Porter County Jail Medical Director Cheryl Casko "confirmed this custom and practice" in her deposition. *Id.,* p. 15. Casko did, indeed, testify that if an inmate or detainee is vomiting and asks for medical attention, the jail staff goes to the cell to ensure that the detainee is vomiting. *Id.;* attachment 2. Since Jail staff did not see any vomit in the holding cell or the medical isolation cell, they did not feel that Puza needed medical attention for that problem.

In this case, Puza's cellmate Mierwa testified that while Puza was vomiting both on the toilet and on a roll of toilet paper next to it, and while Mierwa and another cellmate informed jail staff of that fact, there was no vomit visible in the holding cell

Nadolski v. Hunnicut, Not Reported in F.Supp.2d (2009)

79 Fed. R. Evid. Serv. 1210

since Mierwa and another inmate "had cleaned up the vomit with little napkins." Plaintiff's Response, p. 24 (citing Mierwa Deposition, p. 44). Mierwa also testified that she placed some napkins "over the pile [of vomit] that was by [Puza]." *Id.* Even though Mierwa and another inmate relayed this information to Jail staff, Nurse Dobson did not administer any medical care to Puza when she visited the holding cell, and told Mierwa that Puza "was fine and that she was just pregnant and dope sick ...." Mierwa Deposition, p. 45. In addition, Nurse Dobson testified that the Jail would not administer medical care to a detainee who was vomiting unless a staff member actually saw the vomit. Dobson testified as follows:

Q. You mentioned about wanting to see Ms. Puza's vomit, for what reason?

A. To prove that she was vomiting, because while I was there she hadn't—she wasn't vomiting or anything, and, yes, I did think that something might have been wrong, but I have dealt with so many of them you don't really know what they are doing. So, until you can actually see—physically see it, we can't really do anything because there is so many stories told, and they try to get different things. And a lot of them know that if they are going to withdraw from drugs they try to say—they know what to say to try to get the withdrawal drugs, so until we actually see it there is nothing that we can really do.

**\*15** *Id.*, p. 17 (quoting Dobson Deposition, p. 26.

Nadolski argues that this testimony establishes "that Dobson was enforcing the express policy of the Porter County Sheriff's Department of requiring inmates complaining of nausea and vomiting to show vomit before receiving medical care, even in cases where the inmate's cellmates are advocating for the sick inmate, and the inmate is found sitting next to a toilet." *Id.* Nadolski alleges that this policy or custom of requiring an inmate or detainee to show their vomit to Jail staff before medical care will be rendered resulted "in the deprivation of Puza's constitutional rights. In Puza's case, Puza could not prove she was vomiting to the satisfaction of the jail staff, which had the obvious consequence of placing her at an excessive risk of harm ...." *Id.*, p. 15. Nadolski also reiterates that Puza can be seen vomiting, or at least appears to be vomiting, several times in the videotapes. [7] *Id.*, p. 19. Despite that, and despite the fact that the medical isolation cell was equipped with a video camera, no one administered medical care to Puza.

In addition to Nadolski's allegation that the Sheriff's Department had a custom or policy of not treating inmates or detainees who complain of vomiting unless staff members actually see the vomit, Widup's testimony revealed another very troubling policy (or lack of policy). Widup testified that corrections officers and other staff members at the Jail were not trained to detect or identify when a detainee or inmate was suffering from a drug overdose. Widup testified as follows:

Q.... Your staff does not know how to detect a drug overdose, never been trained for that, have they?

A. No.

Q. And you as Warden of this jail, Sheriff Reynolds, Sheriff Lain, none of the other administrators you know of has ever once taken one single measure to make sure that anybody in jail knows how to tell when somebody has overdosed on cocaine?

A. Right.

Plaintiff's Response, Widup Deposition, p. 13.

It is the plaintiff's position that this evidence establishes that the Porter County Sheriff's Department had in place a policy, custom or procedure that resulted in the denial of medical care to Puza and that liability can attach to the Department under § 1983 for that reason. The court concludes that this evidence at least raises a genuine issue of material fact concerning whether the policies or customs of the Sheriff's Department violated Puza's constitutional right to receive adequate medical care for a serious health condition. For these reasons, the court will deny the Sheriff's Department's motion for summary judgment.

**3. Claims Under Indiana Wrongful Death Statute and Survival Statute.**

79 Fed. R. Evid. Serv. 1210

The defendants argue that Nadolski does not have a viable claim under the Indiana Survival statute or the Indiana Wrongful Death statute. Defendants' Memorandum, pp. 39–44. They state that "[u]nder Indiana law, a claim may be made for either wrongful death OR survival, but not for both." *Id.,* p. 39 (citing *American International Adjustment v. Galvin,* 86 F.3d 1455, 1457 (7th Cir.1996)) (capitalization in original). The defendants maintain that "[i]f [a] victim dies as a result of [an] accident, the claim is for wrongful death. If the victim dies later from unrelated causes, that case is a survival action." *Id.* (citing *Galvin* ). In this case, the defendants argue, Nadolski is alleging that Puza died as a direct result of the acts or omissions of Hunnicut and the Sheriff's Department. Defendants' Memorandum, p. 40. Accordingly, they assert, Nadolski can assert a claim under the Indiana Wrongful Death statute on behalf of Puza's estate, but cannot state a claim under the Survival statute, since that statute provides for damages for pain and suffering the decedent experienced after an accident and before dying as a result of causes unrelated to the accident. Thus, the defendants move for summary judgment in their favor on Nadolski's claim under the Indiana Survival statute.

**\*16** The Indiana Survival statute, in its entirety, states as follows:

34–9–3–4 Action by decedent's representative based on personal injuries causing death

Sec. 4. (a) This section applies when a person:

(1) receives personal injuries caused by the wrongful act or omission of another; and

(2) subsequently dies from causes other than those personal injuries.

(b) The personal representative of the decedent who was injured may maintain an action against the wrongdoer to recover all damages resulting before the date of death from those injuries that the decedent would have been entitled to recover had the decedent lived. The damages inure to the exclusive benefit of the decedent's estate.

The Indiana Wrongful Death statute states, in relevant part, as follows:

34–23–1–1 Death from wrongful act or omission

Sec. 1. When the death of one is caused by the wrongful act or omission of another, the personal representative of the former may maintain an action therefor against the latter, if the former might have maintained an action had he or she, as the case may be, lived, against the latter for an injury for the same act or omission. When the death of one is caused by the wrongful act or omission of another, the action shall be commenced by the personal representative of the decedent within two (2) years, and the damages shall be in such an amount as may be determined by the court or jury, including, but not limited to, reasonable medical, hospital, funeral and burial expenses, and lost earnings of such deceased person resulting from said wrongful act or omission. That part of the damages which is recovered for reasonable medical, hospital, funeral and burial expense shall inure to the exclusive benefit of the decedent's estate for the payment thereof. The remainder of the damages, if any, shall, subject to the provisions of this article, inure to the exclusive benefit of the widow or widower, as the case may be, and to the dependent children, if any, or dependent next of kin, to be distributed in the same manner as the personal property of the deceased.

While there is no express language in either of these statutes stating that they are mutually exclusive, Indiana courts have ruled that they are, as the defendants argue. *See Smith v. Johnston,* 854 N.E.2d 388, 389–90 (Ind.App.2006) (a plaintiff cannot recover under both the Wrongful Death statute and the Survival statute); *Baumgart ex rel. Baumgart v. DeFries,* 888 N.E.2d 199, 207 (Ind.App.2008) (" 'the survival statute precludes recovery on both a wrongful death claim and a survival claim.' ") (quoting *Cahoon v. Cummings,* 734 N.E.2d 535, 544 (Ind.2000)).

The Indiana courts have held repeatedly that a claim under the Survival statute exists when a plaintiff has a cause of action for injuries caused by the defendants in a case, but later dies of an unrelated cause or causes. *Ellenwine v. Fairley,* 846 N.E.2d 657 (Ind.2006). Put another way, "[t]he Survival [statute] provides that if an individual who has a personal injury claim or cause of action dies, the claim or cause of action does not survive-unless the individual dies from causes other than those personal

injuries." *Technisand, Inc. v. Melton,* 898 N.E.2d 303, 305 (Ind.2008). The Survival statute provides a cause of action for a plaintiff who is injured as the result of the act or omission of another (an automobile accident, for example), but who later dies from unrelated causes (heart disease or cancer, for example). The plaintiff would be entitled to "recover all damages resulting before the date of death from those injuries that the decedent would have been entitled to recover had the decedent lived." However, when a plaintiff alleges that the acts or omissions of another individual or individuals *caused* the plaintiff's untimely death, a cause of action arises *only* under the Wrongful Death statute. In this case, Nadolski alleges that Puza died *due to* the acts and/or omissions of Hunnicut and the Sheriff's Department. As the defendants point out, Nadolski "has alleged that Puza's death was due solely to the Defendant[s'] negligence. Thus, the applicable statute is the Indiana Wrongful Death act, and the Plaintiff does not have a claim under the Indiana Survival Statute." Defendants' Memorandum, p. 40. Phrased another way, the "Defendants are entitled to summary judgment on the claims brought against them under the Indiana Survival Statute as there is no evidence that Puza died from a cause *other than* the alleged negligence of the Defendants." Defendants's Motion for Summary Judgment, docket at 56, p. 3 (italics added). The defendants' argument is clearly supported by Indiana law and they are therefore entitled to summary judgment on the plaintiff's claim under the Indiana Survival statute .[8]

 **\*17**  The defendants next contend that even if a claim under the Indiana Wrongful Death statute is the only such state law claim that Nadolski could bring on behalf of Puza, they are entitled to immunity from any wrongful death claim, pursuant to Indiana Code 34–13–3–3(8) and so are entitled to summary judgment on that cause of action. The statute to which the defendants cite states, in relevant part, as follows:

> 34–13–3–3 Immunity of governmental entity or employee.

> Sec. 3. A governmental entity or an employee acting within the scope of the employee's employment is not liable if a loss results from the following: ...

> (8) The adoption and enforcement of or failure to adopt or enforce a law (including rules and regulations), unless the act of enforcement constitutes false arrest or false imprisonment.

The Indiana Supreme Court has explained that the scope of the term "enforcement" under § 34–13–3–3(8) is "limited to those activities in which a governmental entity or its employees compel or attempt to compel the obedience of another to laws, rules or regulations, or sanction or attempt to sanction a violation thereof." *Mullin v. Municipal City of South Bend,* 639 N.E.2d 278, 282 (Ind.1994).

A federal court in the Southern District of Indiana addressed the tort immunity statute and the issue of what constitutes "enforcement" in the case of *Sellers v. Marion County Sheriff's Dept.,* WL1630008 (S.D. Ind. June 27, 2002). In *Sellers,* a police officer was sued under 42 U.S.C. § 1983 after he allegedly used excessive force in effecting an arrest, resulting in the subsequent death of the arrestee. The officer saw the plaintiff's decedent, Mr. Sellers, walking down a street and noticed that Sellers appeared intoxicated. The officer briefly turned on his emergency siren but Sellers did not stop. The officer then pulled into a driveway or parking lot, attempting to "cut off" Sellers and force him to stop to the officer could investigate his condition. During this maneuver, the officer allegedly hit Sellers with his patrol car. Then, the officer (and a second officer who came on the scene), wrestled Sellers to the ground and handcuffed him. At some point during this incident (it was alleged), Sellers received traumatic head injuries and died a few days later. The district court granted the officers' motion for summary judgment on a wrongful death claim included in the lawsuit, reasoning that the officers were, at all times relevant, acting in the scope of their employment and also were "attempting to compel compliance with the law" by trying to get Sellers to stop and submit to questioning (and later, arrest). Therefore, the actions of the officers fell within the Indiana Supreme Court's definition of "enforcement." *Id., \* 5.*

In the present case, Hunnicut attempts to characterize his actions as "enforcing" rules and regulations at the Porter County Jail with respect to ill or allegedly ill inmates. More specifically, Hunnicut claims his actions were "encompassed within the broad definition of 'enforcement' as he was enforcing and executing the law, specifically governing the conduct of prisoners housed at the Jail." Defendants' Memorandum, p. 40. But this is quite a stretch of the Indiana Supreme Court's definition of the term

"enforcement" as it is used in the statute and interpreted by the Indiana courts. Hunnicut's actions, examined in a light most favorable to the plaintiff, do not demonstrate that he was trying to compel Puza to obey some law or to comply with a law. Instead, he was, at best, merely following the internal procedures of the Jail. So the situation in this case is very different from the scenario presented in *Sellers.* Hunnicut presents no cases on point to support his argument that he is entitled to immunity from Nadolski's wrongful death claim under the facts of this case, and this court's own research failed to uncover any such support. Accordingly, the court determines that Hunnicut is not entitled to immunity under the circumstances in this case.[9]

**4. Defendants' Defense Under Doctrine of *Res Judicata.***

**\*18**  The defendants also argue that they are entitled to summary judgment on all of Nadolski's claims since those claims are barred the doctrine of *res judicata.* Defendants' Memorandum, p. 41. The defendants state that the plaintiff had filed a state court action (other than this one, which originated in state court and was removed to this court) which "also arose out of the detention and death of ... Melissa Puza. That ... complaint named a physician from Advanced Correctional Healthcare and Cheryl Casko, the Medical Director of the Porter County Jail, in her capacity as the medical director." Defendants' Memorandum, pp. 41–42. Casko filed a motion to dismiss the claims against her in that lawsuit and her motion was granted. *Id.* Because of that dismissal, the defendants argue that *"res judicata,* or claim preclusion, bars the relitigation of the claims that were brought, or should have been brought, in the state law action that was adjudicated on its merits and dismissed with prejudice." *Id.,* p. 42. The defendants point out that " '[r]es judicata, or claim preclusion, bars the relitigating of claims if the cause of action has been fully and finally determined on the merits between the same parties by a court of competent jurisdiction.' " *Id.* (quoting *Aaron v. Mahl,* 550 F.3d 659, 664 (7th Cir.2008)).

Nadolski argues that the doctrine of *res judicata* does not apply for several reasons. First, he states that "[a]t the time the State Court's claim [sic] was filed against Casko, this Federal Court had already assumed subject-matter jurisdiction over the Porter County Sheriff's Department and Officer Hunnicut. Therefore, the State Court did not and could not acquire subject-matter jurisdiction as [28 U.S.C.] § 1331 grants the Federal Court 'original jurisdiction of all civil actions arising under the Constitution ....' " Plaintiff's Response, p. 40. In addition, Nadolski points out that the previous state court action "was filed against Dr. Shotick and Medical Director Casko as a medical malpractice claim, not as a civil rights action under § 1983.'" *Id.* Nadolski also states that "the Porter County Sheriff's Department and Officer Hunnicut were not parties to the State Court action." *Id.* Finally, Nadolski states that "Casko was dismissed from the State Court medical malpractice action because she was working in the course and scope of her employment for the Porter County Sheriff's Department pursuant to I.C. 34–13–3–5(b). No adjudication of the wrongful death claims or civil rights claims was determined by the State Court." *Id.,* p. 41.

In their reply brief, the defendants first point out that state courts do, in fact, have jurisdiction to adjudicate claims brought under § 1983. Defendants' Reply, p. 22. They also argue that the claims asserted in this lawsuit could have been brought in the state court action and the fact that they were not does not bar the applicability of the doctrine of *res judicata.* " 'Res judicata bars not only those issues actually decided in the prior suit, but all other issues which could have been brought.' " *Id.,* p. 23 (quoting *Aaron v. Mahl,* 550 F.3d at 664). According to the defendants, "Plaintiff had the right and ability to file its [sic] claims in this matter in either the Porter Superior Court or the United State[s] District Court for the Northern District of Indiana. Plaintiff, in essence, has attempted to get two bites of the apple. This is exactly what *res judicata* is designed to prevent." *Id.* The defendants also argue that the prior state court action "was NOT grounded in malpractice. Plaintiff does not allege in the [state court] complaint ... that Casko ever saw or treated Puza.... Thus, a claim for malpractice was not properly plead and the claims were essentially allegations of negligence." *Id.* (capitalization in original). Finally, the defendants claim that the "controversy adjudicated in the former action was between parties to the present suit or their privies." *Id.* The defendants make this rather curious argument by writing as follows:

**\*19**  'The term "privity" describes the relationship between persons who are parties to an action and those who are not parties to an action but whose interests in the action are such that they may nevertheless be bound by the judgment in that action.' *Dickson v. D'Angelo,* 749 N.E.2d 96, 99 (Ct.App.Ind.2001)[sic]. 'The term includes those who control an action, although not a party to it, and those whose interests are represented by a party to the action.' Casko's actions were performed

79 Fed. R. Evid. Serv. 1210

in the scope of her employment with the Porter County Sheriff's Department and thus, the former suit was adjudicated by the same parties and/or privies to the instant suit.

*Id.,* p. 24. These arguments are examples of the several specious arguments made in this case by both sides. [10] As for the plaintiff's alleged attempt to "get two bites of the apple," the court notes that the lawsuit now before this court was brought by Nadolski in the Porter Superior Court. It was *removed* to this court by the defendants. Docket at 2, Notice of Removal. So, while it is true that plaintiff filed two separate lawsuits arising out of essentially the same underlying facts (a situation that does not, in and of itself, automatically invoke the doctrine of *res judicata* ), it is rather disingenuous for the defendants to accuse the plaintiff of some sort of nefarious attempt to litigate the same lawsuit in two separate courts. As for the defendants' argument that the prior state law action sounded in negligence rather than medical malpractice, that may be, but that distinction is insufficient to support the defendants' attempt to equate the claims in the prior state court action with those in the present one for purposes of applying *res judicata.* Most importantly, however, is the issue of the parties to the respective actions. While some of the factual issues presented in the state court action against Dr. Shotick and Ms. Casko may be the same as some presented in the present case, the defendants are overreaching in their attempt to argue that the parties to that lawsuit were in privity to Hunnicut and the Sheriff's Department or that the interests of the defendants in this lawsuit were represented by Casko and Shotick in the state law case. For all of these reasons, the defendants' motion for summary judgment based on the doctrine of *res judicata* is DENIED.

## CONCLUSION

For the reasons set forth in this Opinion and Order, the plaintiff's motion to strike the defendants' reply brief is DENIED; the defendants' motion for leave to file their reply brief *instanter* is DENIED AS MOOT; the defendants' motion to strike the testimony of Dr. Nikkalyn Delaurentis is DENIED; and the defendants' motion for summary judgment is GRANTED in part and DENIED in part.

**Parallel Citations**

79 Fed. R. Evid. Serv. 1210

Footnotes

1    For purposes of clarification, the court notes that Plaintiff Mathew Nadolski's first name is spelled alternately as "Mathew" or "Matthew" in various filings. Defendant Michael Hunnicutt's name is spelled alternately as "Hunnicut" or "Hunnicutt." *See, e.g.,* Agreed Motion to Amend Caption, docket at 26. The original Complaint spells Nadolski's first name with only one "t" and also spells Hunnicut's name with only one "t." Docket at 1. The defendants use the spelling "Hunnicut" in their Answer to the Complaint, but use the spelling "Hunnicutt" in their brief in support of their motion for summary judgment. This confusion is not relevant to any issue, of course, and the court will adopt the spellings as they appear in the original Complaint. Also, throughout this Opinion and Order, the page numbers of the parties' various pleadings to which the court cites are the page numbers assigned to those documents by the court's electronic docketing system (which appear at the top of every page of each document filed), and may or may not coincide with the page numbers placed on those same documents by the parties.

2    Nadolski originally brought this action in the Porter Superior Court on May 1, 2007. The defendants removed the case to this court on May 18, 2007. The original Complaint named David Lain, the Porter County Sheriff, and the Porter County Board of Commissioners as defendants as well as Hunnicut and the Sheriff's Department. The Sheriff, in his personal and official capacity, and the Board of Commissioners filed a joint motion to dismiss the claims against them. This court converted that motion to a motion for partial summary judgment and granted it in a written order issued on August 24, 2007. *See* docket at 22. The case now proceeds only against Hunnicut and the Porter County Sheriff's Department.

3    Nadolski attached to his response brief a copy of Dr. Delaurentis's curriculum vitae, which reveals that she is the Medical Director of Heartland Hospice in Portsmouth, Ohio, and an urgent care physician at the Adena Regional Medical Center in Chillicothe, Ohio. Delaurentis holds a Doctor of Osteopathic Medicine (D.O.) degree from Midwestern University: Chicago College of Osteopathic Medicine. The defendants, however, do not challenge Dr. Delaurentis's medical education or training in their motion to strike her testimony.

**Nadolski v. Hunnicut, Not Reported in F.Supp.2d (2009)**

79 Fed. R. Evid. Serv. 1210

4   The court notes that the plaintiff did not offer Delaurentis's opinion concerning the standard of medical care required in jails or prisons to support any of this arguments. Instead, Delaurentis expressed this opinion while answering questions from defense counsel during her cross-examination.

5   The videotapes were converted to DVD format and submitted as evidence by the plaintiff. The DVDs were, obviously, filed manually, as noted at docket entry 63. The court reviewed the videotapes in their entirety.

6   Oddly, the defendants later write in their brief that "Officer Hunnicut monitored the Plaintiff's decedent hourly in accordance with jail protocols." Defendants' Memorandum, p. 21. This statement seems directly at odds with Hunnicut's assertions that he only observed Puza twice during his shift and that neither he nor any other officer maintained a constant watch of the jail's in-house video system.

7   The defendants challenge Nadolski's assertion that the videotapes show Puza vomiting. The defendants state that "[i]n reality, in observing the video tapes it is impossible to discern what Puza is doing when she makes several trips to the toilet area as it is blocked by a concrete partition. At no time does the video tape actually show Puza vomiting." Defendants' Reply, p. 11. However, the court has reviewed the videotapes and, while they are not definitive on this point (i.e., they do not literally show Puza vomiting), they do seem to indicate—without employing any degree of imagination—that Puza vomited (or perhaps attempted to vomit) several times while she was in the medical isolation cell. In fact, even Hunnicut admitted this in his deposition, stating that when he reviewed the videotapes after the inception of this lawsuit, he noted that Puza "[l]ooked like [she was] throwing up[.]" and that she apparently did so several times. Hunnicut Deposition, p. 31.

8   Nadolski argues in his response that he can maintain a claim under the Indiana Survival statute. Plaintiff's Response, pp. 34–35. He argues that "Puza received personal injuries caused by the wrongful acts or omissions of the Porter County Sheriff's Department and Officer Michael Hunnicut in that her drug overdose was untreated by deliberate indifference. Puza subsequently dies from cocaine toxicity. Therefore, the estate has a viable claim under I.C. 34–9–3–4." *Id.,* p. 35. That is the full extent of Nadolski's response to this issue. While his argument is certainly succinct, it is not well taken. The entire basis for his lawsuit is that Puza's death resulted from the acts and/or omissions of the defendants. He presents the testimony of an expert witness, Dr. Delaurentis, to support his contention that Puza would *not* have died *but for* the acts and/or omissions of the defendants. Consequently, the only state law cause of action Nadolski can bring on Puza's behalf is one under the Wrongful Death statute.

9   The Sheriff's Department argues that it is entitled to the same immunity since Hunnicut was in its employ and was acting within the scope of that employment at the relevant time. Since the court has concluded that Hunnicut's alleged acts or omissions did not constitute "enforcement" of the law as that term has been defined by the Indiana Supreme Court in *Mullins,* the Sheriff's Department is likewise not entitled to immunity from the plaintiff's wrongful death claim.

10  The plaintiff's argument in opposition to the defendants' motion for summary judgment on the state law claim under the Survival statute is also an example. The court does not mean to imply that counsel for the parties in this case are presenting frivolous arguments, only that certain arguments on both sides rest on very weak or contrived legal foundations.

---

**End of Document**                                                © 2013 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 1770817
Only the Westlaw citation is currently available.
United States District Court,
D. South Carolina,
Florence Division.

Corey Jawan ROBINSON, Plaintiff,

v.

SOUTH CAROLINA DEPARTMENT OF CORRECTIONS, Officer S. Mosher, Doctor W. Jones, Sgt. Jordan Williams, Sgt. Morado Smalls, Cpl. John Guinn, Ofc. Susan Spann, Nurse C. Felder, Nurse V. Ashford, Doctor R. Babb, Nurse K. Linnen, Nurse R. Brewer, Warden M. Bodison, Assoc. Warden F. Thompson, Sgt. F. Jefferson, Ofc. S. Nicholas, Lt. R. Stewart, Ofc. U. Palmer, Nurse V. Frazier, Nurse S. West, Ofc. T. Mills, Defendants.

C.A. No. 4:10–157–HMH–TER.    |    May 10, 2011.

**Attorneys and Law Firms**

Anna Elizabeth Hamilton, Reid Thomas Sherard, Nelson Mullins Riley and Scarborough (G), Greenville, SC, for Plaintiff.

Elloree A. Ganes, Robert H. Hood, Robert H. Hood, Jr., Thomas Happel Scurry, Hood Law Firm, Charleston, SC, for Defendants.

**Opinion**

**OPINION AND ORDER**

HENRY M. HERLONG, JR., Senior District Judge.

*1 This matter is before the court on Defendants' motion for reconsideration of the court's February 17, 2011 Order ("February Order") in which the court granted in part and denied in part Defendants' motion for summary judgment. For the reasons explained below, Defendants' motion for reconsideration is granted in part and denied in part.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

The facts underlying Robinson's claims are fully set forth in the court's February Order and summarized below. Robinson alleges that on June 19, 2009, he asked Officer S. Mosher ("Officer Mosher") to see a nurse because he was vomiting and his throat was constricted. (Compl.3.) Officer Mosher purportedly denied his request, and Robinson continued vomiting in his cell. (*Id.*) Robinson alleges that his swollen throat impeded his breathing and caused him to choke on his vomit. (*Id.*) Later in the day, Robinson's cell mate began kicking their cell door attempting to procure medical assistance. (*Id.*) When Officer Mosher approached Robinson's cell and inquired into the matter, Robinson allegedly stated: "I done saw a doctor twice about a virus and I am sick; I almost choke off my vomit nigga." (*Id.*) Officer Mosher sprayed one burst of chemical munitions in Robinson's eyes and face and locked the door. (Compl.3.) Three days later, Robinson was admitted to Trident Medical Center where he was diagnosed with sarcoidosis. (*Id.*) He remained hospitalized for ten days and could eat only through a feeding tube for the next several weeks. (*Id.*)

On January 25, 2010, Robinson commenced this § 1983 action, alleging various violations to his constitutional rights. Defendants moved for summary judgment on July 16, 2010, and the court granted summary judgment in favor of Defendants on all of Robinson's claims except his claims for excessive force and deliberate indifference. On March 17, 2011, Defendants

filed the instant motion, requesting the court to reconsider its denial of summary judgment for Robinson's excessive force and deliberate indifference claims. [1]  In support of their motion to reconsider, Defendants have submitted new affidavits from medical personnel at Lieber Correctional Institution. On April 4, 2011, Robinson filed a response in opposition to Defendants' motion for reconsideration. Defendants filed their reply on April 4, 2011. This matter is now ripe for review.

## II. DISCUSSION OF THE LAW

### A. Summary Judgment Standard

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In deciding whether a genuine issue of material fact exists, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.

**\*2**  A litigant "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir.1985). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." *Monahan v. County of Chesterfield,* 95 F.3d 1263, 1265 (4th Cir.1996).

### B. Merits

#### 1. Deliberate Indifference Claim

Robinson alleges that prison medical personnel and officers were deliberately indifferent to a serious medical need because from "June 19, 2009 through [June] 22, 2009, officers watched me suffer in pain from the result of could not [sic] eat or drink from my sickness of suffering from a disease." (Am.Compl.3.) For Robinson's complaints of delayed medical treatment to rise to the level of a constitutional violation, Robinson must prove that "objectively assessed, he had a sufficiently serious medical need to require medical treatment, and that a prison guard, subjectively aware of the need and of its seriousness, nevertheless acted with deliberate indifference to it by declining to secure available medical attention." *Brice v. Virginia Beach Corr. Ctr.,* 58 F.3d 101, 104 (4th Cir.1995) (internal quotation marks omitted); *see also Smith v. Smith,* 589 F.3d 736, 738–39 (4th Cir.2009) (recognizing that deliberate indifference can be shown where prison officials intentionally delay a prisoner's access to medical care). Under this standard, a prisoner's medical need is sufficiently serious if it is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve,* 535 F.3d 225, 241 (4th Cir.2008). A plaintiff satisfies the subjective component by demonstrating that the prison official knew of the plaintiff's risk of harm and disregarded it. *Miltier v. Beorn,* 896 F.2d 848, 853 (4th Cir.1990).

Defendants argue that Robinson is unable to satisfy either the objective or subjective components of a deliberate indifference claim. In support of their contention, Defendants proffer affidavits from medical personnel at Lieber Correctional Institution, evidencing that Robinson was observed by prison medical staff three times between June 19 and June 22. Following his altercation with Officer Mosher on June 19, Robinson was seen by a nurse who determined that Robinson "was not suffering from any injuries," nor was he in "any acute distress." (Def. Reply Ex. 1 (Linnen Aff. ¶¶ 10, 11).) According to prison medical records, Robinson was seen by a nurse again on June 20 for his complaints of vomiting and being unable to eat or drink. The nurse ordered that Robinson be placed on a liquid diet, and she referred him to Dr. Robert Babb ("Dr.Babb"), a licensed physician employed by the prison. (Def. Mem. Supp. Summ. J. Ex. 2 (Robinson Medical Summary at 17).) On June 22, Robinson was

seen by Dr. Babb, and based upon his assessment, he referred Robinson to Trident Medical Center. (Mot. Recons. Ex. 2 (Dr. Babb Aff. ¶ 11).) In his affidavit, Dr. Babb stated that, based on his review of Robinson's medical records and complaints of vomiting with swollen throat, he would not have referred Robinson to Trident Medical Center had he seen Robinson on June 19, and that in his medical opinion, "any alleged delay in treatment from June 19, 2009 through June 22, 2009, caused no harm to Mr. Robinson." (*Id.* Ex. 2 (Dr. Babb Aff. ¶¶ 9, 10).)

**\*3**  Based on the prison medical records and affidavits from treating medical personnel, Robinson is unable to demonstrate that Defendants were deliberately indifferent to a serious medical need. The records reflect that prison medical staff responded to and provided treatment for Robinson's complaints based upon the symptoms he exhibited. Although Robinson disagrees with the medical care provided and contends that he should have been referred to the hospital sooner, disagreements over medical care fail to rise to the level of a constitutional violation. *Wright v. Collins,* 766 F.2d 841, 849 (4th Cir.1985). At most, Robinson can show that medical personnel were negligent in failing to detect the gravity of his impairment and refer him to the hospital sooner. Negligence, however, fails to establish a cognizable § 1983 claim. *Estelle v. Gamble,* 429 U.S. 97, 107, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Based on the foregoing, the court concludes that Defendants are entitled to summary judgment on Robinson's deliberate indifference claims against prison medical personnel.

Robinson also claims that Officer Mosher was deliberately indifferent to his serious medical needs, contending that Officer Mosher should have promptly secured medical attention based upon his complaints of vomiting and being unable to eat or drink. (Compl.3.) To prevail on his claim for deliberate indifference against Officer Mosher, a non-medical prison official, Robinson must show that Officer Mosher had actual knowledge of his substantial medical risk. *Brice,* 58 F.3d at 105. A prison official may be charged with actual knowledge of an inmate's substantial risk "from the very fact that the risk was obvious." *Farmer v. Brennan,* 511 U.S. 825, 842, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Defendants argue Robinson is unable to satisfy the subjective component of a deliberate indifference claim with respect to Officer Mosher. (Mot.Recons.9.) The court agrees.

Robinson has failed to produce any evidence from which a reasonable inference can be drawn that Officer Mosher or any other non-medical prison official had actual knowledge of the severity of Robinson's medical need. As discussed above, the record shows that even medical personnel were unable to discern the gravity of Robinson's medical condition given the symptoms he exhibited. Given the latency of Robinson's medical condition, Robinson cannot show that Officer Mosher possessed actual knowledge of Robinson's serious medical need. Based on the foregoing, the court concludes that Defendants are entitled to summary judgment on Robinson's deliberate indifference claim.

## 2. Excessive Force

Robinson alleges that Officer Mosher's discharge of chemical munitions in his face and eyes while he was "helpless" in his cell attempting to procure medical assistance constitutes excessive force in violation of the Eighth Amendment. (Am.Compl.3.) In its February Order, the court found that genuine issues of material fact precluded entry of summary judgment in favor of Defendants on this claim. (February Order 11–12.) Defendants concede that many of the facts underlying Robinson's excessive force claim are disputed but contend that they are entitled to summary judgment based upon the facts as alleged by Robinson. (Mot.Recons.10–12.) The court disagrees.

**\*4**  According to Robinson, his cell mate began kicking their cell door in an attempt to secure medical attention for Robinson. (Compl.3.) When Officer Mosher responded to their cell, Robinson stated that he had seen "a doctor twice about a virus and I am sick; I almost choke off my vomit nigga." (*Id.*) Robinson alleges that Officer Mosher called him a "tough guy" and sprayed chemical munitions in his face and eyes while he was confined in his cell. (*Id.*) Robinson produced the declaration of Dion Benjamin ("Benjamin"), another inmate, who states that he witnessed the altercation between Robinson and Officer Mosher. (Decl. Supp. Pl. Answer Def. Mot. Summ. J., generally.) Benjamin's declaration corroborates Robinson's portrayal of the June 19 events. (*Id.*) Officer Mosher, however, avers that he discharged chemical munitions in Robinson's facial area

because Robinson was attempting to exit his cell when the prison was on lockdown, and he refused to obey Officer Mosher's command to "stand down." (Def. Mot. Summ. J. Ex. 6 (Officer Mosher Aff. ¶¶ 7, 10, 11).)

As explained in the court's February Order, the predominate inquiry for an excessive force claim focuses upon the justification for a prison official's infliction of force rather than the quantum of injury inflicted. *Wilkins v. Gaddy,* ——— U.S. ———, ———, 130 S.Ct. 1175, 1179, 175 L.Ed.2d 995 (2010) ( "Injury and force ... are imperfectly correlated, and it is the latter that ultimately counts."). In the context of a prison disturbance, whether force used is unconstitutionally excessive depends upon "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers,* 475 U.S. 312, 320–21, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). The use of mace by prison officials on inmates confined in their cells warrants close judicial scrutiny. *Williams v. Benjamin,* 77 F.3d 756, 763 (4th Cir.1996). "[A]lthough it is not *per se* unconstitutional for guards to spray mace at prisoners confined in their cells," the Fourth Circuit has observed that "it is necessary to examine the totality of the circumstances, including the provocation, the amount of gas used, and the purposes for which the gas is used to determine the validity of the use of tear gas in the prison environment." *Id.* (internal quotation marks omitted). As the court explained in its February Order, the circumstances here are clouded by the fact that the parties present completely different portrayals of the facts underlying Officer Mosher's use of force. In their motion for reconsideration, Defendants claim that they are entitled to summary judgment because Robinson failed to set forth the specific injury he suffered as a consequence of Officer Mosher spraying chemical munitions in his eyes. As a pro se plaintiff, however, Robinson's pleadings are afforded a liberal construction and held to a lower standard than those drafted by licensed attorneys. *Haines v. Kerner,* 404 U.S. 519, 520–21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). Viewing the facts in a light most favorable to Robinson, the court finds that genuine issues of material fact preclude entry of summary judgment in favor of Defendants on Robinson's excessive force claim.

 **5** Defendants alternatively contend that summary judgment is proper because qualified immunity shields Officer Mosher from liability. In support of this contention, Defendants advance the identical arguments previously presented in their objections to the magistrate judge's Report and Recommendation. As explained in its February Order, however, the court is unable to determine whether Officer Mosher is entitled to qualified immunity at this stage of the litigation because the parties dispute virtually all of the facts as to what occurred. Finally, Defendants request leave to file an interlocutory appeal with the Fourth Circuit pursuant to 28 U.S.C. § 1292(b) on the issue of whether Robinson's excessive force claim can proceed when he has failed to allege an injury in his complaint. The Fourth Circuit, however, has admonished that interlocutory review under § 1292(b) is an "extraordinary remedy" that should be exercised only upon a showing of "exceptional circumstances." *Fannin v. CSX Transp.,* No. 88–8120, 1989 WL 42583, *2 (4th Cir. Apr.26, 1989) (unpublished). Defendants have failed to show that exceptional circumstances exist to warrant an immediate right to appeal.

Based on the foregoing, the court concludes that Defendants are entitled to summary judgment on Robinson's claim of deliberate indifference. Their motion for summary judgment on Robinson's excessive force claim, however, is denied.

It is therefore

**ORDERED** that Defendants' motion for reconsideration, docket number 137, is granted in part and denied in part as outlined above.

**IT IS SO ORDERED.**

Footnotes

1    The court's February Order partially granting summary judgment in favor of Defendants is an interlocutory order that the court "retains the power to reconsider and modify." *Am. Canoe Ass'n v. Murphy Farms, Inc.,* 326 F.3d 505, 514 (4th Cir.2003).

222 Fed.Appx. 330

This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter See Fed. Rule of Appellate

Procedure 32.1 generally governing citation of judicial decisions issued on or

after Jan. 1, 2007. See also Fourth Circuit Rule 32.1 (Find CTA4 Rule 32.1)

United States Court of Appeals,

Fourth Circuit.

Tyrone Lorenzo ROBINSON, Plaintiff-Appellant,

and

Tonya Ledell Robinson, Plaintiff,

v.

SOUTH CAROLINA DEPARTMENT OF PUBLIC SAFETY; The South Carolina Highway

Patrol; Joseph Franklin Clipse, Public Safety Trooper First Class, Defendants-Appellees.

Tyrone Lorenzo Robinson, Plaintiff-Appellant,

and

Tonya Ledell Robinson, Plaintiff,

v.

South Carolina Department of Public Safety; The South Carolina Highway Patrol;

Joseph Franklin Clipse, Public Safety Trooper First Class, Defendants-Appellees.

Nos. 06-1384, 06-1741.    |    Submitted: Feb. 9, 2007.    |    Decided: March 28, 2007.

**Synopsis**

**Background:** Motorist brought § 1983 action against police officer, state department of public safety, and the state highway patrol, alleging excessive force, assault with intent to kill, assault and battery with intent to kill, police brutality, and use of deadly force. The United States District Court for the District of South Carolina, Sol Blatt, Jr., Senior District Judge, 2006 WL 278129, dismissed motorist's complaint sua sponte and denied his motions for reconsideration. Motorist appealed.

**[Holding:]** The Court of Appeals held that District Court made an improper credibility finding in determining that police officer was entitled to qualified immunity.

Affirmed in part, vacated in part, and remanded.

**\*331** Appeals from the United States District Court for the District of South Carolina, at Charleston. Sol Blatt, Jr., Senior District Judge. (2:05-cv-03198-SB).

**Attorneys and Law Firms**

Tyrone Lorenzo Robinson, Appellant Pro Se.

Before MICHAEL, TRAXLER, and GREGORY, Circuit Judges.

**Opinion**

Affirmed in part, vacated in part, and remanded by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Tyrone Lorenzo Robinson appeals the district court's orders dismissing, *sua sponte,* his complaint filed under 42 U.S.C. § 1983 (2000), and denying his motions for reconsideration. Robinson asserts on appeal that he should have been allowed to sue Officer Clipse in his individual capacity and that the district court erred by dismissing his action. Robinson also contends that the court improperly resolved a  **\*332**  factual dispute in finding that Clipse was entitled to qualified immunity.

 [1]    We have reviewed the record and conclude that the district court made an improper credibility finding in determining that Clipse was entitled to qualified immunity. In support of his claim that Clipse used excessive force in violation of Robinson's Fourth Amendment rights, Robinson submitted affidavits from two witnesses and also submitted a copy of the transcript of his state court trial at which Clipse testified about the events surrounding Robinson's arrest. The district court concluded that the affidavits did not refute Clipse's state court trial testimony. However, in his complaint sworn under penalty of perjury, Robinson contradicted the version of events to which Clipse testified in the state court trial. *See Vathekan v. Prince George's County,* 154 F.3d 173, 179-80 (4th Cir.1998) (reversing summary judgment where disputed facts existed as to events surrounding use of force); *Rainey v. Conerly,* 973 F.2d 321, 324 (4th Cir.1992) (finding that district court properly denied defendant's immunity-based summary judgment motion because "a determination of what actually happened is absolutely necessary to decide whether [defendant] could reasonably have believed that his actions were lawful").

 [2]    Accordingly, we vacate the portions of the district court's orders in which the court found that Clipse was entitled to qualified immunity and remand for further proceedings in the district court. We affirm the remainder of the district court's orders, grant Robinson's motions to add Clipse as a party [*]  and to amend and supplement his informal brief, and deny his motion to appoint counsel. We also deny Robinson's motion for oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

*AFFIRMED IN PART, VACATED IN PART, AND REMANDED.*

**Parallel Citations**

2007 WL 994862 (C.A.4 (S.C.))

Footnotes

[*]     We note that, in footnote one of its order denying the motion for reconsideration, the district court explicitly denied Robinson's motion to amend his complaint to add a claim against Clipse in his individual capacity. However, the district court effectively made Clipse a party by concluding that he was entitled to qualified immunity-a defense that is available only to a person sued in his individual capacity. *See Ridpath v. Bd. of Governors,* 447 F.3d 292, 306 (4th Cir.2006).

**End of Document**                                              © 2013 Thomson Reuters. No claim to original U.S. Government Works.

374 Fed.Appx. 366

This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter See Fed. Rule of Appellate
Procedure 32.1 generally governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also Fourth Circuit Rule 32.1 (Find CTA4 Rule 32.1)

United States Court of Appeals,

Fourth Circuit.

Hilarie G. SCARBRO, Administratrix of the Estate of Gary Eugene Rummer, Plaintiff-Appellant,

v.

NEW HANOVER COUNTY; New Hanover County Sheriff's Department; New Hanover County Jail; Sidney A. Causey, Individually and in his capacity as Sheriff of New Hanover County; J.T. Leonard, Individually and in his official capacity as detective of the New Hanover County Sheriff's Department; E. Morton, Individually and in his official capacity as deputy of the New Hanover County Sheriff's Department; B.R. Hudson, Individually and in his official capacity as deputy of the New Hanover County Sheriff's Department; T.L. Fuss, Individually and in his official capacity as corporal of the New Hanover County Sheriff's Department; D.E. Keyes, Individually and in his official capacity as deputy of the New Hanover County Sheriff's Department; Mr. Hansen, Individually and in his official capacity as deputy of the New Hanover County Sheriff's Department; J.P. Hatch, Individually and in his official capacity as sergeant of the New Hanover County Sheriff's Department; M. Grimes, Individually and in his official capacity as deputy of the New Hanover County Sheriff's Department; Mr. Ward, Individually and in his official capacity as deputy of the New Hanover County Sheriff's Department; S. Jones, Individually and in his official capacity as deputy of the New Hanover County Sheriff's Department; W. Thomas Parker, Individually and in his official capacity as chief deputy of the New Hanover County Sheriff's Department; Clarence A. Hayes, Individually and in his official capacity as captain of the New Hanover Sheriff's Department; Angela Goebel, Deputy, Individually and/or in her official capacity; Dennis Kutrow, Deputy, Individually and/or in his official capacity; Deputy Drakow, Deputy Sheriff, individually and in his official capacity; Deputy Frink, Deputy Sheriff, individually and in his official capacity, Defendants-Appellees, and

Susan Barfield, R. N., Individually and in her official capacity; Gaysheron Bell, Deputy, Individually and in her official capacity as an employee of the New Hanover County Health Department; New Hanover County Health Department; Janet McCumbie, Individually and in her official capacity as Personal Health Director of the New Hanover County Health Department; Penny Rayner, FNP, Individually and in her official capacity; DAVID RICE, Individually and in his official capacity as Health Director of the New Hanover County Health Department, Defendants.

No. 08-1644.    |    Argued: Dec. 1, 2009.    |    Decided: April 1, 2010.

**Synopsis**

**Background:** Estate of pre-trial detainee, who died while incarcerated, brought § 1983 action against various prison officials and officers, alleging excessive force, inadequate medical care, and conspiracy. The United States District Court for the Eastern District of North Carolina, Louise W. Flanagan, Chief Judge, granted defendants' motion for summary judgment. Estate appealed.

**Holdings:** The Court of Appeals, Shedd, Circuit Judge, held that:

[1] deputy was not malicious, sadistic or wanton in takedown;

[2] detainee had an objectively serious medical need;

[3] triable issues existed as to whether deputy was deliberately indifferent to detainee's serious medical need; and

[4] deputy was not entitled to qualified immunity.

Affirmed in part, reversed in part, and remanded.

**\*367**  Appeal from the United States District Court for the Eastern District of North Carolina, at New Bern. Louise W. Flanagan, Chief District Judge. (7:03-cv-00244-FL).

**Attorneys and Law Firms**

John Dwight Hudson, Hudson & Gentry, LLC, Myrtle Beach, South Carolina, for Appellant. James R. Morgan, Jr., Womble, Carlyle, Sandridge & Rice, PLLC, Winston-Salem, North Carolina, for Appellees.

**\*368**  Before KING and SHEDD, Circuit Judges, and JOHN PRESTON BAILEY, Chief United States District Judge for the Northern District of West Virginia, sitting by designation.

**Opinion**

Affirmed in part, reversed in part, and remanded by unpublished opinion. Judge SHEDD wrote the opinion, in which Judge KING and Judge BAILEY joined.

Unpublished opinions are not binding precedent in this circuit.

SHEDD, Circuit Judge:

Hilarie G. Scarbro, Administratrix of the Estate of Gary Eugene Rummer, appeals the judgment entered in favor of the defendants on her claims under 42 U.S.C. § 1983 for excessive force, inadequate medical care, and conspiracy to deprive Rummer of his constitutional rights. For the following reasons, we affirm in part, but we reverse the district court's order granting summary judgment in favor of Defendant Deputy Billy Ray Hudson on the inadequate medical care claim, and we remand for further proceedings consistent with this opinion.

## I.

### A.

In reviewing the district court's order granting summary judgment to the defendants, we view the facts in the light most favorable to the plaintiff. *Scott v. Harris,* 550 U.S. 372, 378, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). Gary Eugene Rummer was arrested and incarcerated for failure to serve the community service portion of his sentence for driving under the influence of alcohol. A few days after he was incarcerated, Rummer began having delusions and summoned a guard. After learning of Rummer's alcohol addiction, the guard determined that Rummer was suffering from delirium tremens ("DTs") caused by alcohol withdrawal and moved him to a safekeeping cell for inmates who have medical or mental health issues or who are disruptive. Later that morning, Rummer was taken to the medical unit where Nurse Barfield examined him and treated him for DTs. Rummer was alert, oriented, and walking on his own.

Upon his return to the crowded safekeeping cell, Rummer was stumbling over the other inmates' mats and bothering them. When the other inmates complained, Deputy Billy Ray Hudson was ordered to move Rummer to a padded cell. Officer Melody Grimes accompanied Hudson and guarded the door to the safekeeping cell.

Hudson entered the room in a "bum rush." He approached Rummer and grabbed Rummer's arm to handcuff him, but Rummer did not cooperate. At that point, Hudson took him to the concrete floor head-first from a standing position. Other inmates recalled Rummer's head hitting the floor with a thud and then hearing Rummer give a "horrific" scream.

After the takedown, Rummer was bleeding from a scratch above his eye. Because Rummer could not walk on his own, the guards carried him to a padded cell where he laid moaning on the cell floor. A supervising officer then decided to call the medical unit, and after the medical staff refused to come to the cell, Hudson and two other officers lifted Rummer into a wheelchair and transported him to the medical unit.

Rummer's condition had drastically changed since Nurse Barfield first treated him for DTs hours earlier. He was no longer lucid or talking coherently, his glasses were broken, and he had urinated on himself. When Nurse Barfield asked Hudson if Rummer had fallen, Hudson responded, "No, he did not fall," and failed to inform her of the takedown events. **\*369** Unaware of Rummer's head injury, Nurse Barfield prescribed medication for DTs and recommended that Rummer be transferred to Central Prison, a larger facility where he could be monitored more closely.

Rummer was likely unconscious when he was transported to Central Prison. When Central Prison staff observed Rummer's condition, they immediately sent him to Wake Medical Center. There, Rummer's CAT scan revealed a large acute subdural hematoma. Rummer was pronounced dead after an unsuccessful operation. According to Rummer's physician, the most important factor in treating this type of injury is the amount of time it takes for the injured person to receive treatment.

An autopsy revealed that Rummer died from blunt force head trauma and that he had also recently sustained a neck fracture and a bruised right eyebrow. His injuries and rapid deterioration are consistent with his being thrown to the ground from a standing position and hitting his head.

### B.

After Rummer's death, Scarbro filed an action against various members of the New Hanover County Sheriff's Department and the New Hanover County Health Department asserting claims of excessive force, inadequate medical care, conspiracy, and supervisor liability pursuant to 42 U.S.C. § 1983, and supplemental state law claims of medical negligence and wrongful death.[1] The district court dismissed Scarbro's claims against most of the defendants[2] and eventually granted summary judgment in favor of the remaining defendants, including Hudson.

### II.

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). We review the district court's order granting summary judgment *de novo. Jennings v. Univ. of North Carolina,* 482 F.3d 686, 694 (4th Cir.2007) (en banc).[3]

WestlawNext· © 2013 Thomson Reuters. No claim to original U.S. Government Works.

### A.

First, Scarbro argues that the district court erred in granting Hudson summary judgment on the excessive force claim. A pretrial detainee's claim of excessive force is governed by the Due Process Clause of the Fourteenth Amendment. *Orem v. Rephann,* 523 F.3d 442, 446 (4th Cir.2008). To succeed on such a claim, the plaintiff must demonstrate that the defendant "inflicted unnecessary and wanton pain and suffering" upon the detainee. *Whitley v. Albers,* 475 U.S. 312, 320, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986); *Iko v. Shreve,* 535 F.3d 225, 239 (4th Cir.2008). This determination turns on whether the force was applied "in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley,* 475 U.S. at 320-21, 106 S.Ct. 1078 (internal quotation marks omitted); **\*370** *Wilkins v. Gaddy,* --- U.S. ----, 130 S.Ct. 1175, ---L.Ed.2d ---- (2010) (describing this as the "core judicial inquiry"). Moreover, we must accord due deference to an officer's efforts to restrain a detainee when faced with a dynamic and potentially violent situation; otherwise, "we would give encouragement to insubordination in an environment which is already volatile enough." *Grayson v. Peed,* 195 F.3d 692, 697 (4th Cir.1999).

 [1]   To the extent that there are differences in the witnesses' testimony regarding how the takedown occurred, there is no evidence suggesting that Hudson applied force in a malicious, wanton, or sadistic manner. When Hudson grabbed Rummer's arm to handcuff him, Rummer did not cooperate; Hudson then took Rummer to the floor, which was covered by mats, and handcuffed him. During the takedown, the mats covering the floor apparently shifted, allowing Rummer's head to hit the concrete floor. However, this is not evidence that Hudson's purpose was malicious, sadistic or wanton. Therefore, we find that the evidence fails to establish that Hudson used excessive force in subduing Rummer. Accordingly, we affirm the district court's order granting summary judgment to Hudson as to Scarbro's claim of excessive force.

### B.

Scarbro also argues that the district court erred in granting Hudson summary judgment as to her inadequate medical care claim. She challenges the district court's finding that there is no genuine issue of material fact as to whether Hudson subjectively knew of Rummer's serious medical need.[4]

Scarbro bears the burden of establishing that Hudson's conduct constituted a constitutional violation. *Henry v. Purnell,* 501 F.3d 374, 377 n. 2 (4th Cir.2007). The rights of a pretrial detainee complaining of inadequate medical care under the Fourteenth Amendment "are at least as great as the Eighth Amendment protections available to a convicted prisoner." *City of Revere v. Massachusetts Gen. Hosp.,* 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983). To prevail on a claim of inadequate medical care, Scarbro must produce evidence of acts or omissions sufficiently harmful to constitute deliberate indifference to the inmate's serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

First, Scarbro must show that the injury was objectively serious. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Then, she must show that Hudson subjectively knew of Rummer's serious medical need. *Id.* at 834-35, 114 S.Ct. 1970. A factfinder may infer that a prison official knew of a substantial risk of harm from the fact that the risk was obvious, *id.* at 842, 114 S.Ct. 1970, or from the fact that the inmate's need for medical attention was " 'so obvious that even a lay person would easily recognize the necessity for a doctor's attention.' " *Iko,* 535 F.3d at 241 (citation omitted). Finally, Scarbro must show that Hudson acted with deliberate indifference to Rummer's serious medical need. *Farmer,* 511 U.S. at 835, 114 S.Ct. 1970. An officer can be held liable for deliberate indifference only where "the official knows of and disregards an excessive risk to inmate health or safety." *Id.* at 837, 114 S.Ct. 1970; *see Parrish ex rel. Lee v. Cleveland,* 372 F.3d 294, 303 (4th Cir.2004) (citation omitted) **\*371** ("[T]he evidence must show that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.' ").

[2]   Turning to the facts at hand, we must first decide whether Rummer suffered from an objectively serious medical condition. Viewed in the light most favorable to Scarbro, Rummer hit the concrete floor head-first, screamed out in excruciating pain, and was bleeding above his eye. Rummer's glasses were broken, he had urinated on himself, he was unable to speak coherently, and he was unable to walk. In view of this evidence, it is clear that Rummer had an objectively serious medical need after the takedown.

[3]   We now consider whether Hudson subjectively recognized Rummer's serious medical need. After taking Rummer to the floor, Hudson observed that Rummer's condition had seriously deteriorated. Because the substantial risk of harm to Rummer was so obvious, a jury could infer that Hudson knew that Rummer had a serious medical need. *See Farmer,* 511 U.S. at 842, 114 S.Ct. 1970. Therefore, the district court erred in finding that Scarbro failed to provide sufficient evidence to show that Hudson knew that Rummer was at serious risk of head injury.

[4]   Finally, we turn to whether Hudson acted with deliberate indifference toward Rummer's serious medical need. Nurse Barfield specifically asked Hudson if Rummer had fallen, and Hudson told her that he had not. Further, Hudson did not inform her how Rummer sustained his injuries or that he had used force against Rummer. Nurse Barfield's question should have alerted Hudson to the importance of her knowing whether Rummer sustained any physical impact, whether or not his fall was caused by use of force. Nurse Barfield explained that if she had known about the takedown, she would have treated Rummer for a head injury (rather than for DTs) and immediately sent him to the Emergency Room. Evidence of Hudson's misrepresentation of critical medical information requested by medical personnel is sufficient to raise a reasonable inference that he recognized that his response was inappropriate in light of Rummer's serious medical need. *See Parrish ex rel. Lee,* 372 F.3d at 303. Therefore, we conclude that Scarbro provided sufficient evidence to raise a genuine issue of material fact as to whether Hudson was deliberately indifferent to Rummer's serious medical need.

Having determined that there is sufficient evidence of a constitutional violation as to the inadequate medical care claim, we must now consider whether Hudson is entitled to qualified immunity. *See Pearson v. Callahan,* 555 U.S. ----, 129 S.Ct. 808, 815-16, 172 L.Ed.2d 565 (2009). Qualified immunity is resolved using a two-prong analysis: whether the plaintiff provided sufficient facts to make out a constitutional violation and whether the right at issue was clearly established at the time of the alleged violation. *Id.* Having found that Scarbro has met her burden as to the first prong, we must now determine whether Hudson's alleged misconduct "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Hudson bears the burden proving that the right at issue here was not clearly established. *Henry,* 501 F.3d at 378.

A right is clearly established where it has been specifically identified so "as to leave no doubt that the challenged action was unconstitutional." *Swanson v. Powers,* 937 F.2d 965, 969 (4th Cir.1991). "This is not to say that an official action is protected by qualified immunity unless the **\*372** very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer,* 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (internal quotation marks omitted). Thus, in determining whether a right was clearly established, the key issue is "whether it would be clear to a reasonable officer that the conduct was unlawful in the situation he confronted." *Saucier v. Katz,* 533 U.S. 194, 194-95, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

[5]   We have denied qualified immunity to an officer who transferred custody of a detainee to another officer without informing the officer that the detainee was suicidal. *See Gordon v. Kidd,* 971 F.2d 1087, 1096-97 (4th Cir.1992). The misconduct in the instant case is even more egregious than that in *Gordon* because Hudson misrepresented critical medical information that was specifically asked for by medical personnel, and a reasonable inference from this inquiry is that the requested information was necessary to properly treat Rummer's injuries. Unlike *Gordon,* where the officer failed to offer information, Hudson affirmatively misrepresented relevant medical information. No reasonable officer could have believed, in light of clearly established law, that such a misrepresentation was lawful under these circumstances. Therefore, Hudson is not entitled to qualified immunity.

### III.

For the foregoing reasons, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.*


**Parallel Citations**

2010 WL 1252409 (C.A.4 (N.C.))


Footnotes

1     Scarbro later filed another complaint that alleged essentially identical claims against different parties. These cases were thereafter consolidated.

2     Scarbro subsequently filed a stipulation of dismissal as to her claims against other Health Department defendants.

3     Scarbro raises five issues on appeal, but only two merit discussion. The plaintiff's remaining arguments on appeal are without merit. As to those issues, we affirm substantially on the reasoning of the district court. *Scarbro v. New Hanover County,* No. 7:03-CV-244-FL(1) (E.D.N.C. May 8, 2008).

4     The district court also stated that Hudson is entitled to qualified immunity but, because it found no constitutional violation, it did not fully analyze Hudson's claim of qualified immunity.

---

**End of Document**                                    © 2013 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 385095
Only the Westlaw citation is currently available.
United States District Court,
D. South Carolina.

Donald R. SURDAK, Jr., Plaintiff,

v.

Director Jon OZMINT, SC Dep't of Corr.; Richard Bazzle, Warden; Lt. Susan Duffy, Dorm LT; Sgt.
Cotter, Dorm Sgt.; Ofc. John Doe, Dorm Ofcs.; Jane Doe, Dorm Ofcs.; Ofc. NFN Barnes, Defendants.

C/A No. 0:09–3287–TMC–PJG.    |    Jan. 12, 2012.

**Attorneys and Law Firms**

Donald R. Surdak, Jr., McCormick, SC, pro se.

Russell W. Harter, Jr., Chapman Harter and Groves, Greenville, SC, for Defendants.

**Opinion**

### REPORT AND RECOMMENDATION

PAIGE J. GOSSETT, United States Magistrate Judge.

*\*1* The plaintiff, Donald R. Surdak, Jr. ("Surdak"), a self-represented state prisoner, filed this action pursuant to 42 U.S.C. § 1983 alleging a violation of his constitutional rights by the named defendants.[1] This matter is before the court pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) DSC for a Report and Recommendation on the defendants' motion for summary judgment. (ECF No. 78.) Pursuant to *Roseboro v. Garrison,* 528 F.2d 309 (4th Cir.1975), the court advised Surdak of the summary judgment and dismissal procedures and the possible consequences if he failed to respond adequately to the defendants' motion. (ECF No. 79.) Surdak filed a response in opposition (ECF No. 88) and the defendants filed a reply (ECF No. 92). Having reviewed the parties' submissions and the applicable law, the court finds that the defendants' motion should be granted.

### BACKGROUND

The case arises from an assault on Surdak by one or more fellow inmates at Perry Correctional Institution on December 31, 2007. Surdak alleges that on this date, he was playing cards with inmate Lonnie Riddle in the "B–Wing" of the dormitory when inmate Aubrey Tucker approached and verbally threatened him. Surdak stood up and told Tucker to "get out of [his] face" and Tucker responded by pulling out a knife and stabbing Surdak on his left side. Surdak alleges that as Tucker continued to stab him, inmate Kendrick Singleton joined in the fight and stabbed Surdak as well. Surdak contends that officers in the control booth—including Sergeant Daniel Cotter, the officer assigned to the B–Wing—watched the assault yet did nothing to break up the fight until several minutes later. Following the incident, Surdak was transported to Greenville Memorial Hospital where he was treated for his injuries.

Surdak also alleges that, prior to this incident, he had informed Captain Susan Duffy that inmates Tucker and Singleton had been involved in a robbery during which they had used a weapon to force another inmate to give them his walkman and headphones. Surdak claims that Duffy had knowledge of Tucker's and Singleton's behavior yet failed to protect Surdak from being attacked.

**DISCUSSION**

**A. Summary Judgment Standard**

Summary judgment is appropriate only if the moving party "shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A party may support or refute that a material fact is not disputed by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1). Rule 56 mandates entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

 **\*2**  In deciding whether there is a genuine issue of material fact, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.

The moving party has the burden of proving that summary judgment is appropriate. Once the moving party makes this showing, however, the opposing party may not rest upon mere allegations or denials, but rather must, by affidavits or other means permitted by the Rule, set forth specific facts showing that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(c), (e); *Celotex Corp.,* 477 U.S. at 322. Further, while the federal court is charged with liberally construing a complaint filed by a *pro se* litigant to allow the development of a potentially meritorious case, *see, e.g., Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972), the requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege facts which set forth a federal claim, nor can the court assume the existence of a genuine issue of material fact where none exists. *Weller v. Dep't of Soc. Servs.,* 901 F.2d 387 (4th Cir.1990).

**B. Defendants' Motion for Summary Judgment**

**1. Failure to Protect**

Surdak's claims, liberally construed, allege that the defendants failed to protect him from the inmate assault in that they did not respond immediately to the incident. He also alleges that the defendants had knowledge of prior incidents involving these inmates and should have prevented the assault against Surdak from occurring.

To establish a failure to protect claim under the Eighth Amendment to the United States Constitution, an inmate must establish two requirements: (1) a sufficiently serious deprivation occurred, resulting "in the denial of the minimal civilized measure of life's necessities," and (2) the prison official had a sufficiently culpable state of mind. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). To satisfy the second prong, an inmate must show that the prison official's state of mind was "deliberate indifference" to the inmate's health and safety. *Id.* A prison official is deliberately indifferent if he has actual knowledge of a substantial risk of harm to an inmate and disregards that substantial risk. *Id.* at 847; *see also Parrish v. Cleveland,* 372 F.3d 294, 302 (4th Cir.2004) (stating the standard of deliberate indifference requires actual knowledge and disregard of a substantial risk of serious injury). To be liable under this standard, the prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837.

 **\*3**  "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, ... and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842. "While the obviousness of a risk is not conclusive and a prison official may show that the obvious escaped him, ... he would not escape liability if the evidence showed that he

merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." *Id.* at 843 n. 8. Further, a showing of mere negligence does not suffice to establish deliberate indifference. *See id.* at 834 (stating that to satisfy the second prong, an inmate must show that the prison official's state of mind was "deliberate indifference" to the inmate's health and safety); *see also Daniels v. Williams,* 474 U.S. 327, 332–34 (1986). Finally, "a prisoner must allege a serious or significant physical or emotional injury resulting from the challenged conditions or demonstrate a substantial risk of such serious harm resulting from the prisoner's exposure to the challenged conditions." *De'Lonta v. Angelone,* 330 F.3d 630, 634 (4th Cir.2003) (internal quotation marks and citations omitted).

The parties agree that Surdak was assaulted by inmates Tucker and Singleton and that Surdak was physically harmed by this attack. Surdak argues that the correctional officers did not timely respond to the assault when it occurred. In support of his argument, Surdak appears to rely on the affidavit testimony of Sergeant Cotter, which incorporates the December 31, 2007 incident report completed by Cotter. (Cotter Aff. ¶ 2, ECF No. 78–2 at 1; *see generally* Incident Report, ECF No. 78–2 at 3–4.) Specifically, Surdak argues that Sergeant Cotter states in his incident report that he was located in the A–Wing at the time the assault began. Surdak alleges that the B–Wing post "had been deserted and proper security [was] not provided." (Pl.'s Resp. Opp'n Summ. J., ECF No. 88 at 2.) Additionally, Surdak alleges that the officers in the control room, including Captain Duffy and Officer Barnes, watched the assault occur and did not respond to the incident until after Surdak had been stabbed repeatedly. (*Id.* at 1; Am. Compl., ECF No. 49–3 at 2; Surdak Aff., ECF No. 49–1 at 1.)

In response, the defendants provide an affidavit of Captain Duffy, who avers that at the time of the incident, she was in the process of locking up another inmate when the call was made to respond to the B–Wing. (Duffy Aff. ¶ 3, ECF No 97–1 at 1.) Duffy also avers that it was Perry Correctional Institution's policy at the time for each dormitory to have one control room officer and one wing officer, and that the wing officer was responsible for making regular rounds on each side of the dormitory. (Duffy Aff. ¶ 4, ECF No. 97–1 at 2.) Sergeant Cotter's incident report which, as stated above, he incorporates in his affidavit, avers that as soon as he was alerted to the assault, he first got on the radio system to notify the dormitory that there was an emergency and then proceeded to break up the fight. (Cotter Aff. ¶ 2, ECF No. 78–2 at 1; Incident Report, ECF No. 78–2 at 3.) Cotter further details the steps he took to restrain inmate Tucker, including spraying Tucker in the face with "Top Cop." (Incident Report, ECF No. 78–2 at 3; Use of Force Report, ECF No. 78–2 at 5.) By contrast, Surdak presents no evidence supporting his assertion that the defendants intentionally delayed responding to the threat to Surdak once they became aware of it. Based upon the record before the court, no reasonable jury could find that the defendants failed to act in a timely manner to Surdak's assault. Therefore, the defendants are entitled to summary judgment on this claim.

 **\*4**  Surdak also alleges that prior to this assault, he had informed Captain Susan Duffy of a previous robbery involving inmates Tucker and Singleton during which they had used a weapon to force another inmate to give them his walkman and headphones. However, Surdak makes no allegation that he informed Captain Duffy nor any other officer of any specific threat of harm made toward him by either Tucker or Singleton. Rather, Captain Duffy avers that she was not aware of any threats made by inmates Tucker and Singleton against Surdak and that she had no prior knowledge that inmates Tucker or Singleton had plans or intentions to assault Surdak. (Duffy Aff. ¶¶ 3–4, ECF No. 78–3 at 2.)

While Surdak appears to argue that the defendants could infer that a substantial risk of serious harm existed to Surdak based on his conversation with Captain Duffy regarding previous acts of violence involving Tucker and Singleton against other inmates, knowledge that an inmate has behaved violently in the past is alone insufficient to establish deliberate indifference; rather, the defendant must know of facts showing a threat specific to the plaintiff. *See Fuller v. County of Charleston,* 444 F.Supp.2d 494, 498 (D.S.C.2006) ( "Absent some evidence that prison officials were subjectively aware that this inmate was likely to attack Plaintiff, the mere fact that the attacking inmate was classified as potentially violent cannot constitute deliberate indifference."). Moreover, Surdak cannot demonstrate that an inference of harm to Surdak was in fact drawn or that the risk was obvious. *See Farmer,* 511 U.S. at 837, 843. Therefore, viewed in the light most favorable to Surdak, the record shows no evidence that the defendants had knowledge of any substantial risk of harm *to Surdak.* Accordingly, Surdak's claims that the defendants violated his Eighth Amendment rights fail as a matter of law.

**2. Respondeat Superior**

Surdak also raises a claim against Warden Richard Bazzle based only on a general allegation that he was responsible for the supervision and protection of the inmates as well as the operations of the prison. Accordingly, this claim also fails as a matter of law. Similarly, to the extent Surdak's claims against Defendant Ozmint are based on his former position over the prison system, they fail as a matter of law.

A claim based upon the doctrine of respondeat superior does not give rise to a § 1983 claim. *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691–94, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1948, 173 L.Ed.2d 868 (2009). As the *Iqbal* Court observed, because masters do not answer for the torts of their servants in § 1983 cases, "the term 'supervisory liability' is a misnomer." *Id.* at 1949. Indeed, the dissent in *Iqbal* opined that "[l]est there be any mistake, in these words the majority is not narrowing the scope of supervisory liability; it is eliminating [ ] supervisory liability entirely." *Id.* at 1957 (Souter, J., dissenting). Moreover, even if the majority in *Iqbal* did not entirely dispense with the concept of liability of a supervisor in a § 1983 case, the instant Complaint fails entirely to plead facts sufficient to go forward on such a theory based on Fourth Circuit precedent. *See Carter v. Morris,* 164 F.3d 215, 221 (4th Cir.1999); *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.1994) (outlining the requirements to hold a supervisor liable for constitutional injuries inflicted by their subordinates).

**3. Other Claims**

**\*5** To the extent that Surdak's Complaint may be construed to allege any other constitutional violations, the court finds that Surdak has failed to plead sufficient facts to state a plausible claim. *See Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1953, 173 L.Ed.2d 868 (2009). To the extent that Surdak's Complaint could be construed to state any other claims arising under state law, the court should decline to exercise supplemental jurisdiction over those claims. *See* 28 U.S.C. § 1367(c).

**C. Surdak's Motion**

Also pending before the court is Surdak's motion seeking injunctive relief against several South Carolina Department of Corrections ("SCDC") employees as well as general counsel for SCDC involving their alleged interference with Surdak's attempt to obtain witness statements from other inmates. (ECF No. 115.) Counsel for defendants responded by acknowledging Surdak's difficulties and attempted to resolve the issue by communicating by letter with Surdak and various correctional institutions to facilitate Surdak's efforts under certain guidelines. (ECF No. 120.) The court also granted Surdak additional time in which to obtain inmate witness statements. (ECF No. 124.) Prior to his deadline, Surdak filed a reply in which he stated that he had sent letters to various inmates to obtain witness declarations in accordance with the guidelines established by the court, yet he had not received any responses. (ECF No. 129.) Accordingly, Surdak's motion seeking injunctive relief should be terminated as moot.

**RECOMMENDATION**

For the foregoing reasons, the record shows as a matter of law that Surdak is not entitled to the relief he seeks. Accordingly, the court recommends that the defendants' motion for summary judgment be granted (ECF No. 78) and Surdak's motion terminated as moot (ECF No. 115).

Footnotes

1     It appears that Defendants Ofcs. John Doe and Ofcs. Jane Doe were never identified or served with process. Accordingly, the court recommends that these defendants be dismissed from this action without prejudice. *See* Fed.R.Civ.P. 4(m).

**Surdak v. Ozmint, Not Reported in F.Supp.2d (2012)**

---

**End of Document**                                                    © 2013 Thomson Reuters. No claim to original U.S. Government Works.

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**No.** 13-1588    **Caption:** Cody A. Hearn et al. v. Lancaster County et al.

### CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

   This brief complies with the  type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   [✓] this brief contains _____9,629_____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   [ ] this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [✓] this brief has been prepared in a proportionally spaced typeface using
   Microsoft Word_____ [*identify word processing program*] in
   14 pt Times New Roman_____ [*identify font size and type style*]; **or**

   [ ] this brief has been prepared in a monospaced typeface using
   _____ [*identify word processing program*] in
   _____ [*identify font size and type style*].

(s) William A. McKinnon_____

Attorney for Appellants_____

Dated: July 16, 2013_____

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 16th day of July, 2013, I caused this Brief of Appellants and Joint Appendix to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

James M. Davis, Jr.
Joel S. Hughes
Andrew Lindemann
DAVIDSON & LINDEMANN, PA
1611 Devonshire Drive
Post Office Box 8568
Columbia, South Carolina 29202
(803) 806-8222

*Counsel for Appellees*

I further certify that on this 16th day of July, 2013, I caused the required copies of the Brief of Appellants and Joint Appendix to be hand filed with the Clerk of the Court.

/s/ William A. McKinnon
*Counsel for Appellants*